Warren Postman (#330869)
 wdp@kellerlenkner.com
Jason Ethridge (*pro hac vice forthcoming*)
 jason.ethridge@kellerlenkner.com
**KELLER LENKNER LLC**
1300 I Street, N.W., Suite 400E
Washington, DC 20005
Phone: (202) 918-1123
Facsimile: (312) 971-3502

Marquel Reddish (*pro hac vice forthcoming*)
 mpr@kellerlenkner.com
**KELLER LENKNER LLC**
150 N. Riverside Plaza, Suite 4270
Chicago, IL 60606
Phone: (312) 741-5220
Facsimile: (312) 971-3502

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

| | |
|---|---|
| TOPDEVZ, LLC, and NOIREFY, INC., individually and on behalf of all others similarly situated,<br><br>    *Plaintiffs,*<br><br>  vs.<br><br>LINKEDIN CORPORATION,<br><br>    *Defendant.* | Case No. _____<br><br>**CLASS ACTION COMPLAINT**<br><br>1. Violation of California's Unfair Competition Law<br><br>2. Fraudulent Misrepresentation<br><br>3. Fraudulent Concealment<br><br>4. Breach of Implied Duty to Perform with Reasonable Care<br><br>5. Breach of Implied Covenent of Good Faith and Fair Dealing<br><br>**DEMAND FOR JURY TRIAL** |

**<u>NATURE OF THE COMPLAINT</u>**

1.      LinkedIn Corporation operates an online platform that allows individuals to monitor, maintain, and expand their professional networks.  One of LinkedIn's primary sources of revenue is charging advertisers for the opportunity to place advertisements on the LinkedIn platform.  The overwhelming majority of LinkedIn advertisers are small businesses.

2.      In the market for digital advertising, the extent to which ads are viewed and engaged with by an advertiser's desired viewers, or "audience," is deeply material to advertisers. Advertisers make their advertising decisions based on user engagement of a particular audience and typically purchase ads through an auction mechanism.  The amount advertisers are willing to bid for audience members to view or interact with their ads is tied directly to the quality of the audience and the audience engagement that a platform can provide.

3.      LinkedIn generally does not allow the public or advertisers to see the precise composition of the audience or level of engagement they are purchasing from LinkedIn, so advertisers must instead rely on LinkedIn's reporting about users' interactions with advertising on the platform.

4.      The metrics LinkedIn gives advertisers regarding the nature of its audiences and user engagement are systematically distorted to benefit LinkedIn.  These distortions have increased the price of LinkedIn advertising for years.

5.      LinkedIn has misstated the performance of advertising on its platform in multiple ways.  For example, the company recently admitted that, for more than two years, it has been overstating the amount of time users spend watching paid video advertisements, the overall number of video "views," and the number of times certain advertisements appear in front of a LinkedIn user.  These false representations allowed LinkedIn systematically to collect higher payments from advertisers.

6.      But the problems with LinkedIn's ad metrics are far broader than inaccurate data about video advertising, which represents a fraction of the advertising on LinkedIn.  LinkedIn also has been able to inflate the price of its advertising by misreporting user activity that it knows is fraudulent or otherwise does not reflect the benefit of the bargain that it struck with advertisers.

For example, LinkedIn routinely misreports views of advertising (known as "impressions") and interactions with advertising ("clicks") that LinkedIn knows are generated by fake accounts and automated "bots" rather than actual users. And LinkedIn reports clicks as legitimate even though LinkedIn can tell, through users' behavior, the clicks were made in error and do not reflect genuine user engagement.

7. LinkedIn's inaccurate and inflated metrics of user engagement with advertisements violate California's prohibition on unlawful, unfair, and fraudulent business practices and have allowed LinkedIn to inflate systematically the price of advertising that customers pay to purchase ads on the LinkedIn platform.

8. LinkedIn's use of inaccurate advertising metrics also breached LinkedIn's contract with its advertisers. LinkedIn collected premium prices because it markets itself as an online network that delivers ads to high quality professional audiences. Advertisers reasonably expected that LinkedIn would provide accurate metrics on video views and other forms of user engagement with advertisements. LinkedIn would not have been able to collect, and Plaintiffs and Class members would not have paid, the same premium prices for LinkedIn advertising if LinkedIn had not used false and inflated metrics to describe the nature of and engagement from its audiences.

9. Plaintiffs have suffered substantial economic injury as a result of LinkedIn's violations of law. This action seeks recovery for advertisers' monetary losses and appropriate equitable relief to remedy LinkedIn's unlawful conduct.

**PARTIES**

**A.    Defendant**

10. Defendant LinkedIn Corporation is a corporation incorporated under the laws of Delaware and headquartered at 10000 W. Maude, Sunnyvale, CA 94085.

11. LinkedIn is an online network focusing on professional connections. It claims it has over 722 million members in more than 200 countries and territories worldwide, including executives from every Fortune 500 company.[1]

---

[1] *About LinkedIn*, https://about.linkedin.com/ (last accessed: November 17, 2020).

1    12.    LinkedIn itself has over 10,000 employees and offices worldwide.

