KEKER, VAN NEST & PETERS LLP
DAVID SILBERT - # 173128
dsilbert@keker.com
MICHELLE YBARRA - # 260697
mybarra@keker.com
FRANCO MUZZIO - # 310618
fmuzzio@keker.com
MORGAN E. SHARMA - # 313863
msharma@keker.com
LUKE APFELD - # 327029
lapfeld@keker.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:     415 391 5400
Facsimile:     415 397 7188

Attorneys for Defendant
LINKEDIN CORPORATION

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| TOPDEVZ, LLC, and NOIREFY, INC., individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>   v.<br><br>LINKEDIN CORPORATION,<br><br>        Defendant. | Case No. 5:20-cv-08324-SVK<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT LINKEDIN CORPORATION'S MOTION TO DISMISS**<br><br>Date:      March 9, 2021<br>Time:     10:00 a.m.<br>Dept.:    Courtroom 6 – 4th Floor<br><br>Judge: Hon. Susan van Keulen<br><br>Date Filed:  November 25, 2020<br><br>Trial Date: None set |

1631369

# TABLE OF CONTENTS

I.   INTRODUCTION ...............................................................................................................1

II.  BACKGROUND ................................................................................................................2

    A.   LinkedIn's platform for members and advertisers. ...................................................2

    B.   LinkedIn discovers and promptly corrects two metrics errors ...............................4

    C.   The potential for bot traffic and invalid clicks is well-known to advertisers and expressly disclosed by LinkedIn. ......................................................................4

    D.   Plaintiffs are sophisticated entities that contracted to place ads on LinkedIn. ........5

III. ARGUMENT ......................................................................................................................6

    A.   The economic loss rule bars Plaintiffs' fraud claims. ...............................................7

    B.   The UCL does not provide relief for claims that have no connection to the protection of the public. ...........................................................................................9

    C.   Plaintiffs' fraud and UCL claims fail because they are not pled with the particularity Rule 9(b) requires. ...........................................................................11

        1.   Plaintiffs have not identified any allegedly fraudulent statement or omission with particularity. ..........................................................................12

        2.   Plaintiffs fail to allege reasonable reliance with the required specificity. ...................................................................................................14

    D.   Plaintiffs lack standing to seek injunctive relief. ...................................................16

    E.   Plaintiffs' breach of the implied covenant claim fails because it does not identify the express provision given rise to the covenant. ....................................17

    F.   Plaintiffs' breach of the implied duty claim fails because it does not identify the contractual term or course of performance giving rise to the duty. ...............................................................................................................18

IV.  CONCLUSION ................................................................................................................19

1631369

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. Johnson*,
   355 F.3d 1179 (9th Cir. 2004) ...............................................................................18

*AdTrader, Inc. v. Google*, LLC
   No. 17-cv-07082-BLF, 2018 WL 3428525 (N.D. Cal. July 13, 2018)...................18

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)................................................................................................7

*Balistreri v. Pacifica Police Dep't*,
   901 F.2d 696 (9th Cir. 1990) ...................................................................................7

*Baltazar v. Apple, Inc.*,
   No. CV-10-3231-JF, 2011 WL 588209 (N.D. Cal. Feb. 10, 2011) ........................14

*Becton, Dickinson & Co. v. Cytek Biosciences Inc.*,
   No. 18-cv-00933-MMC, 2019 WL 633008 (N.D. Cal. Feb. 14, 2019)...................16

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)................................................................................................7

*Bly-Magee v. California*,
   236 F.3d 1014 (9th Cir. 2001) ...............................................................................12

*Bulletin Mktg. LLC v. Google LLC*,
   No. 17-cv-07211-BLF, 2018 WL 3428562 (N.D. Cal. July 13, 2018)...........2, 9, 17

*Cafasso, United States ex. rel. v. Gen. Dynamics C4 Sys., Inc.*,
   637 F.3d 1047 (9th Cir. 2011) .............................................................................2, 7

*Cansino v. Bank of Am.*,
   224 Cal. App. 4th 1462 (2014) ..............................................................................11

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013)...........................................................................................7, 16

*Davidson v. Apple, Inc.*,
   No. 16-CV-04942-LHK, 2017 WL 976048 (N.D. Cal. Mar. 14, 2017) .................13

*dotStrategy Co. v. Facebook Inc.*,
   No. C 20-00170 WHA, 2020 WL 6591366 (N.D. Cal. Nov. 11, 2020) ..........5, 15, 16

*dotStrategy Co. v. Twitter Inc.*,
   476 F. Supp. 3d 978 (N.D. Cal. 2020) ...............................................................4, 16

1631369

*dotStrategy v. Facebook, Inc.*,
    No. C 20-00170 WHA, 2020 WL 5094832 (N.D. Cal. Aug. 28, 2020) .................................14

*Edwards v. Marin Park, Inc.*,
    356 F.3d 1058 (9th Cir. 2004) .................................................................................................12

*Erlich v. Menezes*,
    21 Cal. 4th 543 (1999) ..............................................................................................................8

*In re Facebook PPC Advert. Litig.*,
    709 F. Supp. 2d 762 (N.D. Cal. 2010) ....................................................................................17

*Foster Poultry Farms v. Alkar-Rapidpak-MP Equip., Inc.*,
    868 F. Supp. 2d 983 (E.D. Cal. 2012).................................................................................7, 8

*Glen Holly Ent., Inc. v. Tektronix, Inc.*,
    352 F.3d 367 (9th Cir. 2003) ...................................................................................................15

*Glenn K. Jackson Inc. v. Roe*,
    273 F.3d 1192 (9th Cir. 2001) .................................................................................................11

*Gold v. Lumber Liquidators, Inc.*,
    No. 14-cv-05373-TEH, 2015 WL 7888906 (N.D. Cal. Nov. 30, 2015) .................................11

*Hodgers-Durgin v. de la Vina*,
    199 F.3d 1037 (9th Cir. 1999) .................................................................................................16

*Holguin v. Dish Network LLC*,
    229 Cal. App. 4th 1310 (2014) ................................................................................................18

*IV Sols., Inc. v. Conn. Gen. Life Ins. Co.*,
    No. CV 13-9026-GW(AJWx), 2015 WL 12843822 (C.D. Cal. Jan. 29, 2015).....................11

*Kearns v. Ford Motor Co.*,
    567 F.3d 1120 (9th Cir. 2009) .................................................................................................12

*Leonard v. NetFRAME Sys., Inc.*,
    No. C-95-0238 DLJ, 1995 WL 798923 (N.D. Cal. Aug. 8, 1995) .....................................12, 13

*Letizia v. Facebook Inc.*,
    267 F. Supp. 3d 1235 (N.D. Cal. 2017) ....................................................................2, 14, 18

*Lewis v. Casey*,
    518 U.S. 343 (1996).....................................................................................................................7

*Linear Tech. Corp. v. Applied Materials, Inc.*,
    152 Cal. App. 4th 115 (2007) ....................................................................................................9