2    **B.    Plaintiffs**

3    13.    TopDevz, LLC, ("TopDevz") is a corporation incorporated under the laws of

4    California and headquartered in Sacramento, California.

5    14.    Noirefy, Inc., ("Noirefy") is a corporation incorporated under the laws of Delaware

6    and headquareted in Chicago, Illinois.

7    **<u>JURISDICTION, VENUE, AND CHOICE OF LAW</u>**

8    15.    This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act

9    of 2005, 28 U.S.C. § 1332(d)(2), because Plaintiffs are pursuing a class action under Rule 23 of the

10   Federal Rules of Civil Procedure that includes claims asserted on behalf of a nationwide class

11   including citizens from states other than California.  The class includes hundreds of thousands of

12   members and the amount in controversy exceeds $5 million.

13   16.    This Court has personal jurisdiction over LinkedIn because the company is

14   headquartered in California.  Moreover, LinkedIn also conducted substantial business from which

15   the claims in this case arise in California and has agreed to personal jurisdiction in this Court.

16   17.    Venue is appropriate in this judicial district pursuant to 28 U.S.C. § 1391 because

17   LinkedIn is headquartered in this judicial district, LinkedIn has engaged in substantial business

18   within this district that gives rise to the claims in this case, and the parties have agreed by contract

19   to venue in this district.

20   18.    LinkedIn's "LinkedIn Ads Agreement" provides that it "is governed by the laws of

21   the State of California, and any action or proceeding (including those arising from non-contractual

22   disputes or claims) related to this Ads Agreement will be brought in a federal court in the Northern

23   District of California."[2]

24   **<u>INTRADISTRICT ASSIGNMENT</u>**

25   19.    This action is properly assigned to the San Jose Division of this District under Civil

26   Local Rule 3-2(c) and (e), because LinkedIn is headquartered, and a substantial part of the events

27   _____

28   [2] *LinkedIn Ads Agreement*, https://www.linkedin.com/legal/sas-terms (last accessed: November 14, 2020).

that give rise to the claim occurred, in Santa Clara County, which is served by the San Jose Division.

**BACKGROUND**

**A. LinkedIn Ad Campaigns**

20.     LinkedIn operates an online network whose membership consists primarily of working professionals.  Professionals who use LinkedIn's platform either visit LinkedIn's website on a computer or accesses the platform through LinkedIn's mobile app on a cell phone or other mobile device.  LinkedIn's online network allows users to publicly post all or portions of their resumes and work history, so that users can connect with other professional contacts or potential employers.

21.     LinkedIn claims to be the world's largest online professional network and was purchased by Microsoft Corporation in 2016 for $26 billion.  LinkedIn's platform aggregates the profile information of well over half a billion professionals, their interrelationships, their posts, and their cross-endorsements.  LinkedIn's user agreement states that the purpose of its service is to "promote economic opportunity" and provide a place for professionals "to meet, exchange ideas, learn, and find opportunities."

22.     One of LinkedIn's primary sources of revenue is charging advertisers for the opportunity to place advertisements on the LinkedIn platform.  Because advertising on LinkedIn allows businesses to target their ads to a tailored audience of engaged professionals, LinkedIn is able to charge a significant price premium above digital marketing on other social media platforms.

23.     In its own advertising materials, LinkedIn tells digital marketers that its hundreds of millions of professional users "are the decision makers, influencers, and leaders of today and tomorrow – the people you want to target, all in one place."[3]  LinkedIn claims that its users "are not just coming to LinkedIn in huge numbers; they're engaging with a huge purpose . . . specifically to connect to networks, brands, and opportunities by engaging with high-quality content across the LinkedIn platform."  *Id.*

---

[3] LinkedIn, *The Sophisticated Marketer's Guide to LinkedIn*, at 3 (2017), https://business.linkedin.com/content/dam/me/business/en-us/marketing-solutions/cx/2017/pdfs/Sophisticated-Marketers-Guide-to-LinkedIn-v03.12.pdf, attached as Exhibit A.

24.     LinkedIn likewise claims that it "is a platform enabling sophisticated marketers to forge relationships with these professionals," making it "the go-to content publishing platform for marketers." *Id.* at 4.  LinkedIn claims that marketers have the ability to "reach a quality audience in a professional context." *Id.* (emphasis in original).  The message to advertisers is explicit: LinkedIn's platform allows marketers to target high-quality professional audiences.

25.     The overwhelming majority of LinkedIn advertisers are small businesses.  These advertisers have been willing to pay high advertising prices due to the ability to target high quality and engaged professional audiences.

26.     LinkedIn currently is projected to earn $1.70 billion in U.S. ad revenue in 2020.[4] This is an increase from the $1.39 billion in U.S. ad revenue that the company earned in 2019.

27.     Advertisers can place several types of paid ads on LinkedIn, including LinkedIn Sponsored Content, which allows marketers to place ad content (such as written ads or video ads) directly into a users' LinkedIn feeds.  The LinkedIn feed allows users to scroll through a continuous stream of content-containing posts of other LinkedIn users.  Some of those posts are paid advertisements, such as Sponsored Content.  LinkedIn users engage with such Sponsored Content by scrolling through their feed and either reading, viewing, or clicking on those advertisements.