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992).......................................................................................................2, 7, 16

iii

1631369

*Lusson v. Apple, Inc.*,
No. 16-cv-00705-VC, 2016 WL 6091527 (N.D. Cal. Oct. 19, 2016) ....................................11

*Macedonia Distrib., Inc. v. S-L Distrib. Co., LLC*,
No. SACV 17-1692 JVS (KESx), 2018 WL 6190592 (C.D. Cal. Aug. 7, 2018)...................10

*McKinney v. Google, Inc.*,
No. 5:10-CV-01177 EJD (PSG), 2011 WL 3862120 (N.D. Cal. Aug. 30, 2011) .................15

*Nabors v. Google, Inc.*,
No. 5:10-CV-03897 EJD (PSG), 2011 WL 3861893 (N.D. Cal. Aug. 30, 2011) .................12

*Nicosia v. Wells Fargo Bank*,
No. C 10-0398 PJH, 2010 WL 4269279 (N.D. Cal. Oct. 25, 2010).........................................17

*Oracle USA, Inc. v. XL Glob. Servs., Inc.*,
No. C 09-00537 MHP, 2009 WL 2084154 (N.D. Cal. July 13, 2009) .......................................7

*Philipson & Simon v. Gulsvig*,
154 Cal. App. 4th 347 (2007) .........................................................................................................11

*Punian v. Gillette Co.*,
No. 14-CV-05028-LHK, 2016 WL 1029607 (N.D. Cal. Mar. 15, 2016) ...............................16

*Robinson Helicopter Co. v. Dana Corp.*,
34 Cal. 4th 979 (2004) ...................................................................................................................1, 7

*Rodriguez v. Wells Fargo Bank, N.A.*,
No. 2:11-CV-00553 JAM-EFB, 2011 WL 2946381 (E.D. Cal. July 21, 2011) ....................17

*Rosenbluth Int'l, Inc. v. Super. Ct.*,
101 Cal. App. 4th 1073 (2002) ........................................................................................................9

*Spencer v. DHI Mortg. Co.*,
642 F. Supp. 2d 1153 (E.D. Cal. 2009)........................................................................................18

*Stearns v. Select Comfort Retail Corp.*,
No. 08-2746 JF, 2009 WL 1635931 (N.D. Cal. June 5, 2009).................................................15

*Vess v. Ciba-Geigy Corp, USA*,
317 F.3d 1097 (9th Cir. 2003) .......................................................................................................12

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*,
467 F. Supp. 3d 849 (N.D. Cal. 2020) ..........................................................................................13

*In re Webkinz Antitrust Litig.*,
695 F. Supp. 2d 987 (N.D. Cal. 2010) ..............................................................................2, 9, 10, 11

*WeBoost Media S.R.L. v. LookSmart Ltd.*,
No. C 13-5304 SC, 2014 WL 2621465 (N.D. Cal. June 12, 2014) ..................................1, 8, 9

iv

1631369

*Williams v. Apple, Inc.*,
    449 F. Supp. 3d 892 (N.D. Cal. 2020) ...................................................................................14

*Wine Bottle Recycling, LLC v. Niagara Sys. LLC*,
    No. 12-1924 SC, 2013 WL 5402072 (N.D. Cal. Sept. 26, 2013) ...............................................9

*Yastrab v. Apple Inc.*,
    No. 14-cv-01974-EJD, 2015 WL 1307163 (N.D. Cal. Mar. 23, 2015) ...................................11

**Other Authorities**

Fed. R. Civ. P. 9 ................................................................................................................. *passim*

Fed. R. Civ. P. 12 ...................................................................................................................6, 7

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT LINKEDIN
CORPORATION'S MOTION TO DISMISS
Case No. 5:20-cv-08324-SVK

1631369

1

## I.      INTRODUCTION

Last August, LinkedIn discovered that two errors in metrics used to measure the performance of certain "Sponsored Content" advertisements on its platform may have affected prices charged to advertisers. Upon discovering the errors, LinkedIn immediately took steps to correct them, notify the public, and issue makegoods to all potentially affected advertisers that in most instances ***exceeded*** the amount of any possible overcharge.

Sensing an opportunity for a windfall, Plaintiffs and their class-action counsel filed claims shortly after LinkedIn disclosed the errors, asserting that LinkedIn's ***entire*** advertising system is fraudulent, in violation of California's Unfair Competition Law ("UCL"), and in breach of an implied contractual duty and covenant. Plaintiffs allege that LinkedIn knowingly misrepresented the accuracy of all of its advertising metrics by failing to account for bot traffic, fraudulent clicks, and erroneous clicks, as well as by not discovering the Sponsored Content errors when they first arose. These overreaching claims are meritless and fail, even at the pleading stage, for the following reasons.

***First***, Plaintiffs' claims for fraudulent misrepresentation and fraudulent concealment fail for the fundamental reason that they seek contract—not tort—remedies. The claims are premised on "purely economic loss due to disappointed expectations" under the parties' contracts. *See Robinson Helicopter Co. v. Dana Corp.,* 34 Cal. 4th 979, 988 (2004), *Reh'g denied*, (2005). Such claims blur the boundary between contract remedies and torts, and are therefore barred by California's "economic loss" rule. *See WeBoost Media S.R.L. v. LookSmart Ltd.*, No. C 13-5304 SC, 2014 WL 2621465, at *6 (N.D. Cal. June 12, 2014) (holding that fraud claims by advertiser against online platform for allegedly failing to disclose click fraud and bot traffic—claims that are functionally identical to Plaintiffs' claims here—are barred by the economic loss rule).

***Second***, Plaintiffs lack standing to assert their UCL claims, which seek to redress their alleged failure to receive "the benefit of the bargain" from LinkedIn. The UCL protects the public, and also protects businesses in certain limited circumstances relating to anticompetitive practices such as price fixing. It does not, however, empower corporations to bring claims that "fundamentally sound in contract" and have no "connection to the protection of the public." *In re*

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT LINKEDIN
CORPORATION'S MOTION TO DISMISS
Case No. 5:20-cv-08324-SVK

1631369

1 *Webkinz Antitrust Litig.*, 695 F. Supp. 2d 987, 999 (N.D. Cal. 2010). Plaintiffs here are not

2 consumers, but sophisticated businesses seeking to remedy their purported economic losses from

3 private contracts they entered into with LinkedIn. Their claims have nothing to do with a

4 protection of the public, and the UCL was not intended to, and does not, create a cause of action

5 for them under these circumstances.