28.     Sponsored Content advertisements are purchased by digital marketers through a "second-price auction."  In essence, a second-price auction is an auction in which the winning bidder pays $0.01 above the second highest bid in the auction.  This type of auction incentivizes advertisers to bid the highest amount they are willing to pay to show an ad to members of a targeted audience, knowing that they will only end up paying $0.01 more than then second-price bid.

29.     Other types of paid LinkedIn advertisements include Text Ads (which appear in a sidebar on the LinkedIn user interface as a basic textblock with a headline, next to a company logo), Sponsored InMail (personalized direct messages sent to specific contacts), and Dynamic Ads (ads that allow marketers to target specific audiences with personalized content).

---

[4] Jillian Ryan, *Microsoft Reports Strong Growth for LinkedIn and Cloud Platform Azure in Q3 2020*, Business Insider, https://www.businessinsider.com/microsoft-shows-strong-growth-for-linkedin-azure-in-q3-2020-10.

1    30.    LinkedIn tracks several metrics to assess users' interactions and engagement with

2    the content and advertisements on LinkedIn's platform.

3    31.    Advertisers on LinkedIn use these ad metrics to "grade the success of" marketing

4    campaigns, which in turn allow advertisers to determine what kinds and how much paid advertising

5    opportunities to purchase.[5]  Such metrics include "impressions," "views," and "clicks," and are

6    sometimes referred to as "reach metrics."  An "impression" means that a piece of content was

7    loaded on the user's interface such that it could have been viewed.  A "view" means that the content

8    was actually viewed by the users.  LinkedIn video views are meant to "count" only after the user

9    has viewed the ad on the user interface for a few seconds, not when a user merely scrolls past a

10   video that continues to play off screen.  "Clicks" measures the number of users who selects an ad

11   with a mouse or other cursor (or with a finger on a touch screen device).

12   32.    LinkedIn claims that its ad metrics enable marketers purchasing Sponsored Content

13   and other types of ads to "track how well [their] posts hit the mark and fine-tune [their] strategy

14   instantly." *Id.* at 26.

15   33.    In addition, LinkedIn claims that it will optimize advertisers' campaigns to

16   maximize the number of clicks, impressions, or conversions.  Marketers typically operate on a

17   daily, weekly, or monthly budget and trust LinkedIn to optimize their campaign to maximize for

18   either CPM (cost per thousand impressions) or CPC (cost per click).

19   34.    LinkedIn's ad metrics also enable marketers to track and understand data that

20   directly affect their return on ad spend, and that directly impact the amount of money that

21   advertisers are willing to pay LinkedIn for ad campaigns.  *Id.* at 36, 38. LinkedIn claims to give

22   advertisers "clear visibility into [their] programs' impact throughout the purchase process." *Id.* at

23   38.

24   35.    To run an advertising campaign on LinkedIn, a user creates a LinkedIn Campaign

25   Manager account, and agrees to LinkedIn's terms.  Marketers often begin by organizing various

26   LinkedIn's metrics into what are commonly referred to as Key Performance Indicators (KPIs).

27

28   [5] Exhibit A, *supra*, at 5.

Typically, and at LinkedIn's own recommendation, advertisers selected the Automated Bid feature on LinkedIn, which allows LinkedIn to set bids for the advertiser in order to maximize the KPI selected by the advertiser.

36. Although LinkedIn touts its ad metric transparency when inducing advertisers to sign up and purchase ad space on its platform, LinkedIn does not disclose the data underlying its advertising metrics.

37. In deciding whether to buy advertisements on LinkedIn and how much they are willing to pay for those advertisements, advertisers must rely on LinkedIn's metrics regarding user engagement.

38. Advertisers are willing to pay more for advertisements on a platform that receive impressions from a higher quality audience—i.e., an audience actually composed of real human users who are members of the group that the advertiser is trying to reach—and higher engagement from that audience. Advertisers are less willing to pay for advertisements that receive impressions from a lower quality audience and lower engagement from an audience.

39. Advertisers are also willing to pay more for advertisements that are part of a higher quality "ad inventory." That is, in addition to preferring ads that are displayed to the correct audience, advertisers care about how well a platform serves and places ads in a way that draws the attention of users and produces a desired action.

40. LinkedIn's ad metrics are highly material to digital marketers, and those marketers rely on LinkedIn to make sure that its metrics are accurate. Marketers rely on LinkedIn's ad metrics to shape digital marketing campaigns, and those advertisers look at the metrics provided by the platform in deciding how much to bid and spend on ad campaigns. Marketing experts focus on the ad metrics that align with the KPIs that match the goal of their marketing campaigns.[6]

41. For example, a marketer looking to increase awareness of its product or service will look to set bids that optimize based on CPM, because the number of impressions that an ad receives

---

[6] Christine Warner, *Optimizing for Return on Ad Spend Using LinkedIn Metrics*, Skyword, (Oct. 29, 2019), https://www.skyword.com/contentstandard/optimizing-for-return-on-ad-spend-using-linkedin-metrics/.

is tied to the potential for the ad campaign to increase awareness of the product or service.

42.    For results tied to user engagement, marketers base budgets, bids, and purchasing decisions off of metrics like CPC because the number of clicks indicates how much online traffic is being driven to a particular product page or website.