6      ***Third***, even if Plaintiffs could bring a viable fraud or UCL claim (which they cannot), the

7 complaint fails to allege the claims with sufficient specificity as required under Rule 9(b). Rule

8 9(b) demands that claims sounding in fraud identify "the who, what, when, where, and how of the

9 misconduct charged." *Cafasso, United States ex. rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d

10 1047, 1054-55 (9th Cir. 2011). Similarly, to satisfy the UCL's actual-reliance requirement at the

11 pleading stage, a UCL plaintiff must allege that she ***saw*** a specific misrepresentation, ***when*** she

12 saw it, and that she ***actually*** relied on it. *Letizia v. Facebook Inc.*, 267 F. Supp. 3d 1235, 1243

13 (N.D. Cal. 2017). Plaintiffs do none of these. To the contrary, the complaint alternately takes aim

14 at LinkedIn's metrics, as well as LinkedIn's statements *about* its metrics, but fails to allege that

15 Plaintiffs actually saw or relied on either. And Plaintiffs' conclusory allegations of backward-

16 looking harm are merely speculative and insufficient to establish standing to seek injunctive

17 relief. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 (1992).

18      ***Finally***, Plaintiffs' claims for breaches of the implied covenant of good faith and fair

19 dealing and implied duty to use reasonable care fail because Plaintiffs' conclusory allegations fail

20 to identify ***any*** contractual term or course of conduct that give rise to the obligations they seek to

21 enforce. *Bulletin Mktg. LLC v. Google LLC*, No. 17-cv-07211-BLF, 2018 WL 3428562, at *3

22 (N.D. Cal. July 13, 2018).

23      For these reasons, and more discussed below, the Court should dismiss Plaintiffs'

24 complaint in its entirety.

25 **II.    BACKGROUND**

26     **A.    LinkedIn's platform for members and advertisers.**

27      Founded in 2002, LinkedIn is a global online social network with more than 700 million

28 members. Compl. ¶ 11. LinkedIn members use the platform to post resumes, find job listings,

2
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT LINKEDIN
CORPORATION'S MOTION TO DISMISS
Case No. 5:20-cv-08324-SVK

1631369

share and receive relevant content, and connect with career contacts and potential employers. *Id.*
¶¶ 20, 21. The LinkedIn platform provides an online forum "to meet, exchange ideas, learn, and
find opportunities" in a professional context. *Id.* ¶ 21.

To run an advertising campaign on LinkedIn, an advertiser must create an account in
LinkedIn's "Campaign Manager" portal and agree to LinkedIn's terms of service. Compl. ¶ 35.
Advertisers may place ads on LinkedIn in a variety of ways, including through (1) Sponsored
Content, which delivers ads directly into LinkedIn members' feeds; (2) Text Ads, which appear in
a sidebar or at the top of the LinkedIn user interface; (3) Sponsored InMail, which delivers direct
messages to specific contacts, and (4) Dynamic Ads, which target specific audiences with
personalized content. Compl. ¶¶ 27, 29.

These options allow advertisers to place ads tailored to their unique advertising goals and
optimize ad campaigns to meet their stated objectives. *Id.* ¶ 33. Those objectives may include
raising brand awareness by maximizing the number of people who see an ad; driving online
traffic to a particular product page or website; or maximizing user engagement through extended
viewing of advertiser video content. *Id.* ¶¶ 41-43.

LinkedIn provides advertisers with various metrics to help track ad performance and
"grade the success" of their marketing campaign. Compl. ¶¶ 30-34. Those metrics include
"impressions" (content loaded on a member's interface such that it could have been viewed);
"views" (content actually viewed by members); and "clicks" (selection of an advertisement with a
mouse or other cursor, or with a finger on a touch screen device). *Id.* ¶ 31.[1] Advertisers pay to
place Sponsored Content through a "second-price auction" – essentially, an auction in which the
winning bidder pays $0.01 above the second-highest bid. *Id.* at ¶ 28. Advertisers can choose the
type of pricing model they want to use for their advertisement campaigns, and select a campaign
objective, where each campaign objective is tied to a billable event—e.g., paying per thousand
impressions, per click, or per view. *Id.* ¶¶ 33, 43.

---

[1] For the purposes of this motion to dismiss only, LinkedIn treats well-pleaded factual allegations
of the complaint as true.

1631369

### B.     LinkedIn discovers and promptly corrects two metrics errors.

In August 2020, LinkedIn realized that a discrepancy in its impression and video view metrics may have affected prices charged to advertisers for certain Sponsored Content advertisements. Compl. ¶¶ 48–49. As soon as LinkedIn became aware of the potential overcharge errors, it began working to correct them. *Id.* Within a few months, LinkedIn rolled out new software code that addressed the errors, and disclosed the errors to the public. *Id.* ¶ 52. LinkedIn's investigation revealed that the underlying technical errors may have caused LinkedIn to overreport video views and impressions for some Sponsored Content ads. *Id.* ¶¶ 48 n.7, 49 n.8.[2]

In the immediate aftermath of the discovery—and before Plaintiffs filed this lawsuit—LinkedIn began to identify all advertisers potentially impacted by these technical errors and made available makegoods to compensate for any charges resulting from the errors. Compl. ¶¶ 48 n.7, 49 n.8; LinkedIn Blog Post. LinkedIn has now issued makegoods to virtually all advertisers it has identified as potentially affected by the errors. The value of those makegoods matched, and in most cases exceeded, the errors' impact. LinkedIn also notified advertisers that it continues to work with third parties, such as the Media Rating Council and Moat, to audit its metrics and provide reliable analytics that are consistent with industry standards. *Id.*

### C.     The potential for bot traffic and invalid clicks is well-known to advertisers and expressly disclosed by LinkedIn.

As online advertisers well know, some amount of bot traffic and invalid activity is ubiquitous in online advertising, despite platforms' efforts to prevent it. For example, Judge Breyer and Judge Alsup recently found that reasonable advertisers who pay to place ads on Facebook and Twitter should expect this type of traffic on the platforms. *See dotStrategy Co. v. Twitter Inc.*, 476 F. Supp. 3d 978, 983 (N.D. Cal. 2020) ("A reasonable advertiser would understand that achieving its goals might require some interaction with Twitter users who use the platform to disseminate spam, violate Twitter's terms of service, or otherwise qualify as 'fake'

---

[2] *See* "*We discovered two measurement issues. Here's how we're making it right,*" (hereafter, "LinkedIn Blog Post"), LinkedIn Marketing Solutions Blog (Nov. 12, 2020) at https://business.linkedin.com/marketing-solutions/blog/linkedin-news/2020/how-we-re-working-to-improve, cited at Compl. ¶ 49 n.8

1631369

despite being human."); *dotStrategy Co. v. Facebook Inc.*, No. C 20-00170 WHA, 2020 WL 6591366, at *7 (N.D. Cal. Nov. 11, 2020) ("To the extent that fake accounts also viewed plaintiff's ads, a reasonable consumer would understand that not all users on Facebook would adhere to Facebook's authenticity policy or would be interested in its ads.").