43.    As to videos, LinkedIn tracks video views separately, measured by views and impressions.  Marketers creating video ads can thus base budgets, bids, and purchasing decisions off of metrics such as CPM or "cost-per-view" or "CPV," depending on whether the advertiser is seeking to maximize the number of videos presented to users or whether the advertiser is seeking to maximize users' engagement with the video content through more extended viewing of the video.

44.    Video views and the percentage of a video that is viewed are highly material to advertisers that are marketing a more complicated product that requires more explanation.  Often, a video will serve as an introduction to a product and service and the marketer will the re-target (send additional ads that give additional information or make an offer) to the users who watched a significant portion of the video.  If a marketer's analytics on who watched the video and for how long are distorted, it is likely to waste additional marketing dollars targeting those potentially fake or disinterested users with more ads.

45.    LinkedIn video ad metrics are thus highly material to digital marketers and those advertisers rely on LinkedIn to deliver information about how an ad campaign is expected to impact these metrics and how ad campaigns actually perform on these metrics after the campaign is launched.

**B.    LinkedIn's Inflated Advertisement Metrics for All Forms of Advertising on Its Platform**

46.    LinkedIn has systematically inflated ad metrics in its favor, which has enabled it to overstate the quality of its audiences, the quality of its ad inventory, and the engagement from its audiences.  That, in turn, has allowed LinkedIn to collect an inflated price from advertisers.

47.    One set of metrics that LinkedIn tracked to justify the prices charged to advertisers measures how users engage with video advertisement on the LinkedIn app.  Two such metrics are video "views," where a user watches a video for some time on the LinkedIn feed, and video "view-

throughs," where a user watches a video on their LinkedIn feed from start to finish. Both of these metrics are highly material to advertisers and therefore directly affect the amount that they will be charged for placing a video ad on LinkedIn.

48. LinkedIn has recently admitted that its video ad metrics have been inflating the amounts it charged advertisers launching ad campaigns on the LinkedIn platform.[7] For example, LinkedIn has admitted that its ad metrics were logging video views from a user's LinkedIn app even when the user merely scrolled past the video and the video was only playing off screen. In other words, advertisers were charged for a video "view" even when the user was not actually looking at the ad's content.

49. LinkedIn has admitted that this practice may have affected more than 418,000 advertisers for a period of over two years.[8]

50. Advertisers contracting with LinkedIn were justified in expecting that they would not be charged for video "views" or "view-throughs" where users merely scroll past a video to view other content while the video ad only plays in the background. Yet LinkedIn has been charging advertisers inflated advertising fees based on erroneous video ad metrics. Advertisers did not get the benefit of their bargain due to LinkedIn's erroneous ad metrics.

51. LinkedIn has also been overreporting metrics related to user impressions on sponsored-content ad campaigns. In other words, LinkedIn has been systematically inflating the data that determines CPM-based pricing in LinkedIn's favor.

52. Advertisers had no way of knowing that LinkedIn's ad metrics were overstating the level of engagement with its video advertising and sponsored-content campaigns until November 12, 2020, when LinkedIn disclosed that the metrics it had been using had been incorrect. LinkedIn has known that its metrics were overstating the number of video views by users since at least August of 2020, and reasonably should have known this far earlier. However, LinkedIn intentionally

---

[7] Sahil Patel, *LinkedIn Finds Measurement Errors That Inflated Video and Ad Metrics*, Wall St. J. (Nov. 12, 2020), https://www.wsj.com/articles/linkedin-finds-measurement-errors-that-inflated-video-and-ad-metrics-11605228577.
[8] Gyanda Sachdeva, *We discovered two measurement issues. Here's how we're making it right*, LinkedIn Marketing Solutions Blog (Nov. 12, 2020), https://business.linkedin.com/marketing-solutions/blog/linkedin-news/2020/how-we-re-working-to-improve.

concealed those inaccurate statements and continued to overstate the performance of video ads and other sponsored content ads to advertisers. LinkedIn did not fix its video viewership metrics and disclose the inaccuracy of its prior metrics until November 2020.

53.     LinkedIn has been intentionally collecting an increased price from advertisers who have relied on video ad metrics and LinkedIn knew those metrics were inaccurate.

54.     If LinkedIn had disclosed that actual user engagement with video advertising and other sponsored ad content was lower than its metrics suggested, advertisers would have paid a lower price to advertise on LinkedIn.

55.     The problems with LinkedIn's ad metrics are far broader than inaccurate data about video advertising, which represents a fraction of the advertising on LinkedIn. LinkedIn has also inflated other ad metrics on non-video advertising across its platform by reporting as legitimate a massive amount of activity that reflects fraudulent accounts, automated accounts, or accidental clicks. These false metrics have systematically allowed LinkedIn to collect a premium price from advertisers across its platform.

56.     Because LinkedIn is marketed as offering an audience of authenticated professionals, LinkedIn is able to collect a premium price.

57.     In exchange for this substantial premium, advertisers expect to get more highly engaged leads from a more desirable audience than they would get on other digital marketing platforms. Advertisers pay a higher price per click because LinkedIn claims to offer higher quality leads.

58.     LinkedIn is aware that many purported impressions and clicks on its platform are not attributable to actual engaged users.