Although online advertisers, including Plaintiffs, are aware of such activity when they purchase ads, LinkedIn also notifies them of it in the LinkedIn Ads Agreement—the primary contract governing LinkedIn's relationship with its advertisers, which Plaintiffs incorporate by reference in their complaint. Compl. ¶¶ 18, 110.  *See also*, Decl. of Luke Apfeld in Supp. of Def.'s Req. for Judicial Not. ("Apfeld Decl."), Ex. A at p. 4. The Ads Agreement explicitly warns advertisers of the potential for bot traffic and other invalid activity on LinkedIn's platform:

> The amount you owe will be calculated based on LinkedIn's tracking mechanisms. LinkedIn is not responsible for ***click fraud, fraudulent leads, technological issues or other potentially invalid activity by third parties that may affect the cost of running Ads***. Your exclusive remedy for suspected invalid activity is to make a claim for an Ad Services credit within 90 days of the date of that activity, and LinkedIn's exclusive liability is, in LinkedIn's sole discretion, to issue Ad Services credit for suspected invalid activity.

Apfeld Decl., Ex. A at p. 4 (emphasis added).

Despite the industry-wide prevalence of bot traffic and click fraud, LinkedIn devotes substantial resources to limiting their pervasiveness on its platform. LinkedIn employs measures, including technological countermeasures, to identify and block unauthorized bots. LinkedIn invests millions of dollars annually on such countermeasures, which block approximately 95 million bot access attempts *per day*.

### D.      Plaintiffs are sophisticated entities that contracted to place ads on LinkedIn.

Like virtually all LinkedIn advertisers, Plaintiffs here are not individual consumers, but sophisticated businesses. Plaintiff TopDevz is a software development company with operations across the United States and in Canada. Compl. ¶ 68; https://www.topdevz.com/about-us. According to its website, TopDevz employs, among other executives, a Senior Director of Marketing who "studied marketing and ecommerce at McGill University," and who is responsible for overseeing the company's marketing efforts. Plaintiff Noirefy "is a diversity recruiting platform that connects underrepresented professionals with career opportunities at high growth

5

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT LINKEDIN CORPORATION'S MOTION TO DISMISS
Case No. 5:20-cv-08324-SVK

1631369

companies." Compl. ¶ 70. Noirefy also claims to employ a professional marketing executive (with the title "Social Media Analyst") as part of its leadership team. https://noirefy.com/about-us-4/. The complaint alleges that Plaintiffs and putative class members paid for Sponsored Content on LinkedIn pursuant to written contracts, including the LinkedIn Ads Agreement. Compl. ¶¶ 18, 68–71, 108, 110, 116. Based on those agreements, Plaintiffs "used LinkedIn to advertise [their] services to potential clients using a variety of LinkedIn's advertising methods, including Sponsored Content advertisements"–though as explained below, Plaintiffs do not specify what type of Sponsored Content ads they purchased. Compl. ¶¶ 69, 71, 108, 116.

Plaintiffs contend that LinkedIn fraudulently misrepresented and concealed material facts regarding the accuracy of its ad metrics and violated unfair competition laws in the process. *See generally id.* ¶¶ 84–106. Plaintiffs allege that LinkedIn had a duty to disclose to advertisers that its ad metrics were inflated due to the Sponsored Content errors discovered in August 2020, as well as bot traffic and other invalid clicks. *See generally id.* ¶¶ 47–64. They also contend that LinkedIn breached an implied contractual duty to use reasonable care and an implied contractual covenant of good faith and fair dealing. *See generally id.* ¶¶ 107–121.

Despite the seriousness of those allegations, Plaintiffs fail to identify a single misrepresentation LinkedIn made that Plaintiffs saw—much less relied on—at any time over the course of the parties' relationship. *See id.* ¶¶ 69, 71. Instead, Plaintiffs allege generally that they "relied on LinkedIn's representations about its ad metrics through the advertising process," but fail to point to any specific representation or at which point in the advertising process they saw the purported misrepresentation. *Id.* Neither Plaintiff identifies what LinkedIn advertisements they purchased, when they purchased advertisements, or how much they paid. *Id.* Nor do Plaintiffs allege how any of the ad metrics they received were inflated or otherwise inaccurate. *Id.* And Plaintiffs fail to identify any conduct, contract term, or even any contract, that supports their claims.

## III.   ARGUMENT

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is

6

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT LINKEDIN
CORPORATION'S MOTION TO DISMISS
Case No. 5:20-cv-08324-SVK

1631369

plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Dismissal under Rule 12(b)(6) is proper when there is either a "lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).

Where a party alleges fraud, Rule 9(b) requires they "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). The complaint must identify "the who, what, when, where, and how of the misconduct charged." *Cafasso*, 637 F.3d at 1054-55. Additionally, a party seeking injunctive relief must demonstrate it has Article III standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). "[S]tanding is not dispensed in gross," *see Lewis v. Casey*, 518 U.S. 343, 358, n.6 (1996), but is claim and relief-specific. The party must allege an injury that is "concrete, particularized, and actual or imminent . . . allegations of *possible* future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (internal quotations omitted). Absent that, a court lacks subject-matter jurisdiction and must grant a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1).

### A.      The economic loss rule bars Plaintiffs' fraud claims.

Plaintiffs' fraud claims seek purely economic damages arising from the parties' agreements, and should be dismissed under the economic loss rule. That rule holds that "no tort cause of action will lie where the breach of duty is nothing more than a violation of a promise which undermines the expectations of the parties to an agreement." *Oracle USA, Inc. v. XL Glob. Servs., Inc.*, No. C 09-00537 MHP, 2009 WL 2084154, at *4 (N.D. Cal. July 13, 2009). The rule is designed to prevent "the law of contract and the law of tort from dissolving one into the other." *Robinson Helicopter,* 34 Cal. 4th at 988. Courts apply the economic loss rule "to bar fraud claims where the damages plaintiffs seek are the same economic losses arising from the alleged breach of contract." *Foster Poultry Farms v. Alkar-Rapidpak-MP Equip., Inc.*, 868 F. Supp. 2d 983, 991 (E.D. Cal. 2012) (internal quotations omitted). The rule "applies even when the breach is accomplished in a fraudulent manner." *Robinson Helicopter*, 34 Cal. 4th at 995.

California courts have recognized limited exceptions to the economic loss rule where: (1) a defendant's actions that constituted breach of contract also caused physical injury; (2) a

1631369

1    wrongful discharge violated a fundamental public policy; or (3) where the plaintiff was

2    fraudulently induced to enter a contract. *Erlich v. Menezes*, 21 Cal. 4th 543, 551-52 (1999). None

3    of which are pled here.