59.     For example, LinkedIn is aware that there are numerous fraudulent accounts and automated accounts (often referred to as "bots") on its platform. These fraudulent accounts and bots increase the amount of "inventory" on LinkedIn (i.e., the amount of impressions available for advertisers) as well as the amount of clicks. Some bots are also designed to take further action after clicking on an ad (e.g., submitting a subsequent form on the destination page). However, these impressions, clicks, and subsequent activity from fraudulent accounts and bots are in fact worthless

to the business purchasing the advertisings.

60. LinkedIn also knows that many users mistakenly click on ads, but then immediately leave the page after realizing their mistake.

61. Nevertheless, investigations and studies conducted by digital marketing experts have uncovered that LinkedIn counts all of the above as legitimate instances of user engagement.

62. According to a study from the global digital agency RMG, LinkedIn's metrics include extensive traffic generated by fraudulent accounts, bot traffic, and unchecked misclicks.[9] These factors systematically overstate the quality of engagement with advertising on LinkedIn and allow LinkedIn to collect an inflated price from advertisers.

63. Unlike some advertising platforms such as Google, which has a process for auditing non-human traffic and misclicks, LinkedIn does not allow third party analysis of advertising on its platform.

64. Upon information and belief, LinkedIn has known for years that fraudulent accounts and misclicks overstate the quality of the audience, ad inventory, and audience engagement on its platform, which in turn allows it to collect a higher price from advertisers.

65. Users paying premium prices for LinkedIn ads do not reasonably expect that they will be systematically charged for ads that were engaged with by fraudulent accounts and misclicks. Indeed, LinkedIn claims that the use of bots or other automated fraudulent methods to access the platform is a violation of LinkedIn's User Agreement. Further, advertisers generally have no way of knowing the amount of fraudulent traffic or misclicks they are paying for.

66. Plaintiffs and class members were unaware, and could not reasonably have been aware until only recently, that fraudulent accounts, non-human users, and accidental misclicks were causing them to pay more for advertising campaigns on LinkedIn than they bargained for.

67. The inflation of these advertising metrics was material to advertisers on LinkedIn, as the metrics directly impact how much advertisers will pay for LinkedIn advertising and allow advertisers to assess how effective their digital marketing efforts on LinkedIn were. Absent these

---

[9] RMG, *Why Your LinkedIn Marketing Campaign Isn't Working*, YouTube (Aug. 24, 2020), https://www.youtube.com/watch?v=jKuyxgWuiRM.

inflated metrics, LinkedIn would not have been able to charge the same premium prices for its advertising, and each Plaintiff and Class Member would have paid less to LinkedIn as a result.

## PLAINTIFF SPECIFIC ALLEGATIONS

68.     TopDevz is a team of software developers, designers, project managers, and quality assurance testers that develops custom software solutions for sophisticated businesses.

69.     For the past four years, TopDevz has used LinkedIn to advertise its services to potential clients using a variety of LinkedIn's advertising methods, including Sponsored Content advertisements and videos.  LinkedIn has admitted to TopDevz that it "may have over-reported some [] Sponsored Content metrics for impression and video views."[10]  TopDevz did not know and had no reason to know that LinkedIn's metrics regarding the efficacy of its advertising services were inflated.  TopDevz reasonably relied on LinkedIn's representations about its ad metrics through the advertising process, and would not have paid the premium prices it was paying had it known that LinkedIn's advertising metrics were inflated.

70.     Noirefy is a diversity recruiting platform that connects underrepresented professionals with career opportunities at high growth companies.

71.     For the past 6 months, Noirefy has used Linkedin to advertise its services to both potential candidates and hiring entities using a variety of LinkedIn's advertising methods, including Sponsored Content advertisements.  Noirefy did not know and had no reason to know that LinkedIn's metrics regarding the efficacy of its advertising services were inflated.  Noirefy reasonably relied on LinkedIn's representations about its ad metrics through the advertising process, and would not have paid the premium prices it was paying had it known that LinkedIn's advertising metrics were inflated.

## CLASS ACTION ALLEGATIONS

72.     Plaintiffs re-allege and incorporate by reference herein all the allegations contained above.

73.     Pursuant to Federal Rule of Civil Procedure 23(b)(3), Plaintiffs assert claims on

---

[10] *See* LinkedIn, *Transactional Email Message to Ashkan Rajaee (CEO of TopDevz)*, attached as Exhibit B.

behalf of the following Class: All persons or entities who paid for the placement of advertisements on LinkedIn's platform up to the date of the filing of this action. Excluded from the Class are Defendant, any entity in which Defendant or its corporate parent Microsoft have a controlling interest, and Defendant's officers, directors, legal representatives, successors, and assigns. Also excluded from the Class is any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

74. Plaintiffs reserve the right to amend the Class definition if discovery and further investigation reveal that the Class should be expanded, divided into subclasses, or modified in any other way.

75. This action has been brought and may properly be maintained as a class action as it satisfies the numerosity, commonality, typicality, adequacy, and superiority requirements of Rule 23(b)(3). Plaintiffs seek to represent an ascertainable Class, as determining inclusion in the class can be done through LinkedIn's records.