4         The Northern District of California has previously held that the economic loss rule bars

5    fraud claims identical to the ones Plaintiffs assert here. In *WeBoost Media S.R.L. v. LookSmart*

6    *Ltd.*, plaintiff advertisers entered into an agreement with a defendant website owner in which the

7    website owner agreed to publish the plaintiffs' advertisements on its websites. No. C 13-5304 SC,

8    2014 WL 2621465, at *1 (N.D. Cal. June 12, 2014). The plaintiffs agreed to pay the website

9    owner based on the total number of clicks on those ads. *Id.* Seven months into their partnership,

10   the plaintiffs discovered that a "significant portion" of the clicks for which the website owner

11   billed were the result of "click fraud" and bot traffic. *Id.* at *2. The plaintiffs sued the website

12   owner, alleging among other things that the website owner had fraudulently concealed "the truth

13   about its 'bogus' websites and click-fraud bots." *Id.* at *5. In holding that the advertisers'

14   fraudulent concealment claim was barred by the economic loss rule, the Court reasoned that the

15   fraud claim was "exactly" the same as a breach of contract claim—"but with the addition of

16   fraudulent intent and concealment." *Id.* at *6. Accordingly, the claim was barred by the economic

17   loss rule. *Id.*; *see also Foster Poultry*, 868 F. Supp. 2d at 991.

18        As in *WeBoost*, Plaintiffs here assert fraud claims that sound entirely in contract. Plaintiffs

19   allege that LinkedIn committed fraud by "falsely represent[ing] its ad metrics" and concealing

20   that its ad metrics were "inflated and misleading," resulting in Plaintiffs paying "more for

21   advertising on LinkedIn than they otherwise would have paid." Compl. ¶¶ 93, 96, 100, 105. But

22   LinkedIn's alleged use of "inflated and misleading" metrics likewise forms the basis for

23   Plaintiffs' contract claims. *See, e.g.*, *Id.* ¶ 8 ("LinkedIn's use of inaccurate advertising metrics

24   also breached LinkedIn's contract with its advertisers."); ¶ 86 ("LinkedIn's dissemination of

25   inaccurate and inflated user engagement metrics … was contrary to LinkedIn's agreements with

26   advertisers."); ¶ 112 ("LinkedIn breached [its contractual] duty by … including inaccurate metrics

27   in what it communicated to advertisers."). Indeed, the allegations related to the delivery of

28   inaccurate ad metrics—and the harm due to overbilling resulting therefrom—are the same for the

8

1631369

fraud claims as for Plaintiffs' claims for breaches of the implied duty to perform with reasonable care and the implied covenant of good faith and fair dealing. *Id.* ¶ 9 (stating that all of Plaintiffs' claims seek ***"recovery for advertisers' monetary losses"*** due to inaccurate metrics in addition to injunctive relief) (emphasis added).

Thus, as in *WeBoost*, Plaintiffs' fraud claims are barred by the economic loss rule because they merely restate the breach of contractual obligations "but with the addition of fraudulent intent and concealment." 2014 WL 2621465 at *6; *see also Wine Bottle Recycling, LLC v. Niagara Sys. LLC*, No. 12-1924 SC, 2013 WL 5402072, at *3 (N.D. Cal. Sept. 26, 2013) (holding that a fraudulent concealment claim was barred by the economic loss rule because all of the omissions related "exclusively to Defendants' performance of the contract" and "permitting this work-around pleading would open the door to all manner of tort claims based only on whether a defendant would and could do what the contract said").

Because the economic loss rule bars Plaintiffs' fraud claims as a matter of law, the Court should dismiss the causes of action for fraudulent misrepresentation and fraudulent concealment with prejudice. Plaintiffs must seek recovery in contract, if at all—not in tort.

**B.    The UCL does not provide relief for claims that have no connection to the protection of the public.**

The California legislature enacted the UCL "to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services." *Linear Tech. Corp. v. Applied Materials, Inc.*, 152 Cal. App. 4th 115, 135 (2007) (*quoting Kasky v. Nike*, 27 Cal. 4th 939, 949 (2002)). Where corporate plaintiffs raise claims "based on contracts not involving either the public in general or individual consumers who are parties to the contract, a corporate plaintiff may not rely on the UCL for the relief it seeks.'" *Id.*; *see also Bulletin Mktg.*, 2018 WL 3428562, at *5. Plaintiffs therefore lack standing to raise UCL claims that "fundamentally sound in contract and do not allege facts sufficient to demonstrate a connection to the protection of the public." *In re Webkinz Antitrust Litig.*, 695 F. Supp. 2d 987, 999 (N.D. Cal. 2010); *see also Rosenbluth Int'l, Inc. v. Super. Ct.*, 101 Cal. App. 4th 1073, 1077 (2002) ("[A] UCL action based on a contract is not appropriate where the public in general is not harmed by the defendant's alleged unlawful

9
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT LINKEDIN
CORPORATION'S MOTION TO DISMISS
Case No. 5:20-cv-08324-SVK

1631369

1    practices.").

2         The Northern District of California has dismissed UCL claims, like the one Plaintiffs

3    assert here, that have no relation to the protection of the public. In *Webkinz*, for example, several

4    "small mom and pop merchants" brought an unfair competition lawsuit against a large toy

5    distributer. 695 F. Supp. 2d at 998. The plaintiffs asserted that the toy distributer had committed

6    unfair and fraudulent business practices under the UCL in failing to deliver products in a

7    "reasonably timely manner." *Id.* The court determined that the plaintiffs did not have standing to

8    assert a UCL claim, holding that "the central issue presented under California law is whether the

9    public at large, or consumers generally, are affected by the alleged unlawful business practice."

10   *Id.* at 998–99. In rejecting the plaintiffs' argument that they had standing because they were small

11   companies, rather than large and sophisticated litigants, the Court held that UCL claims are

12   necessarily invalid where they fail to state "a connection to the protection of the general public,"

13   regardless of the size or sophistication of the litigants. *Id.* at 999. Because the plaintiffs'

14   allegations "fundamentally sound[ed] in contract and [did] not allege facts sufficient to

15   demonstrate a connection to the protection of the public," the allegations were insufficient to state

16   a claim under the UCL. *Id.*

17        Plaintiffs' UCL claim suffers from these same flaws. Plaintiffs here are not traditional

18   consumers; they are established businesses seeking to remedy a commercial dispute with

19   LinkedIn. Compl. ¶¶ 13, 14, 68, 71. Plaintiffs allege that they have standing to bring their UCL

20   claim "because they were injured and lost money or property ***in their direct dealings with***

21   ***LinkedIn***." *Id.* ¶ 90 (emphasis added). And they contend that they were harmed due to LinkedIn

22   disseminating inflated metrics "***contrary to LinkedIn's agreements with advertisers***." *Id.* ¶ 86

23   (emphasis added). But they fail to allege any harm to the general public as a result of those

24   dealings. Rather, the complaint seeks redress for LinkedIn's purported failure to provide Plaintiffs

25   with "the benefit of the bargain" under the terms of the parties' contractual agreements. *Id.* ¶¶ 6,

26   50, 86, 114, 120. The UCL does not provide a remedy for such a claim. *See Macedonia Distrib.,*

27   *Inc. v. S-L Distrib. Co., LLC*, No. SACV 17-1692 JVS (KESx), 2018 WL 6190592, at *9 (C.D.