76. Although the precise number of Class members is unknown and can only be determined through appropriate discovery, the proposed Class numbers at least in the hundreds of thousands and is therefore so numerous that joinder of all members would be impracticable.

77. Questions of law and fact common to the putative Class exist that predominate over questions affecting only individual members, including:

    a. Whether LinkedIn intentionally made material misrepresentations abouts advertising on its platform, including misrepresenting the number of "views" and "view-throughs" and "impressions" of such ads;

    b. Whether LinkedIn intentionally made material misrepresentations about user engagement with advertisements on its platforms, including with respect to the amount of fraudulent accounts and misclicks that it knew were occurring on its platform;

    c. Whether LinkedIn's use of inaccurate, unaudited, and unverified ad metrics was likely to deceive members of the public and thus constituted a fraudulent business practice under California's Unfair Competition Law (Cal. Bus. & Prof. Code §

17200);

    d.   Whether LinkedIn's failure to properly audit and verify its ad metrics was unethical, unscrupulous, or substantially injurious to ad purchasers and thus constituted an unfair business practice under California's Unfair Competition Law;

    e.   Whether LinkedIn breached its contractual duty to perform competently and with reasonable care when it reported erroneous ad metrics and failed to adequately audit and verify those metrics; and

    f.   Whether LinkedIn breached the implied covenant of good faith and fair dealing when it reported erroneous ad metrics and failed to adequately audit and verify those metrics;

78.    Plaintiffs are members of the putative Class. The claims asserted by the Plaintiffs in this action are typical of the claims of the members of the putative Class, as the claims arise from the same course of conduct by the Defendant and the relief sought is common.

79.    Plaintiffs will fairly and adequately represent and protect the interests of the members of the putative Class, as their interests are coincident with, not antagonistic to, the other members of the Class.

80.    Plaintiffs have retained counsel competent and experienced in both unfair competition claims and class action litigation.

81.    Certification of the Class is appropriate pursuant to Fed. R. C. P. 23(b)(3) because questions of law or fact common to the respective members of the Class predominate over questions of law or fact affecting only individual members. This predominance makes class litigation superior to any other method available for the fair and efficient adjudication of these claims including consistency of adjudications. Absent a class action it would be unlikely that many members of the Class would be able to protect their own interests because the cost of litigation through individual lawsuits might exceed the expected recovery.

82.    A class action is a superior method for the adjudication of the controversy in that it will permit a large number of claims to be resolved in a single forum simultaneously, efficiently, and without the unnecessary hardship that would result from the prosecution of numerous

individual actions and the duplication of discovery, effort, expense, and the burden of the courts that individual actions would create.

83.     In the alternative, the Class should be certified because:

a.     The prosecution of separate actions by the individual members of the proposed class would create a risk of inconsistent adjudications, which could establish incompatible standards of conduct for LinkedIn;

b.     The prosecution of individual actions could result in adjudications, which as a practical matter, would be dispositive of the interests of non-party class members or which would substantially impair their ability to protect their interests; and

c.     LinkedIn has acted or refused to act on grounds generally applicable to the proposed Class, thereby making appropriate final and injunctive relief with respect to the members of the proposed Class as a whole.

**FIRST CAUSE OF ACTION**
**(On behalf of the Class)**
**CALIFORNIA UNFAIR COMPETITION LAW,**
**CAL. BUS. & PROF. CODE § 17200, *et seq.***

84.     Plaintiffs re-allege and incorporate by reference herein all the allegations contained above.

85.     LinkedIn violated California's Unfair Competition Law (UCL), Cal. Bus. & Prof. Code § 17200 et seq., by engaging in the unlawful, unfair, and fraudulent business acts and practices alleged previously, and as further specified below.

86.     LinkedIn's dissemination of inaccurate and inflated user engagement metrics is a false statement of purported fact that reasonable people would have relied on, that was contrary to LinkedIn's agreements with advertisers, and that constitutes a fraudulent practice under the UCL, as it is likely to deceive Class members into believing that their advertisements received greater engagement than they actually did, all of which caused Class members to pay higher prices for their LinkedIn advertising campaigns.

87.     LinkedIn's failure to properly audit and verify the accuracy of its advertising metrics and their disseminating them to Class members is unethical, unscrupulous, and substantially

injurious to the Class, and thus constitutes an unfair practice under the UCL. LinkedIn's practice was also contrary to legislatively declared and public policies that seek to protect consumers from misleading statements, as reflected by laws like the Federal Trade Commission Act (15 U.S.C. § 45), Consumers Legal Remedies Act (Cal. Civ. Code § 1750 et seq.), and California False Advertising Law (Cal Bus. & Prof. Code § 17500). LinkedIn's deceitful conduct is not essential to its business operations, is not authorized by law, and is inconsistent with industry practice. The harm these practices caused to Plaintiffs and the Class members is substantial and outweighs their utility, if any, and is not a harm the Plaintiffs and the Class members could reasonably have avoided.

88.     LinkedIn knew or reasonably should have known that its CPV metrics (for both video view and view duration), CPM metrics, CPC metrics, and other advertising metrics, were inaccurate and inflated. The false metrics that LinkedIn allowed to persist for years were obvious errors that would have been discovered by a reasonable auditing and verification process.