28   Cal. Aug. 7, 2018) (dismissing a putative class action UCL claim where the claim was "based on

1631369

1  a contract not involving competition or the public in general"); *IV Sols., Inc. v. Conn. Gen. Life*

2  *Ins. Co.*, No. CV 13-9026-GW(AJWx), 2015 WL 12843822, at *17 n.70 (C.D. Cal. Jan. 29,

3  2015) (noting that the UCL has "no application in commercial disputes between two businesses"

4  that are not competitors).

5       As in *Webkinz*, Plaintiffs' UCL claim "pleads harm only to the Plaintiffs and Class

6  members and alleges only that the conduct has a tendency to cause injury to their business

7  interests under the contracts each plaintiff presumably has with [LinkedIn]." 695 F. Supp. 2d at

8  999. Plaintiffs cannot rely on the UCL to state such a claim.

9       **C.    Plaintiffs' fraud and UCL claims fail because they are not pled with the**
10                **particularity Rule 9(b) requires.**

11       Even if Plaintiffs' fraud and UCL claims were not barred for the reasons discussed above,

12  the allegations on which they are premised fall well short of Rule 9(b)'s particularity

13  requirements. To state a claim for fraudulent misrepresentation, a plaintiff must plead (1) a

14  misrepresentation by the defendant; (2) that the defendant knows to be false; (3) with the intent to

15  defraud the plaintiff; (4) reasonable reliance by the plaintiff; and (5) resulting damage. *See*

16  *Philipson & Simon v. Gulsvig,* 154 Cal. App. 4th 347, 363 (2007) (citing *Agric. Ins. Co. v. Super.*

17  *Ct.,* 70 Cal. App. 4th 385, 402 (1999). The elements for fraudulent concealment are "essentially

18  the same … , except that rather than an affirmative statement, the plaintiffs must allege deliberate

19  concealment or failure to comply with a duty to disclose." *Lusson v. Apple, Inc.*, No. 16-cv-

20  00705-VC, 2016 WL 6091527, at *3 (N.D. Cal. Oct. 19, 2016).

21       As fraud allegations involve "a serious attack on character," they must be pleaded with

22  specificity. *Cansino v. Bank of Am.*, 224 Cal. App. 4th 1462, 1469 (2014); *see also* Fed. R. Civ.

23  P. 9(b). This requirement applies not only to common law fraud claims, but fraud-based claims

24  under the UCL as well. *See, e.g., Gold v. Lumber Liquidators, Inc.*, No. 14-cv-05373-TEH, 2015

25  WL 7888906, at *2, 9 (N.D. Cal. Nov. 30, 2015); *Yastrab v. Apple Inc.*, No. 14-cv-01974-EJD,

26  2015 WL 1307163, at *3 (N.D. Cal. Mar. 23, 2015); *see also Glenn K. Jackson Inc. v. Roe*, 273

27  F.3d 1192, 1203 (9th Cir. 2001) ("[T]he breadth of § 17200 does not give a plaintiff license to

28  "plead around" the absolute bars to relief contained in other possible causes of action by recasting

11

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT LINKEDIN
CORPORATION'S MOTION TO DISMISS
Case No. 5:20-cv-08324-SVK

1631369

those causes of action as ones for unfair competition.").

To satisfy Rule 9(b)'s particularity requirement, "[a]verments of fraud must be accompanied by *the who, what, when, where, and how* of the misconduct charged." *Vess v. Ciba-Geigy Corp, USA,* 317 F.3d 1097, 1106 (9th Cir. 2003) (emphasis added and quotation omitted). "A party alleging fraud must set forth more than the neutral facts necessary to identify the transaction." *Kearns v. Ford Motor Co.,* 567 F.3d 1120, 1124 (9th Cir. 2009) (quotation omitted). Broad allegations with "no particularized supporting detail" are insufficient. *Bly-Magee v. California,* 236 F.3d 1014, 1018 (9th Cir. 2001). Instead, the plaintiff must allege with precision "the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations." *Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1066 (9th Cir. 2004).

### 1. Plaintiffs have not identified any allegedly fraudulent statement or omission with particularity.

A claim for fraudulent misrepresentation requires the plaintiff to "set forth what is false or misleading about a statement, and why it is false." *Leonard v. NetFRAME Sys., Inc.*, No. C-95-0238 DLJ, 1995 WL 798923, at *2 (N.D. Cal. Aug. 8, 1995) (*citing In re Glenfed, Inc. Sec. Litig.*, 42 F.3d 1541, 1548 (9th Cir. 1994)). A claim for fraudulent concealment "must describe the content of the omission and where the omitted information should or could have been revealed, as well as provide representative samples of advertisements, offers, or other representations that plaintiff relied on to make her purchase and that failed to include the allegedly omitted information." *Nabors v. Google, Inc.*, No. 5:10-CV-03897 EJD (PSG), 2011 WL 3861893, at *5 (N.D. Cal. Aug. 30, 2011).

Here, Plaintiffs do nothing of the sort. Their vague and conclusory allegations fail to identify any specific alleged misrepresentation, leaving the Court and LinkedIn to guess what statements are at issue. For instance, Plaintiffs generally allege that LinkedIn "falsely represented its ad metrics" and concealed that its "metrics are inflated and misleading." Compl. ¶¶ 93, 99; *see also* ¶ 86 (alleging a UCL claim for purportedly fraudulent business practices premised on the "dissemination of inaccurate and inflated user engagement metrics"). But Plaintiffs fail to allege

1631369

1     *what* advertisements they purchased, *how* those advertisements were priced, *what* metrics they

2     received, *why* the metrics were inaccurate, and *when* they received the metrics. Plaintiffs' failure

3     to provide information regarding *when* they saw the purported misrepresentation is particularly

4     problematic, as it prevents LinkedIn and the Court from assessing whether the purported fraud

5     occurred before Plaintiffs decided to purchase an advertisement, during the bidding process, or

6     after Plaintiffs began the advertising campaign. Without such information, LinkedIn cannot

7     adequately defend itself. *See In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod.*

8     *Liab. Litig.*, 467 F. Supp. 3d 849, 860 (N.D. Cal. 2020) (dismissing fraud claim where the

9     plaintiffs failed to "'specify when' they were exposed to the defendant's misrepresentations").

10        Without providing those details, Plaintiffs fail to allege that they even purchased

11     advertisements affected by the Sponsored Content errors or bot traffic and other invalid clicks.

12     For example, if Plaintiffs purchased ads priced by cost-per-click, they cannot have been

13     overcharged as a result of the Sponsored Content errors, which affected metrics measuring

14     impressions and video views. Thus, Plaintiffs fail to identify even the "neutral facts necessary to

15     identify the transaction in question," much less explain "what is false or misleading" about any

16     alleged misrepresentation. *See Leonard*, 1995 WL 798923, at *2. Rule 9(b) requires far more. *See*

17     *Davidson v. Apple, Inc.*, No. 16-CV-04942-LHK, 2017 WL 976048, at *8 (N.D. Cal. Mar. 14,

18     2017) (dismissing fraud claim where plaintiffs failed to allege they "encountered a representation

19     made by Defendant—let alone what those representations were, when they were made, and why

20     they were false").