89.     LinkedIn's failure to correct these inaccuracies unfairly allowed LinkedIn to claim that it was providing higher quality and more effective video-advertising services and marketing campaign services than it actually was.

90.     Plaintiffs have standing to bring these claims under the UCL because they were injured and lost money or property in their direct dealings with LinkedIn, including but not limited to money paid for LinkedIn advertisements, as a result of LinkedIn's fraudulent and unfair business practices. Plaintiffs would not have paid as much for video-advertising services or other advertising services if LinkedIn had not used inflated metrics. They have thus suffered an economic injury that was caused by LinkedIn's violation of the UCL.

91.     Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiffs seek injunctive relief to prevent the continued use of LinkedIn's unfair and fraudulent practices and restitution to restore to the Class all money LinkedIn may have acquired by means of its fraudulent and unfair business practices.

### SECOND CAUSE OF ACTION
**(On behalf of the class)**
**FRAUDULENT MISREPRESENTATION**

92.     Plaintiffs re-allege and incorporate by reference herein all the allegations contained

above.

93.     LinkedIn falsely represented its ad metrics.  LinkedIn knew that it had been systematically inflating ad metrics, yet it continued to collect inflated prices from advertisers based on user engagement measures that it knew were incorrect.  LinkedIn's metrics describing video "views," "view-throughs," and percentage views did not actually represent user engagement with an advertisement because they included playing of videos off the screen.  Linked's CPM metrics also overstated the amount of times sponsored content ads appeared on user interfaces.

94.     LinkedIn also falsely represented the extent of user impressions of and "clicks" on advertisements, even though many of those impressions and clicks involved non-human traffic or misclicks.  LinkedIn either knew that the impression and click figures it communicated to advertisers was wrong or LinkedIn made these representations recklessly and without regard for their truth.

95.     LinkedIn intended that Plaintiffs and Class members rely on its advertising metrics.  LinkedIn knew that these metrics were highly material to advertisers.

96.     Plaintiffs and Class members reasonably relied on LinkedIn's representations about its ad metrics when deciding whether they would purchase advertising from LinkedIn and how much advertising to purchase from LinkedIn.  As a result of LinkedIn's misrepresentations, Plaintiffs and Class members were harmed: Plaintiffs and Class members paid more for advertising on LinkedIn than they otherwise would have paid.

97.     Plaintiffs seek an award of compensatory and punitive damages.  LinkedIn's conduct as previously described constitutes oppression, fraud, or malice, and was authorized or ratified by LinkedIn's officers.

**THIRD CAUSE OF ACTION**
**(On behalf of the class)**
**FRAUDULENT CONCEALMENT**

98.     Plaintiffs re-allege and incorporate by reference herein all the allegations contained above.

99.     LinkedIn has concealed from Plaintiffs and Class members that LinkedIn's advertising metrics are inflated and misleading, and conceals that it is inflated due to errors in its

video ad metrics, user interface appearances, as well as fake accounts and misclicks.

100.    LinkedIn knew that its ad metrics were inflated and misleading, and it used these false metrics to conceal the fact that its advertising platform is of a lower quality than its metrics suggest.

101.    LinkedIn has a duty to disclose to Plaintiffs and Class members that its ad metrics are inflated and misleading; that its platform includes numerous fake accounts; that bots and misclicks drive up the impression and click metrics communicated to advertisers; and that it has been calculating estimates and final advertising costs on the basis of these false metrics. LinkedIn had exclusive knowledge of these material facts and did not disclose them to advertisers.

102.    Because of LinkedIn's omissions and concealment, Plaintiffs and Class members did not know when they bid for LinkedIn advertisements that the ad metrics were inflated and misleading; that fraudulent accounts and misclicks lower the quality of LinkedIn advertisements; or that advertisers were systematically overpaying for LinkedIn advertisements.

103.    LinkedIn intentionally concealed that its metrics were inflated and misleading and that fraudulent accounts and misclicks lowered the quality of LinkedIn ads with the intention of defrauding Plaintiffs and Class members.

104.    Plaintiffs and Class members would have acted differently had they known that LinkedIn's metrics were inflated and misleading and that fraudulent accounts and misclicks count as instances of user engagement that materially affect the price of advertising on LinkedIn. Specifically, they would have paid less for LinkedIn advertisements.

105.    As a result of LinkedIn's concealment and omissions described in this complaint, Plaintiffs and Class members were harmed: Plaintiffs and Class members paid more for advertising on LinkedIn than they otherwise would have.

106.    Plaintiffs seek an award of compensatory and punitive damages. LinkedIn's conduct as previously described constitutes oppression, fraud, or malice, and was authorized or ratified by LinkedIn's officers.

**FOURTH CAUSE OF ACTION**
**(On behalf of the class)**
**BREACH OF IMPLIED DUTY TO PERFORM WITH REASONABLE CARE**

107.    Plaintiffs re-allege and incorporate by reference herein all the allegations contained above.

108.    Plaintiffs and Class members contracted with LinkedIn to provide them with video-advertising services and other advertising campaign services.  They did so through one or more of LinkedIn's advertising interfaces, where Class members can, among other things submit video advertisements, set a daily advertising budget that can be adjusted later, and set or adjust their target audiences.