21        Plaintiffs contend that, in addition to the metrics themselves, "LinkedIn's representations

22     *about* its ad metrics" were fraudulent. Compl. ¶ 96 (emphasis added). But there, too, Plaintiffs

23     fail to allege what specific misrepresentation is at issue, when they saw it, or how it is misleading.

24     And although Plaintiffs attach a LinkedIn marketing presentation to the complaint, *Id.* ¶ 23 n.3,

25     neither Plaintiff alleges they saw the document, much less any specific statement contained

26     therein. Such bare allegations are insufficient to state a claim for fraud. *See Davidson*, 2017 WL

27     976048, at *8.

28

1631369

### 2. Plaintiffs fail to allege reasonable reliance with the required specificity.

Plaintiffs also fail to adequately plead that they relied on any misrepresentation to their detriment. To adequately allege reliance in support of a claim for fraud, "the mere assertion of 'reliance' is insufficient." *Baltazar v. Apple, Inc.*, No. CV-10-3231-JF, 2011 WL 588209, at *3 (N.D. Cal. Feb. 10, 2011) (quoting *Cadlo v. Owens–Illinois, Inc.*, 125 Cal. App. 4th 513, 519 (2004)). Rather, a "plaintiff must allege the specifics of his or her reliance on the misrepresentation." *Id.* Likewise, to state a viable UCL claim based on an alleged misrepresentation, "a plaintiff must have ***actually relied*** on the misrepresentation and suffered economic injury as a result of that reliance, in order to have standing to sue under the statute." *dotStrategy v. Facebook Inc.*, No. C 20-00170 WHA, 2020 WL 5094832, at *5 (N.D. Cal. Aug. 28, 2020) (emphasis added); *see also Williams v. Apple, Inc.*, 449 F. Supp. 3d 892, 913 (N.D. Cal. 2020) (noting that plaintiffs in UCL cases based on a misrepresentation "must allege that they ***actually read*** the challenged representations") (emphasis added).[3]

Plaintiffs' failure to identify what metrics they saw or when they saw them forecloses Plaintiffs from adequately pleading reliance here. Plaintiffs cannot allege they relied on metrics they fail to view. *See Baltazar*, 2011 WL 588209, at *3 n.2 (dismissing common law fraud claim where the plaintiffs generally alleged that they relied on "a commercial" without identifying the specific commercial they relied on); *dotStrategy v. Facebook*, 2020 WL 5094832, at *6 (dismissing UCL claim where the plaintiffs did nothing more than assert an "unspecific and bare allegation about reliance"); *Letizia*, 267 F. Supp. 3d at 1243-44 (dismissing UCL claim where the plaintiffs "never state[d] in their complaint that they ever saw the miscalculated metrics").

Nor does Plaintiffs' conclusory assertion that they "reasonably relied on LinkedIn's representations ***about its ad metrics***" suffice. Compl. ¶¶ 69, 71 (emphasis added). The complaint fails to allege Plaintiffs ever saw any specific representation by LinkedIn "about its ad metrics," much less the specifics of Plaintiffs' reliance on such a statement. This is fatal to their fraud

---

[3] The actual reliance requirement applies to the fraudulent, unfair, and unlawful prongs of the UCL equally where the claims are, as here, "grounded in misrepresentation or deception." *dotStrategy v. Facebook*, 2020 WL 5094832, at *5–*6.

1631369

1    claims. *See McKinney v. Google, Inc.*, No. 5:10-CV-01177 EJD (PSG), 2011 WL 3862120, at *5

2    (N.D. Cal. Aug. 30, 2011) (dismissing a fraudulent omission claim where the plaintiff asserted

3    that she based her decision to buy a product on Google's misrepresentations but had "not

4    particularly identified any representation upon which she relied or alleged facts showing her

5    actual and reasonable reliance on any such representations").

6         In fact, the only specific LinkedIn representation "about its ad metrics" noted in the

7    complaint is a general statement regarding how metrics allow marketers to "track how well [their]

8    posts hit the mark and fine-tune [their] strategy instantly." Compl. ¶ 32. Neither Plaintiff alleges

9    they actually saw or relied on the statement. In any event, a subjective statement regarding

10   whether posts "hit the mark" and how ads are "fine-tune[d]" cannot serve as the basis for fraud

11   because it does not mislead a reasonable consumer. *See Glen Holly Ent., Inc. v. Tektronix, Inc.*,

12   352 F.3d 367, 379 (9th Cir. 2003) (affirming dismissal of fraud claims based on statements that

13   "were generalized, vague and unspecific assertions, constituting mere 'puffery' upon which a

14   reasonable consumer could not rely"). The Northern District of California recently held that

15   similar statements regarding the impact of bot traffic on online advertising are nonactionable. *See*

16   *dotStrategy v. Facebook*, 2020 WL 6591366, at *7 (holding that statements such as "Facebook

17   ads are optimized to help you get more people to visit your website or increase conversion" are

18   nothing more than non-actionable "puffery because they are difficult to measure concretely"); *see*

19   *also Stearns v. Select Comfort Retail Corp.*, No. 08-2746 JF, 2009 WL 1635931, at *11 (N.D.

20   Cal. June 5, 2009) (noting that "vague, highly subjective claims" are nonactionable because "no

21   reasonable consumer relies on puffery").

22        Plaintiffs' failure to adequately plead reasonable reliance on a statement about bot traffic

23   and other invalid clicks is unsurprising. As noted above, LinkedIn expressly discloses the

24   potential for invalid or fraudulent traffic in the Ads Agreement—the same contract that Plaintiffs

25   rely on to support their claims for breaches of the implied covenant and implied duty. *See* Compl.

26   ¶¶ 18, 110; Apfeld Decl., Ex. A at p. 4 (disclosing that "click fraud, fraudulent leads,

27   technological issues or other potential invalid activity by third parties … may affect the cost of

28   running Ads").

1631369

Moreover, courts in this district have repeatedly recognized that reasonable advertisers are aware that bot traffic will impact ad performance on online platforms. *See dotStrategy v. Twitter*, 476 F. Supp. 3d at 983 (noting that reasonable advertisers would understand that advertising on online platforms would include interactions with "fake" accounts); *dotStrategy v. Facebook*, 2020 WL 6591366, at *7 (same). Absent an allegation that LinkedIn made specific representations to create the expectation that bot traffic and other invalid clicks would be excluded entirely from its advertising metrics, a fraud claim premised on that activity must fail. *Cf. Punian v. Gillette Co.*, No. 14-CV-05028-LHK, 2016 WL 1029607, at *15 (N.D. Cal. Mar. 15, 2016) ("In order to be deceived" by a representation, "members of the public must have had an expectation or an assumption about the matter in question.") (internal quotation marks omitted). Plaintiffs have failed to make such an allegation.