109.    Plaintiffs and Class members met all or substantially all of their contractual obligations, including submitting their advertising for LinkedIn's approval and paying for LinkedIn's advertising services.

110.    LinkedIn has obligations to the Class based on LinkedIn's course of dealing with the class, industry practice, and from various web pages created by LinkedIn including the "LinkedIn Ads Agreement" (https://www.linkedin.com/legal/sas-terms), LinkedIn's "User Agreement" (https://www.linkedin.com/legal/user-agreement), and LinkedIn's "LinkedIn Advertising Policies" (https://www.linkedin.com/legal/ads-policy), among others.

111.    One of LinkedIn's obligations is to provide Plaintiffs and Class members with accurate ad metrics.  This obligation is implied by LinkedIn's course of dealing with the Class, industry practice, and LinkedIn's agreement with advertisers.

112.    Under California law, LinkedIn was required to perform its contractual obligations competently and with reasonable care.  LinkedIn breached that duty by incorrectly measuring viewer engagement with the advertising it placed for Plaintiffs and Class members; by including inaccurate metrics in what it communicated to advertisers; and by systematically reporting inaccurate advertising-performance metrics to Plaintiffs and Class members.

113.    Had LinkedIn used reasonable care, it would have calculated advertising metrics correctly  and it would not have used incorrect metrics for years.

114.    As a result of LinkedIn's failure to provide its agreed advertising services competently and using reasonable care, Plaintiffs and Class members paid an inflated price for advertising and failed to receive the benefit of their bargain.  They are entitled to damages in an

1     amount to be proven at trial.

2     **FIFTH CAUSE OF ACTION**
**(On behalf of the class)**
3     **BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

4     115.    Plaintiffs re-allege and incorporate by reference herein all the allegations contained

5     above.

6     116.    Plaintiffs and Class members contracted with LinkedIn to provide them with

7     advertising services.

8     117.    These contracts were subject to implied covenants of good faith and fair dealing that

9     all parties would act in good faith and with reasonable efforts to perform their contractual duties

10     (both explicit and fairly implied) and not to impair the rights of other parties to receive the rights,

11     benefits, and reasonable expectations under the contracts. These included the covenants that

12     LinkedIn would act fairly and in good faith in carrying out its contractual obligations to provide

13     Plaintiffs and Class members with accurate advertising metrics.

14     118.    LinkedIn breached these implied covenants of good faith and fair dealing by failing

15     to provide Plaintiffs and Class members with accurate advertising metrics. For example, instead

16     of implementing a reasonable process to ensure the accuracy of its video ad "views" and "view-

17     throughs" metrics, its "impressions" metrics, and its "cost-per-click" metrics, LinkedIn did not

18     implement a process to ensure the accuracy of the metrics that it communicated to advertisers.

19     119.    Plaintiffs and Class members met all or substantially all of their contractual

20     obligations, including submitting their advertisements for approval and paying for LinkedIn's

21     advertising services.

22     120.    LinkedIn's failure to act in good faith in providing accurate metrics denied Plaintiffs

23     and Class members the full benefit of their bargain. Plaintiffs and Class members received

24     advertising services that were less valuable than what they paid for and less valuable than their

25     reasonable expectations under their agreement with LinkedIn. Plaintiffs and Class members were

26     damaged by an amount at least equal to this overpayment.

27     121.    Accordingly, Plaintiffs have been injured as a result of LinkedIn's breach of the

28     covenant of good faith and fair dealing and are entitled to damages and/or restitution in an amount

to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs TopDevz and Noirefy, on behalf of themselves and the Class, seek the following relief:

a.  And order certifying this action as a class action under Fed. R. Civ. 23, defining the Class as requested herein, finding that Plaintiffs are proper representatives of the Class requested herein, and appointing Plaintiffs' counsel as Class Counsel.

b.  Plaintiffs request injunctive relief. Awarding injunctive and other equitable relief as is necessary to protect the interests of the Class, including: (i) and order prohibiting LinkedIn from engaging in the wrongful acts described herein; (ii) requiring LinkedIn to engage third-party auditors to conduct audits and evaluations of LinkedIn's ad metrics and ordering them to promptly correct any problems or issues detected by these auditors, and (iii) requiring LinkedIn to disclose any further inaccuracies with respect to its ad metrics in a timely and accurate manner.

c.  Plaintiffs also request damages, restitution, punitive damages, attorneys' fees, statutory costs, and such other relief as is just and proper. Plaintiffs seek attorneys' fees under California Code of Civil Procedure 1021.5.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand trial by jury in this action of all issues so triable.

Dated: November 25, 2020

Respectfully submitted,

/s/ Warren Postman

Marquel Reddish (*pro hac vice forthcoming*)
mpr@kellerlenkner.com
**KELLER LENKNER LLC**
150 N. Riverside Plaza, Suite 4270
Chicago, IL 60606
(312) 741-5220

Warren Postman (#330869)
wdp@kellerlenkner.com
Jason Ethridge (*pro hac vice forthcoming*)
jason.ethridge@kellerlenkner.com
**KELLER LENKNER LLC**
1300 I Street, N.W., Suite 400E
Washington, DC 20005
(202) 918-1123
*Attorneys for Plaintiffs*