### D.   Plaintiffs lack standing to seek injunctive relief.

Plaintiffs also seek injunctive relief under the UCL to prevent LinkedIn's use of purportedly unfair and fraudulent practices. Compl. ¶ 91. To pursue this claim, Plaintiffs must allege an injury that is "actual or imminent," *Clapper*, 568 U.S. at 409, as well as facts showing a "a realistic threat of *future* injury." *Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1040 (9th Cir. 1999) (emphasis added). *See also Lujan*, 504 U.S. at 564 ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief … if unaccompanied by any continuing, present adverse effects.").

Here, the harm Plaintiffs allege is entirely backward-looking. Plaintiffs contend that they have "used LinkedIn to advertise [their] services" and "paid" more than they should have, Compl. ¶¶ 69, 71, 90. But Plaintiffs do not allege that they continue to use LinkedIn's services or intend to do so in the future. Thus, Plaintiffs cannot allege a likelihood of *any* future injury, much less one that is "actual or imminent," as Article III standing requires. *Lujan*, 504 U.S. at 560; *see also Becton, Dickinson & Co. v. Cytek Biosciences Inc.*, No. 18-cv-00933-MMC, 2019 WL 633008, at *7 (N.D. Cal. Feb. 14, 2019) ("Injunctive relief has no application to wrongs which have been completed, absent a showing that past violations will probably recur."). This defect is fatal to Plaintiffs' injunctive relief claim, and the claim should be dismissed.

1631369

E.    **Plaintiffs' breach of the implied covenant claim fails because it does not identify the express provision given rise to the covenant.**

Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing fails for a simple reason: they have not identified a single express contractual term that gives rise to the claimed duty. Every contract contains "a covenant by each party not to do anything which will deprive the other parties thereto of the benefits of the contract." *In re Facebook PPC Advert. Litig.*, 709 F. Supp. 2d 762, 770 (N.D. Cal. 2010) (quoting *Harm v. Frasher*, 181 Cal. App. 2d 405, 417 (1960)). But the covenant does not exist in a vacuum; it "is limited to assuring compliance with the express terms of the contract, and cannot be extended to create obligations not contemplated by the contract." *Bulletin Mktg.*, 2018 WL 3428562, at *3 (quoting *Integrated Storage Consulting Servs., Inc., v. NetApp, Inc.*, No. 5:12-CV-06209-EJD, 2013 WL 3974537, at *7 (N.D. Cal. July 31, 2013)). Put another way, the implied covenant is necessarily tethered to an express contractual term, and a claim for breach of the implied covenant cannot proceed "where no express term exists on which to hinge an implied duty." *In re Facebook*, 709 F. Supp. 2d at 770.

Plaintiffs allege that LinkedIn breached the implied covenant by failing to provide "accurate advertising metrics" and implement "a process to ensure the accuracy of the metrics that it communicated to advertisers." Compl. at ¶ 118. But Plaintiffs do not (and cannot) identify any express contractual term from which those specific obligations arise. *See Rodriguez v. Wells Fargo Bank, N.A.*, No. 2:11-CV-00553 JAM-EFB, 2011 WL 2946381, at *3 (E.D. Cal. July 21, 2011) (dismissing a breach of the implied covenant claim where the plaintiff failed "to point to any terms of the contract that were affected by the Defendant"). Because Plaintiffs' "overly vague" allegations "fail to explain in a coherent manner the source of any duties owed to plaintiffs" and breached by LinkedIn, their breach of the implied covenant claim must be dismissed. *Nicosia v. Wells Fargo Bank*, No. C 10-0398 PJH, 2010 WL 4269279, at *3 (N.D. Cal. Oct. 25, 2010).

1631369

**F.    Plaintiffs' breach of the implied duty claim fails because it does not identify the contractual term or course of performance giving rise to the duty.**

Plaintiffs similarly fail to state a viable claim for breach of the implied duty of reasonable care. The implied duty of reasonable care obligates every party to a contract "to perform with care, skill, reasonable expedience, and faithfulness the thing agreed to be done." *Holguin v. Dish Network LLC*, 229 Cal. App. 4th 1310, 1324 (2014). To state a claim for breach, a plaintiff must allege either a contract term or course of performance between the parties that gives rise the duty. *See Holguin*, 229 Cal. App. 4th at 1324; *Letizia*, 267 F. Supp. 3d at 1251. Plaintiffs did neither.

Although Plaintiffs concede that they "contracted with LinkedIn to provide them with video-advertising services and other advertising campaign services," and that their implied duty claim is premised on "LinkedIn's agreements with advertisers," Plaintiffs fail to identify a single contract term that supports their theory of liability. Compl. ¶¶ 108, 111. Plaintiffs decline to even name the applicable contract from which a duty may be implied. Such vague and conclusory assertions are insufficient to state a claim. *Cf. Spencer v. DHI Mortg. Co.*, 642 F. Supp. 2d 1153, 1165 (E.D. Cal. 2009) (reference to "oral and/or written agreements with all defendants," without more, insufficient to state a claim for breach of the implied covenant). Plaintiffs "cannot assert a non-existent implied duty" to state their claim. *AdTrader, Inc. v. Google*, LLC, No. 17-cv-07082-BLF, 2018 WL 3428525, at *4 (N.D. Cal. July 13, 2018).

Plaintiffs alternatively contend that an implied duty arose from "LinkedIn's course of dealing with the class." Compl. ¶ 110. But the complaint alleges nothing about the parties' course of dealing from which a duty could be implied. To the contrary, the complaint is almost entirely devoid of allegations about *Plaintiffs'* dealings with LinkedIn; the four paragraphs it devotes to "Plaintiff Specific Allegations" don't include a single allegation that either Plaintiff ever received or saw *any* advertising metrics provided by LinkedIn. *Id.* ¶¶ 68-71. Instead, Plaintiffs ask the Court to transform a bare, conclusory assertion—"LinkedIn has obligations to the Class based on LinkedIn's course of dealing with the class" (*id.* ¶ 110)—into a course of conduct giving rise to an implied contractual duty. But "conclusory allegations of law and unwarranted inferences" are insufficient to defeat a motion to dismiss." *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir.

18

1631369

1    2004). Plaintiffs' claim for breach of the implied duty cannot survive.

2    **IV.    CONCLUSION**

3           For the foregoing reasons, the Court should dismiss Plaintiffs' complaint in its entirety.

4    Dated:  January 27, 2021                          KEKER, VAN NEST & PETERS LLP

5

6                                              By:    *s/David Silbert*
                                                      DAVID SILBERT
7                                                     MICHELLE YBARRA
                                                      FRANCO MUZZIO
8                                                     MORGAN E. SHARMA
                                                      LUKE APFELD
9
                                                      Attorneys for Defendant
10                                                    LINKEDIN CORPORATION

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT LINKEDIN
CORPORATION'S MOTION TO DISMISS
Case No. 5:20-cv-08324-SVK

1631369