Warren Postman (#330869)
  wdp@kellerlenkner.com
Jason Ethridge (*pro hac vice*)
  jason.ethridge@kellerlenkner.com
**KELLER LENKNER LLC**
1300 I Street, N.W., Suite 400E
Washington, DC 20005
Phone: (202) 918-1123
Facsimile: (312) 971-3502

*Attorneys for Plaintiffs TopDevz, LLC, and
Noirefy, Inc.*

(Additional counsel listed on signature page)

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

|  |  |
|---|---|
| *In Re LinkedIn Advertising Metrics Litigation* | Case No.:   5:20-cv-08324-SVK |
| | **CONSOLIDATED CLASS ACTION COMPLAINT** |
| | 1.  Violation of California's Unfair Competition Law |
| | 2.  Fraudulent Misrepresentation |
| | 3.  Fraudulent Concealment |
| | 4.  Negligent Misrepresentation |
| | 5.  Breach of Implied Duty to Perform with Reasonable Care |
| | 6.  Breach of Implied Covenant of Good Faith and Fair Dealing |
| | 7.  Accounting |
| | **DEMAND FOR JURY TRIAL** |

Plaintiffs Noirefy, Inc.; Synergy RX PBM LLC; and TopDevz, LLC, individually and on behalf of all others similarly situated, bring this Consolidated Class Action Complaint and Demand for Jury Trial against Defendant LinkedIn Corp.  Plaintiffs allege the following upon personal knowledge as to their own acts and experiences, and as to all other matters upon information and belief, including investigation conducted by their attorneys.

## NATURE OF THE COMPLAINT

1.      LinkedIn operates an online platform that allows individuals to develop, maintain, and expand their professional networks.  One of LinkedIn's major sources of revenue is charging advertisers for the opportunity to display advertisements to users on its platform.  Most LinkedIn advertisers are small businesses.

2.      Like most digital advertising platforms, LinkedIn advertisements are sold through online auctions.  When determining how much to bid on a campaign, LinkedIn advertisers base spending decisions on the quality of the audience and that audience's level of engagement with the advertisements.  Advertisers are willing to pay higher prices for a higher level of engagement by a higher quality audience.

3.      LinkedIn does not provide advertisers with access to raw data to determine which users viewed their ads, their level of engagement, or whether the users are real humans or automated bots.  As such, when deciding how much to bid or whether and how much to spend on future campaigns, LinkedIn advertisers rely completely on LinkedIn to accurately report audience composition and engagement metrics.

4.      Abusing that position of trust, LinkedIn has allowed rampant invalid activity on its platform, which has resulted in LinkedIn continually reporting audience and engagement metrics that it knew or should have known were highly inflated.  Those exaggerated metrics, in turn, have inflated the price of LinkedIn advertising for years, to LinkedIn's benefit and to advertisers' detriment.

5.      LinkedIn's inflated metrics and pricing were caused by its own misconduct.  For example, LinkedIn recently admitted that, for more than two years, it overstated the amount of time

users spend watching paid video advertisements, the overall number of video "views," and the number of times certain advertisements appear in front of a LinkedIn user.

6.      Had LinkedIn employed reasonable auditing and verification systems, like other social-media platforms have for years, the overstated metrics could have been quickly detected before they inflated ad pricing.

7.      But the problems with LinkedIn's ad metrics are far broader than the measurement errors that overstated video views and impressions, which only affected a portion of the advertising on LinkedIn.  LinkedIn also routinely counts views of advertising (known as "impressions") and interactions with advertising ("clicks") that LinkedIn knows or should know are generated by fake accounts and automated "bots" rather than actual users, in addition to other instances of non-genuine engagement with ads placed on LinkedIn such as obviously accidental misclicks.  And LinkedIn reports these impressions and clicks as legitimate even though LinkedIn can tell and should know that these interactions are invalid.

8.      LinkedIn overstated ad metrics at every stage of the advertising process, including when advertisers placed their bids and when they viewed the performance of active campaigns.  LinkedIn's inflated metrics induced advertisers into contracting to place ads on LinkedIn's platform, contracts those advertisers would not have entered into at the prices charged had LinkedIn accurately reported its ad metrics.

9.      LinkedIn's dissemination of inaccurate metrics to its advertisers violates California's prohibition on unlawful, unfair, and fraudulent business practices; constitutes common-law fraudulent misrepresentation and concealment, and negligent misrepresentation; breaches the implied covenants and duties accompanying LinkedIn's advertising contracts; and calls for an accounting.

10.      LinkedIn's misconduct has allowed it to systematically inflate the price of advertising on its platform, to its benefit and its advertisers' substantial detriment.  LinkedIn collected premium prices because it markets itself as an online network that delivers ads to high quality professional audiences.  Advertisers reasonably expected that LinkedIn would accurately convey the composition and engagement of that premium audience.  LinkedIn would not have been

able to collect, and Plaintiffs and Class members would not have paid, the same premium prices for LinkedIn advertising if LinkedIn had not disseminated inflated metrics.

11.     Given LinkedIn's conceded position as the leading online network for business professionals, LinkedIn's systemically inflated ad metrics and inflated advertising costs have broad impact on the public.  Without accurate ad metrics, businesses cannot decide how much to pay for ads or assess their return on ad spending, which inhibits those businesses from making informed advertising decisions.  Paying inflated advertising costs on LinkedIn also leaves advertisers with less money to spend on other aspects of their businesses, including the content and quality of their ads (which diminishes LinkedIn users' experience on the platform), and their product and service offerings, which diminishes overall consumer welfare.

12.     Plaintiffs have suffered substantial economic injury as a result of LinkedIn's violations of law.  This action seeks recovery for advertisers' monetary losses and appropriate equitable relief to remedy LinkedIn's unlawful conduct.

## PARTIES

### A. Defendant

13.     LinkedIn is a Delaware corporation headquartered at 1000 W. Maude, Sunnyvale, CA 94085.

14.     LinkedIn's social network focuses on professional connections.  It claims it has over 740 million members in more than 200 countries and territories worldwide, including executives from every Fortune 500 company.

15.     LinkedIn itself has over 10,000 employees and offices worldwide.

### B. Plaintiffs

16.     TopDevz is a California limited liability company headquartered in Sacramento, California.

17.     Noirefy is a Delaware corporation headquartered in Chicago, Illinois.

18.     Synergy is a Delaware limited liability company headquartered in Valley Stream, New York.

1

**JURISDICTION, VENUE, AND CHOICE OF LAW**

2      19.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act

3  of 2005, 28 U.S.C. § 1332(d)(2), because Plaintiffs are pursuing a class action under Rule 23 of the

4  Federal Rules of Civil Procedure that includes claims asserted on behalf of a nationwide class

5  including citizens from states other than California.  The Class includes hundreds of thousands of

6  members and the amount in controversy exceeds $5 million.

7      20.     This Court has personal jurisdiction over LinkedIn because the company is

8  headquartered in California.  LinkedIn also conducted substantial business from which the claims

9  in this case arise in California and has agreed to personal jurisdiction in this Court.

10      21.     Venue is appropriate under 28 U.S.C. § 1391 because LinkedIn is headquartered in

11  this judicial district, LinkedIn has engaged in substantial business within this district that gives rise

12  to the claims in this case, and the parties have agreed by contract to venue in this district.

13      22.     LinkedIn's form contract with all advertisers, the "LinkedIn Ads Agreement,"

14  provides that it "is governed by the laws of the State of California, and any action or proceeding

15  (including those arising from non-contractual disputes or claims) related to this Ads Agreement

16  will be brought in a federal court in the Northern District of California."[1]

17

**INTRADISTRICT ASSIGNMENT**

18      23.     This action is properly assigned to the San Jose Division of this District under Civil

19  Local Rule 3-2(c) and (e), because LinkedIn is headquartered, and a substantial part of the events

20  that give rise to the claim occurred, in Santa Clara County, which is served by the San Jose Division.

21

**BACKGROUND**

22  **A.  LinkedIn Ad Campaigns**

23      24.     LinkedIn claims to be the world's largest online professional network and was

24  purchased by Microsoft Corporation in 2016 for $26 billion.  LinkedIn's platform aggregates the

25  profile information of well over half a billion professionals, their interrelationships, their posts, and

26

27

28  [1] *LinkedIn Ads Agreement*, at § 9, LinkedIn (July 16, 2020), https://www.linkedin.com/legal/sas-terms, attached as Exhibit C.

their cross-endorsements.  LinkedIn's User Agreement states that the purpose of its service is to "promote economic opportunity" and to provide a place for professionals "to meet, exchange ideas, learn, and find opportunities."[2]

25.    One of LinkedIn's major sources of revenue is charging businesses to advertise on its platform.  Because LinkedIn claims to allow businesses to target their ads to engaged professionals, LinkedIn is able to charge a significant price premium over other social media platforms.

26.    LinkedIn tells digital advertisers that its hundreds of millions of professional users "are the decision makers, influencers, and leaders of today and tomorrow – the people you want to target, all in one place."[3]  LinkedIn claims that its users "are not just coming to LinkedIn in huge numbers; they're engaging with a huge purpose . . . specifically to connect to networks, brands, and opportunities by engaging with high-quality content across the LinkedIn platform." *Id.*

27.    LinkedIn likewise claims that it "is a platform enabling sophisticated marketers to forge relationships with these professionals," making it "the go-to content publishing platform for marketers." *Id.* at 4.  LinkedIn claims that advertisers have the ability to "reach a quality audience in a professional context." *Id.* (emphasis in original).  The message to advertisers is explicit: LinkedIn's platform allows advertisers to target high-quality, highly engaged, professional audiences.

28.    Most LinkedIn advertisers are small businesses.  These advertisers have been willing to pay high advertising prices due to the ability to target high-quality, highly engaged, professional audiences.

---

[2] *LinkedIn User Agreement*, LinkedIn (Aug. 11, 2020), https://www.linkedin.com/legal/user-agreement.
[3] LinkedIn Corp., *The Sophisticated Marketer's Guide to LinkedIn*, LinkedIn, 3 (2017), https://business.linkedin.com/content/dam/me/business/en-us/marketing-solutions/cx/2017/pdfs/Sophisticated-Marketers-Guide-to-LinkedIn-v03.12.pdf, attached as Exhibit A.

29.     As of October 2020, LinkedIn was projected to earn $1.70 billion in U.S. ad revenue in 2020.[4]  This is an increase from the $1.39 billion in U.S. ad revenue that the company earned in 2019.  In its most recent earnings release, Microsoft stated that LinkedIn's overall revenue had increased 23%.[5]

30.     Advertisers can place several types of paid ads on LinkedIn, including LinkedIn Sponsored Content, which allows advertisers to place ads directly into users' LinkedIn feeds.[6] LinkedIn users engage with Sponsored Content by scrolling through their feed and either reading, viewing, or clicking on those advertisements.

31.     Sponsored Content ads, like all other ads on LinkedIn's platform, are sold via what LinkedIn calls a "second-price auction."  In essence, a second-price auction is an auction in which the winning bidder pays $0.01 above the second highest bid in the auction.  Second-price auctions incentivize advertisers to bid the highest amount they are willing to pay to show an ad to members of a targeted audience, knowing that they will only end up paying $0.01 more than then second-price bid.

32.     In addition to Sponsored Content ads, other types of paid LinkedIn advertisements include Text Ads (which appear in a sidebar on the LinkedIn user interface as a basic text block with a headline, next to a company logo), Sponsored InMail (personalized direct messages sent to specific contacts), and Dynamic Ads (ads that allow advertisers to target specific audiences with personalized content).

**B.  LinkedIn Ad Metrics**

33.     LinkedIn tracks several metrics to assess users' interactions and engagement with advertisements on LinkedIn.  Those metrics include "impression," "views," and "clicks," and are sometimes referred to as "reach metrics."  An "impression" is an instance of an ad being displayed

---

[4] Jillian Ryan, *Microsoft Reports Strong Growth for LinkedIn and Cloud Platform Azure in Q3 2020*, Business Insider (Oct. 29, 2020), https://www.businessinsider.com/microsoft-shows-strong-growth-for-linkedin-azure-in-q3-2020-10.
[5] *Earnings Release FY21 Q2*, Microsoft (Jan. 26, 2021), https://www.microsoft.com/en-us/Investor/earnings/FY-2021-Q2/press-release-webcast.
[6] The LinkedIn feed allows users to scroll through a stream of content-containing posts of other LinkedIn users.  Some of those posts are paid advertisements, such as Sponsored Content.

to a user such that it could have been seen.  A "view" means that the video was actually viewed by the user.  And a "click" occurs when a user presented with an ad selects either the ad or the advertiser using a cursor (on desktop) or finger (on mobile).

34.   LinkedIn claims to count impressions only when an ad is displayed on a user's interface such that at least half of the ad is visible for a set period of time (one second on desktop; 300 milliseconds on mobile).  LinkedIn claims to count a view only when at least half a video ad is visible on a user's interface for two or more seconds,  not when a user merely scrolls past a video that continues to play off screen.

35.   LinkedIn advertisers use these ad metrics to "grade the success of" marketing campaigns, which in turn allow advertisers to determine what kinds of ads to purchase, and how much to pay for them.[7]

36.   LinkedIn claims that its ad metrics enable advertisers purchasing Sponsored Content and other types of ads to "track how well [their] posts hit the mark and fine-tune [their] strategy instantly."[8]

37.   LinkedIn's ad metrics also enable advertisers to track and understand data that directly affect their return on ad spend, and that directly impact the amount of money that advertisers are willing to pay LinkedIn for ad campaigns.[9]  LinkedIn claims to give advertisers "clear visibility into [their] programs' impact throughout the purchase process."[10]

**C. Purchasing LinkedIn Advertising**

38.   To run an advertising campaign on LinkedIn, an advertiser creates a LinkedIn Campaign Manager account and agrees to LinkedIn's Ads Agreement.

39.   After setting up an account, advertisers can begin purchasing ad campaigns through their Campaign Manager.

---

[7] Exhibit A, *supra*, at 5.
[8] *Id.* at 26.
[9] *Id.* at 36, 38.
[10] *Id.* at 38.

40.     To launch campaigns, advertisers begin by selecting campaign objectives. These objectives include brand awareness, website visits, engagement, video views, lead generation, website conversions, and job applicants. The campaign objective selected determines the metrics available for bidding. These metrics drive advertisers' budget, bidding, and purchasing decisions throughout the process of launching a campaign.

41.     For example, an advertiser looking to increase brand awareness will base their budget, bidding, and purchasing decisions on cost-per-impression ("CPM") metrics because impressions are tied to the potential for the ad campaign to increase awareness of the product or service.

42.     For campaigns tied to user engagement, advertisers base their budget, bidding, and purchasing decisions on metrics like cost-per-click ("CPC") metrics because clicks indicate how much online traffic is being driven to a particular product page or website.

43.     Advertisers creating video campaigns can base their budget, bidding, and purchasing decision on several metrics, such as CPM or cost-per-view ("CPV"), depending on whether the advertiser is seeking to maximize the number of videos presented to users or the users' engagement with the video content through more extended viewing of the video.

44.     When advertisers move their cursors over different objectives, LinkedIn represents that advertisers' purchased ads will be shown to people most likely to help advertisers achieve their selected objective. For example, when an advertiser selects the campaign objective "engagement," LinkedIn represents that the campaign will be shown to the people most likely to engage with the ad or follow the advertiser's company. Similarly, when an advertiser selects the objective "video views," LinkedIn represents that the campaign will be shown to people most likely to view the Advertiser's videos.

45.     After selecting a campaign objective, advertisers define a target audience for their ads, and then set their campaign budget, schedule, and bidding methods. Advertisers can choose between automated and manual bidding methods. As part of the interface used by advertisers to set their budget, schedule and bidding parameters, LinkedIn displays a box called "Forecasted

Results" that estimates the results an advertiser can expect in terms impressions, video views, and/or clicks.

46.    LinkedIn states that the Forecasted Results are generated using a simulated auction based on an advertiser's selections, and "similar campaigns and advertisers."  As such, if the metrics in LinkedIn's system are inflated, it directly impacts the estimates that LinkedIn displays to advertisers at the moment when they are setting their bids.

47.    The default bidding method is automated bidding, which allows LinkedIn to bid on behalf of the advertiser.  If an advertiser selects manual bidding, LinkedIn recommends specific amounts for advertisers to bid based on the key ad metrics associated with the advertiser's campaign objective.  LinkedIn rejects advertisers' manual bids that it determines to be too low.

48.    After completing all required fields, an advertiser can purchase and launch a campaign.  LinkedIn includes a link to the Ads Agreement at the point of purchase for every campaign.

49.    After a campaign launches, LinkedIn charges an advertiser each time the metric the advertiser selected is satisfied (i.e., an impression, video view, or click).  Advertisers can view the results of their campaigns in real-time in Campaign Manager, which displays the number of impressions, video views, and/or clicks, as well as derived metrics such as "video view rates" (i.e., the number of video views divided by the number of impressions).

50.    Under the LinkedIn Ads agreement, every advertiser "agree[s] to pay on the basis and at the rate shown when a campaign, order or other purchase was submitted through your account ('Rate'), e.g., price per impression, click, other conversion, lead or period, whether with a fixed or automatically optimized bid, whether with daily budget, lifetime pacing, or other budget options."[11]

51.    Thus, every ad purchase is necessarily accompanied by an explicit representation by LinkedIn, which forms the basis of the transaction, that the prices charged for advertisement are calculated based on LinkedIn's ad metrics.

---

[11] Exhibit C, *supra*, at 3.

### D. Advertisers Depend on Metrics from LinkedIn

52. After an advertiser purchases an ad campaign through their Campaign Manager, LinkedIn is responsible for calculating the amount of the advertiser's budget that is spent on the campaign as it progresses and when it is completed. LinkedIn calculates ad metrics about expected, ongoing, and completed performance of ad campaigns based on the Rate that an advertiser selected when purchasing the campaign. Advertisers view these metrics on their Campaign Manager account when placing bids for paid advertisements on LinkedIn.

53. In deciding whether to buy advertisements and how much to pay for them, advertisers have no choice but to rely on the metrics reported in Campaign Manager, since LinkedIn does not provide advertisers with access to the raw data underlying those reports.

54. Advertisers rely on ad metrics at every stage of the advertising process, and those metrics dictate their advertising activities and decisions.

55. Advertisers rely on ad metrics before launching a campaign. Throughout the process of setting up a campaign, LinkedIn displays forecasted campaign results, which include the target audience size, forecasted spend, and forecasted key campaign metrics. For example, when an advertiser is setting up a campaign to maximize video views, LinkedIn displays forecasted video view metrics, along with other reach metrics, such as impressions and view-through rate. Advertisers rely on these forecasted results while making decisions about how to set up their campaigns, how to bid, and how much to bid.

56. Advertisers also necessarily rely on LinkedIn's representations regarding metrics and audience composition when agreeing to pay a Rate for a campaign. As a result, for every purchase, advertisers rely on LinkedIn to accurately calculate the ad metrics underlying the Rate they agreed to pay. For example, an advertiser that agrees to pay on a cost-per-click basis for an ad campaign relies on the accuracy of LinkedIn's click metrics, which directly impact the amount that the advertiser will pay for that ad campaign and the number of clicks that an advertiser expects to receive. The same is true for all other Rates that advertisers agree to pay.

57. Put differently, every time a LinkedIn advertiser agrees to a Rate for a campaign, they rely on LinkedIn's representation that the underlying metric is real. That is, that impressions

are impressions before actual LinkedIn users, that clicks are real clicks and not bot activity or accidental, that views are real views, and the like.

58.    Advertisers also rely on ad metrics after purchasing campaigns.  After advertisers launch campaigns, the metrics associated with the campaigns are displayed on the home pages of the advertisers' campaign manager account, meaning that advertisers observe these metrics every time they access their accounts.

59.    Advertisers rely on the accuracy of these metrics when monitoring the ongoing performance of an ad campaign and determining whether to make adjustments to the campaign.

60.    And advertisers rely on the accuracy of ad metrics when evaluating the performance of a completed ad campaign and deciding whether and how to purchase future ad campaigns, and deciding whether to continue advertising on LinkedIn at all.

**E.  LinkedIn's Inflated Metrics Inflate Prices**

61.    It is self-evident that inflated metrics will inflate the prices.  Advertisers are willing to pay more for advertisements on a platform that receive a higher rate and higher quality of impressions from a higher quality audience—i.e., an audience actually composed of real human users who are members of the group that the advertiser is trying to reach—and higher engagement from that audience.  Advertisers are less willing to pay for advertisements that receive impressions from a lower quality audience with lower engagement rates.

62.    Advertisers also pay more for advertisements that are part of a higher quality "ad inventory."  That is, in addition to preferring ads that are displayed to the correct audience, advertisers care about how well a platform's ad placement and service draws the attention of users and produces a desired action.

63.    Although LinkedIn touts its ad-metric transparency when inducing advertisers to sign up and purchase ad space on its platform, LinkedIn does not disclose the data underlying its metrics.  Nor, until recently, did LinkedIn allow outside auditors to review its processes and data, contrary to standard industry practices.

64.     Since at least early 2017, LinkedIn's largest competitors have retained an independent auditor, the Media Ratings Council (MRC), to validate their metrics.[12]  LinkedIn, by contrast, chose to self-audit for years, a practice akin to "grading its own homework."[13]  When LinkedIn finally retained outside auditors, it came only "after years of advertisers demanding more transparency and third-party auditing of the metrics provided by social-media giants."[14]

65.     LinkedIn's failure to adequately evaluate its ad metrics for systemic errors is contrary to reasonable practices for digital advertising platforms, as evidenced by LinkedIn's admission that it has misstated certain ad metrics for *years* and covered up those errors for some time after discovering them.

66.     LinkedIn's broader problems with non-human and non-genuine engagement were covered up and only exposed after sophisticated researchers discovered LinkedIn's deceit.

**F.  LinkedIn's Inflated Advertisement Metrics**

67.     LinkedIn has systematically inflated ad metrics in its favor, which has enabled it to overstate the quality of its audiences, the quality of its ad inventory, and the engagement from its audiences.  That, in turn, has allowed LinkedIn to collect inflated prices from advertisers.

---

[12] Jessica Goodfellow, *Facebook agrees to be audited by Media Rating Council following misreporting scandal*, The Drum (Feb. 10, 2017) https://www.thedrum.com/news/2017/02/10/facebook-agrees-be-audited-media-rating-council-following-misreporting-scandal; Ronan Shields, *Google bows to third-party verification demands with YouTube now open to Media Ratings Council audit*, The Drum (Feb. 21, 2017), https://www.thedrum.com/news/2017/02/21/google-bows-third-party-verification-demands-with-youtube-now-open-media-ratings

[13] Suzanne Vranica and Jack Marshall, *Facebook Overestimated Key Video Metric for Two Years*, Wall Street Journal (Sept. 22, 2016) (quoting Keith Weed, chief marketing officer of Unilever that "tech companies that don't let third parties measure their platforms is equivalent to 'letting them mark their own homework'."), https://www.wsj.com/articles/facebook-overestimated-key-video-metric-for-two-years-1474586951; John Herrman and Sapna Maheshwari, *Facebook Apologizes for Overstating Video Metrics*, New York Times (Sept. 23, 2016) (quoting Omnicom that "third-party verification is a fundamental requirement. Publishers should not 'grade their own homework'."),https://www.nytimes.com/2016/09/24/business/media/facebook-apologizes-for-overstating-video-metrics.html

[14] Sahil Patel, *LinkedIn Finds Measurement Errors That Inflated Video and Ad Metrics*, Wall Street Journal (Nov. 12, 2020), https://www.wsj.com/articles/linkedin-finds-measurement-errors-that-inflated-video-and-ad-metrics-11605228577

68.     For instance, LinkedIn tracked user engagement with video advertisements in the LinkedIn mobile app.  One video metric was video "views," where a user watches a video for some time on the LinkedIn feed.  Another was video "view-throughs," where a user watches a video on their LinkedIn feed from start to finish.  Both of these video metrics directly affect the price advertisers will be charged for placing a video ad on LinkedIn.

69.     Because advertisers cannot access raw data in LinkedIn's closed ecosystem, advertisers are forced to rely on LinkedIn's statements about when videos are viewed, for how long, and whether those views are legitimate.

70.     LinkedIn recently admitted that its video ad metrics were inflated, which inflated the prices charged to video advertisers.[15]  LinkedIn has admitted that it counted video views from a user's LinkedIn app even when the user merely scrolled past the video and the video was only playing off screen.  In other words, advertisers were charged for a video "view" even when the user was not actually looking at the ad's content.  The off-screen views also inflated the "view-through rates" calculated by LinkedIn.

71.     LinkedIn has admitted that video ad metrics were inflated for more than two years, with over 418,000 advertisers overcharged as a result.[16]

72.     Compounding its misconduct, LinkedIn discovered its video metric inflation in August 2020, three months before disclosing it.  Had LinkedIn used reasonable, industry-standard auditing and anti-fraud measures, it would have detected the inflation years earlier.

73.     Instead of investing in the infrastructure required to ensure ad-metric accuracy years earlier in line with industry practice, LinkedIn waited until November 2020 to announce that it retained the Media Rating Council to "audit" its metrics.  LinkedIn's sub-standard practices and

---

[15] Sahil Patel, *LinkedIn Finds Measurement Errors That Inflated Video and Ad Metrics*, Wall St. J. (Nov. 12, 2020), https://www.wsj.com/articles/linkedin-finds-measurement-errors-that-inflated-video-and-ad-metrics-11605228577.

[16] Gyanda Sachdeva, *We discovered two measurement issues. Here's how we're making it right*, LinkedIn Marketing Solutions Blog (Nov. 12, 2020), https://business.linkedin.com/marketing-solutions/blog/linkedin-news/2020/how-we-re-working-to-improve.

failure to "invest in improvements to [its] processes and systems" much earlier caused harm to all advertisers placing ads on its platform.

74.     Video advertisers had no reason to know that LinkedIn would charge them for "views" or "view-throughs" where users merely scroll past a video to view other content while the video ad only plays in the background.  These errors violated LinkedIn's own viewability standards which represent that LinkedIn only charges an advertiser for a "video view" for two or more continuous seconds of playback with at least 50% of the video visible on the screen.

75.     Common usage would dictate that a video playing off screen has not been viewed or viewed through in any meaningful sense.  Industry practice likewise would not count off-screen play as a view or view-through.

76.     LinkedIn also overstated user impressions on sponsored-content ad campaigns. LinkedIn's inflated metrics increased prices across the board for impression-based advertisements. In other words, LinkedIn systematically inflated the data that determines CPM-based pricing in its own factor LinkedIn's favor, and to advertisers' detriment.

77.     Advertisers had no way to know that LinkedIn inflated video-engagement and sponsored-content metrics until November 12, 2020, when LinkedIn admitted as much.

78.     LinkedIn has known that its video metrics were inflated since at least August of 2020, and reasonably should have known this far earlier.  However, LinkedIn intentionally concealed its inaccurate statements about its metrics and continued to keep advertisers in the dark thereafter.

79.     LinkedIn has been intentionally collecting increased prices from advertisers who relied on its video and other metrics, and LinkedIn knew or should have known those metrics were inaccurate.

80.     If LinkedIn had disclosed that actual user engagement with video advertising and other sponsored ad content was lower than its metrics suggested, advertisers would not have been willing to buy ads at the prices that they paid and would have paid a lower price to advertise on LinkedIn or another platform.

81.     Nonetheless, LinkedIn charged advertisers inflated prices, spending those advertisers' contractually established ad budgets, and inducing them to purchase more ad campaigns in their Campaign Manager Accounts based on its misstated and erroneous video ad metrics.

82.     Advertisers did not get the benefit of their bargain due to LinkedIn's erroneous ad metrics, and they were defrauded into spending even more money on LinkedIn over time. LinkedIn's misconduct harmed and continue to harm advertisers and the public in violation of state policies prohibiting such dishonest conduct.

**G. LinkedIn's Undisclosed Metric Inflation**

83.     LinkedIn's metric-inflation problem goes far beyond what it disclosed on November 12, 2020.

84.     LinkedIn also inflates its metrics by reporting as legitimate widespread activity from fraudulent accounts, automated accounts, or accidental clicks.

85.     These inflated metrics have systematically allowed LinkedIn to collect a premium price from advertisers.

86.     LinkedIn's years of falsely reporting ad metrics at each stage of the advertising process induced advertisers to enter contracts and purchase ad campaigns on LinkedIn at higher prices than they otherwise would have been willing to pay.

87.     Advertisers were initially induced to contract with LinkedIn based on representations that they would pay for ad campaigns on the basis of an accurately calculated Rate reflecting genuine user engagement.  For each subsequent ad campaign, advertisers were induced to contract with LinkedIn based on inflated metrics relating to their prior ad campaigns.

88.     Because LinkedIn claims to offer an audience of authenticated professionals, LinkedIn is able to collect a premium price.

89.     In exchange for this substantial premium, advertisers expect to get more highly engaged leads from a more desirable audience than they would get on other digital marketing platforms.  Advertisers pay a higher price per click because LinkedIn claims to offer higher quality leads.

90.     LinkedIn is aware that many purported impressions, clicks, and other interactions with ad content on its platform are not attributable to actual engaged users.

91.     For example, LinkedIn is aware that there are numerous automated accounts (often referred to as "bots") and other fraudulent accounts (which can be operated by humans, but for fraudulent purposes) on its platform.  These fraudulent accounts and bots increase the amount of "inventory" on LinkedIn (i.e., the number of impressions available for advertisers) as well as the number of clicks and other interactions with ad content.  Some bots are also designed to take further action after clicking on an ad (e.g., submitting a subsequent form on the destination page).

92.     However, these impressions, clicks, and subsequent activity from fraudulent accounts and bots are worthless to advertisers.  LinkedIn is aware that these non-genuine interactions with ad content are worthless, but it fails to take adequate preventative measures as that would decrease its revenue.

93.     LinkedIn also knows that many users mistakenly click on ads, but then immediately leave the page after realizing their mistake.  LinkedIn knows that mistaken clicks and other unintentional interactions with ad content drive up LinkedIn's ad revenues, so it has intentionally looked the other way.

94.     Nevertheless, investigations and studies conducted by digital marketing experts have uncovered that LinkedIn counts all of the above as legitimate instances of user engagement. But for these studies bringing LinkedIn's wrongful conduct to light, LinkedIn would have had every incentive to continue allowing non-legitimate interactions with ad content on its platform to drive up what it could charge advertisers.

95.     LinkedIn's metrics include extensive traffic generated by fraudulent accounts, bot traffic, and unchecked misclicks, in excess of industry standards.[17]  These non-genuine and non-human interactions with ad content on LinkedIn systematically overstate the quality of engagement with advertising on LinkedIn and allow LinkedIn to collect an inflated price from advertisers.

---

[17] RMG, *Why Your LinkedIn Marketing Campaign Isn't Working*, YouTube (Aug. 24, 2020), https://www.youtube.com/watch?v=jKuyxgWuiRM.

96.     Unlike some advertising platforms such as Google, which has a process for auditing non-human traffic and misclicks, LinkedIn has not allowed third party analysis of advertising on its platform.  It now claims to have begun to engage with media industry watchdogs and "invest in its improvements to [its] processes and systems" for calculating ad metrics, but only after systemically inflating its ad metrics and fees for years

97.     For years, LinkedIn has known or been recklessly indifferent to fraudulent accounts and misclicks overstating the quality of the audience, ad inventory, and audience engagement on its platform.  LinkedIn's refusal or failure to correct those misstatements  in turn allow it to collect a higher price from advertisers.

98.     Unlike its competitors, LinkedIn does not provide an adequate or transparent process for obtaining billing adjustments due to invalid activity.  Small businesses have been denied refunds as LinkedIn's sole discretion even when presented with evidence of invalid activity.

99.     Users paying premium prices for LinkedIn ads do not reasonably expect to be charged for ads that were engaged with by fraudulent accounts, automated accounts, user mistakes, or fault measurement.  Indeed, LinkedIn claims that the use of bots or other automated fraudulent methods to access the platform is a violation of LinkedIn's User Agreement.

100.    Plaintiffs and the Class members were unaware, and could not reasonably have been aware until only recently, that fraudulent accounts, non-human users, and accidental misclicks were causing them to pay more for advertising campaigns on LinkedIn than they bargained for.  Further, advertisers generally have no way of knowing the amount of fraudulent traffic or misclicks they are paying for, in part because LinkedIn does not provide data confirming the legitimacy of the engagement to advertisers.

101.    LinkedIn's inflated metrics were material to advertisers, as the metrics determine how much advertisers will pay for LinkedIn advertising campaigns.  Absent these inflated metrics, LinkedIn would not have been able to charge the same premium prices for its advertising, and each Plaintiff and Class Member would have paid less money to LinkedIn for its ad inventory as a result.

1

**PLAINTIFF-SPECIFIC ALLEGATIONS**

2    **A.  TopDevz**

3        102.    TopDevz is a small-business team of software developers, designers, project

4    managers, and quality assurance testers that develops custom software solutions for sophisticated

5    businesses.

6        103.    Over four years, TopDevz used LinkedIn to advertise its services to potential clients

7    using a variety of LinkedIn's advertising methods, including Sponsored Content advertisements

8    and videos.  Like all advertisers, TopDevz agreed at the outset of every ad campaign to pay

9    LinkedIn an agreed-upon Rate calculated based on LinkedIn's ad metrics.

10       104.    Every time TopDevz established and bid on an ad campaign, TopDevz viewed and

11   relied on LinkedIn's forecasted ad metrics in doing so.  After launching its campaigns, TopDevz

12   viewed and relied on the ad metrics associated with its campaigns in its campaign manager account.

13       105.    When TopDevz purchased LinkedIn ads, it did so in reliance on the metrics

14   presented being substantially accurate, and that the activity underlying the metrics—views,

15   impressions, clicks, etc.—was legitimate and not exaggerated.

16       106.    LinkedIn has admitted to TopDevz that it "may have over-reported some []

17   Sponsored Content metrics for impression and video views."[18]

18       107.    When purchasing LinkedIn Ads, TopDevz did not know and had no reason to know

19   that LinkedIn's ad metrics were inflated.

20       108.    TopDevz reasonably relied on LinkedIn's representations about its ad metrics

21   through the advertising process, and would not have paid the premium prices it was paying had it

22   known that LinkedIn's advertising metrics were inflated.

23       109.    LinkedIn's misrepresented ad metrics prevented TopDevz from accurately

24   evaluating the success of its ad campaigns and making informed business decisions about its digital

25   advertising strategy.

26

27   _____

28   [18] *See* LinkedIn, *Transactional Email Message to Ashkan Rajaee (CEO of TopDevz)*, attached as
     Exhibit B.

110.    By paying inflated prices for advertisements, TopDevz had less money to spend on other aspects of its business.

111.    After learning about LinkedIn's metrics inflation, TopDevz reduced its LinkedIn advertising. TopDevz would like to purchase more LinkedIn ads in the future based upon accurate metrics and with industry-standard auditing and anti-fraud measures in place.

**B. Noirefy**

112.    Noirefy is a diversity recruiting startup that connects underrepresented professionals with career opportunities at high growth companies.

113.    For six months in 2020, Noirefy used LinkedIn to advertise its services to both potential candidates and hiring entities using a variety of LinkedIn's advertising methods, including Sponsored Content advertisements.  Like all advertisers, Noirefy agreed at the outset of every ad campaign to pay LinkedIn a Rate calculated based on LinkedIn's ad metrics.

114.    Every time Noirefy established and bid on an ad campaign, Noirefy viewed and relied on LinkedIn's forecasted ad metrics in doing so.  After launching its campaigns, Noirefy viewed and relied on the ad metrics associated with its campaigns in its campaign manager account.

115.    When Noirefy purchased LinkedIn ads, it did so in reliance on the metrics presented being substantially accurate, and that the activity underlying the metrics—views, impressions, clicks, etc.—was legitimate and not exaggerated.

116.    LinkedIn has admitted to Noirefy that it "may have over-reported some [] Sponsored Content metrics for impression and video views."[19]

117.    When purchasing LinkedIn ads, Noirefy did not know and had no reason to know that LinkedIn's metrics regarding the efficacy of its advertising services were inflated.

118.    Noirefy reasonably relied on LinkedIn's representations about its ad metrics through the advertising process, and would not have paid the premium prices it was paying had it known that LinkedIn's advertising metrics were inflated.

---

[19] *See* LinkedIn, *Transactional Email Message to Shaniqua Davis (Noirefy CEO)*, attached as Exhibit D.

119.    LinkedIn's misrepresented ad metrics prevented Noirefy from accurately evaluating the success of its ad campaigns and making informed business decisions about its digital advertising strategy.

120.    By paying inflated prices for advertisements on LinkedIn, Noirefy had less money to spend on other aspects of its business, which directly impacted its ability to achieve its mission of connecting underrepresented professionals with career opportunities.

121.    Noirefy has stopped purchasing ads on LinkedIn.  Noirefy would like to purchase LinkedIn ads in the future, based upon accurate metrics and with industry-standard auditing and anti-fraud measures in place.

**C.  Synergy**

122.    Synergy is an SMB offering technology solutions to skilled-nursing and long-term care facilities to help them reduce their pharmacy spend.

123.    Beginning in April 2019, Synergy purchased LinkedIn ads, including video ads, to advertise its services.  Like all advertisers, Synergy agreed at the outset of every ad campaign to pay LinkedIn a Rate calculated based on LinkedIn's ad metrics.

124.    Synergy viewed and relied on LinkedIn's forecasted ad metrics when making decisions about how to set up its ad campaigns.  After launching its campaigns, Synergy viewed and relied on the ad metrics associated with its campaigns in its campaign manager account.

125.    When Synergy purchased LinkedIn ads, it did so in reliance on the metrics presented being substantially accurate, and that the activity underlying the metrics—views, impressions, clicks, etc.—was legitimate and not exaggerated.

126.    When purchasing LinkedIn Ads, Synergy did not know and had no reason to know that LinkedIn's ad metrics were inflated.

127.    Synergy reasonably relied on LinkedIn's representations about its ad metrics through the advertising process, and would not have paid the premium prices it was paying had it known that LinkedIn's advertising metrics were inflated.

128.     LinkedIn's misrepresented ad metrics prevented Synergy from accurately evaluating the success of its ad campaigns and making informed business decisions about its digital advertising strategy.

129.     By paying inflated prices for advertisements, Synergy had less money to spend on other aspects of its business.

130.     Because Synergy continues to advertise on LinkedIn, it faces an actual threat of future harm of being further exposed to inflated metrics on LinkedIn.

## CLASS-ACTION ALLEGATIONS

131.     Plaintiffs re-allege and incorporate by reference herein all the allegations contained above.

132.     Pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3), Plaintiffs assert claims on behalf of the following Class: "All persons or entities who paid for the placement of advertisements on LinkedIn's platform up to the date of the filing of this action."  Excluded from the Class are Defendant, any entity in which Defendant or its corporate parent Microsoft have a controlling interest, and Defendant's officers, directors, legal representatives, successors, and assigns.  Also excluded from the Class are any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

133.     Plaintiffs reserve the right to amend the Class definition if discovery and further investigation reveal that the Class should be expanded, divided into subclasses, or modified in any other way.

134.     Although the precise number of Class members is unknown and can only be determined through appropriate discovery, the proposed Class numbers at least in the hundreds of thousands and is therefore so numerous that joinder of all members would be impracticable.

135.     Questions of law and fact common to the putative Class predominate over questions affecting only individual members. Those common questions include:

a.     Whether LinkedIn intentionally made material misrepresentations abouts advertising on its platform, including misrepresenting the number of "views" and "view-throughs" and "impressions" of such ads;

b.   Whether LinkedIn intentionally made material misrepresentations about user engagement with advertisements on its platforms, including with injunctive to the number of fraudulent accounts and misclicks that it knew were occurring on its platform;

c.   Whether LinkedIn's use of inaccurate, unaudited, and unverified ad metrics was likely to deceive members of the public and thus constituted a fraudulent business practice under California's Unfair Competition Law (Cal. Bus. & Prof. Code § 17200);

d.   Whether LinkedIn's failure to properly audit and verify its ad metrics was unethical, unscrupulous, or substantially injurious to ad purchasers and thus constituted an unfair business practice under California's Unfair Competition Law;

e.   Whether LinkedIn negligently misrepresented its advertising metrics;

f.   Whether LinkedIn breached its contractual duty to perform competently and with reasonable care when it reported erroneous ad metrics and failed to adequately audit and verify those metrics;

g.   Whether LinkedIn breached the implied covenant of good faith and fair dealing when it reported erroneous ad metrics and failed to adequately audit and verify those metrics; and, in the alternative to the questions above;

h.   Whether LinkedIn owes the Class an accounting.

136.   Plaintiffs are members of the putative Class.  The claims asserted by the Plaintiffs in this action are typical of the claims of the members of the putative Class, as the claims arise from the same course of conduct by the Defendant and the relief sought is common.

137.   Plaintiffs will fairly and adequately represent and protect the interests of the members of the putative Class, as their interests are coincident with, not antagonistic to, the other members of the Class.

138.   Plaintiffs have retained counsel competent and experienced in both unfair competition claims and class action litigation.

139.    Certification of the Class is appropriate pursuant to Fed. R. Civ. P. 23(b)(3) because questions of law or fact common to the respective members of the Class predominate over questions of law or fact affecting only individual members.   This predominance makes class litigation superior to any other method available for the fair and efficient adjudication of these claims including consistency of adjudications.   Absent a class action it would be unlikely that many members of the Class would be able to protect their own interests because the cost of litigation through individual lawsuits might exceed the expected recovery.

140.    A class action is a superior method for the adjudication of the controversy in that it will permit a large number of claims to be resolved in a single forum simultaneously, efficiently, and without the unnecessary hardship that would result from the prosecution of numerous individual actions and the duplication of discovery, effort, expense, and the burden of the courts that individual actions would create.

141.    In the alternative, the Class should be certified under Rule 23(b)(2) because LinkedIn has acted or refused to act on grounds generally applicable to the proposed Class, thereby making appropriate final and injunctive relief with respect to the members of the proposed Class as a whole.

**FIRST CAUSE OF ACTION**
**(On behalf of the Class)**
**CALIFORNIA UNFAIR COMPETITION LAW,**
**CAL. BUS. & PROF. CODE §§ 17200, *et seq.***

142.    Plaintiffs re-allege and incorporate by reference herein all the allegations contained above.

143.    LinkedIn violated California's Unfair Competition Law (UCL), Cal. Bus. & Prof. Code §§ 17200 *et seq.*, by engaging in the unlawful, unfair, and fraudulent business acts and practices alleged previously, and as further specified below.

144.    LinkedIn's systemic dissemination of inflated user-engagement metrics is a false statement of purported fact.

145.    Reasonable purchasers of LinkedIn ads would have relied on LinkedIn's represented user-engagement metrics.  Because of LinkedIn's closed ecosystem and strict terms, Plaintiffs and the Class had no choice but to do so.

146.    LinkedIn's ad metrics conveyed to advertisers including Plaintiff and the Class during the ad-purchasing process were inflated as described above, and therefore false.

147.    LinkedIn's inflated ad metrics were likely to deceive reasonable purchasers, who had no reason to know of their falsity and no available means of verifying their accuracy.

148.    LinkedIn's inflated metrics duped Plaintiffs and the Class members into believing that their advertisements would and did receive greater engagement than they actually did.

149.    LinkedIn's inflated ad metrics, and advertisers' reliance on them, caused Plaintiffs and the Class members to pay higher prices for their LinkedIn advertising campaigns.

150.    LinkedIn's failure to ensure the accuracy of its advertising metrics, and its resulting dissemination of inflated ad metrics to Plaintiffs and the Class, was unethical, unscrupulous, and substantially injurious to the Class, and thus constitutes an unfair practice under the UCL.

151.    LinkedIn's conduct was also contrary to legislatively declared public policies that seek to protect consumers from misleading statements, as reflected by laws like the Federal Trade Commission Act (15 U.S.C. § 45), Consumers Legal Remedies Act (Cal. Civ. Code § 1770), and California False Advertising Law (Cal Bus. & Prof. Code § 17500).

152.    LinkedIn's failure to ensure the accuracy of its ad metrics is not essential to its business operations, is not authorized by law, and is inconsistent with industry practice.

153.    The harm LinkedIn caused to Plaintiffs and the Class members is substantial and outweighs their utility, if any, and is not a harm the Plaintiffs and the Class members could reasonably have avoided.

154.    LinkedIn's prohibition on advertisers communicating to third parties about LinkedIn's ad metrics and their effects on pricing, while simultaneously disseminating systemically inflated metrics, was also an unfair practice.  This prohibition enabled LinkedIn to cover up its misconduct for years and runs contrary to legislatively declared public policies against misrepresented and inaccurate pricing, and to industry practice.

155.     LinkedIn's billing practices were also unfair because LinkedIn calculated advertisers' payment Rate based on systemically inaccurate and inflated metrics, but its policies prevented advertisers from learning the truth about the Rates they were paying.

156.     Although LinkedIn required advertisers to "have fair billing practices and follow all applicable laws,"[20] LinkedIn's conduct demonstrated that this commitment was not a two-way street.

157.     LinkedIn's systemic breaches of its contracts with advertisers, including its breach of its breach the implied duty to perform with reasonable care and the implied covenant of good faith and fair dealing, also constitute an unlawful and unfair practice under the UCL.

158.     LinkedIn knew or reasonably should have known that its advertising metrics, were inaccurate and inflated.  The false metrics that LinkedIn allowed to persist for years were obvious errors that would have been discovered by a reasonable auditing and verification process.

159.     LinkedIn's failure to correct these inaccuracies unfairly allowed LinkedIn to claim that it was providing higher quality and more effective video-advertising services and marketing campaign services than it actually was.

160.     Plaintiffs have standing to bring these claims under the UCL because they lost money or property in their direct dealings with LinkedIn, including but not limited to money paid for LinkedIn advertisements, as a result of LinkedIn's fraudulent and unfair business practices.

161.     Pursuant to the terms of their form contracts with LinkedIn, Plaintiffs were obligated to pay LinkedIn a Rate based on ad metrics that that LinkedIn alone was permitted to verify.

162.     Plaintiffs would not have paid as much for video-advertising services and other advertising services if LinkedIn had not used inflated metrics.  They have thus suffered an economic injury that was caused by LinkedIn's violation of the UCL.

163.     LinkedIn's unlawful, fraudulent, and unfair business acts harm the public and the economy.   LinkedIn has prevented businesses from accurately assessing their advertising

---

[20] *See LinkedIn Advertising Policies*, LinkedIn (June 29, 2020), https://www.linkedin.com/legal/ads-policy [https://web.archive.org/web/20201110222916/https://www.linkedin.com/legal/ads-policy].

1   campaigns, making informed decisions about resource allocation, and achieving growth through

2   improved advertising campaign strategies.

3       164.   By charging inflated advertising costs, LinkedIn has also left advertisers with less

4   money to spend on other aspects of their businesses, including the content and quality of their ads,

5   which diminishes LinkedIn users' experience on the platform, and their product and service

6   offerings, which diminishes overall consumer welfare.

7       165.   LinkedIn's misconduct is especially harmful to small businesses, which allocate a

8   substantial portion of their budgets to marketing and advertising, and which comprise an outsized

9   percentage of LinkedIn's advertisers.

10      166.   Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiffs seek injunctive relief to

11  prevent the continued use of LinkedIn's unfair and fraudulent practices and restitution to restore to

12  the Class all money LinkedIn acquired by means of its fraudulent and unfair business practices.

### SECOND CAUSE OF ACTION
**(On behalf of the class)**
**FRAUDULENT MISREPRESENTATION**

15      167.   Plaintiffs re-allege and incorporate by reference herein all the allegations contained

16  above.

17      168.   LinkedIn falsely represented its ad metrics.   LinkedIn knew that it had been

18  systematically inflating ad metrics, yet it continued to collect inflated prices from advertisers based

19  on user engagement measures that it knew were incorrect.

20      169.   LinkedIn's metrics describing video "views," "view-throughs," and percentage

21  views did not actually represent user engagement with an advertisement because they included

22  playing of videos off the screen.   LinkedIn's CPM metrics also overstated the number of times

23  sponsored content ads appeared on user interfaces.

24      170.   LinkedIn also falsely represented the extent of other ad metrics, including user

25  "impressions" of and "clicks" on advertisements, even though many of those metrics reflected non-

26  human and non-genuine traffic or misclicks.   LinkedIn either knew that the ad metrics it

27  communicated to advertisers were wrong or LinkedIn made these representations recklessly and

28  without regard for their truth.

171.   LinkedIn intended that Plaintiffs and Class members rely on its advertising metrics.

172.   LinkedIn knew that these metrics were material to advertisers, as the metrics were a term of each advertising transaction.

173.   Plaintiffs and Class members viewed LinkedIn's misrepresented ad metrics on their Campaign Manager accounts.

174.   Plaintiffs and the Class members relied on LinkedIn's misrepresented ad metrics at every stage of the advertising process.

175.   Plaintiffs and the Class members relied on LinkedIn's inflated metrics when deciding whether they would initially contract to purchase advertising from LinkedIn.

176.   Plaintiffs and the Class members again relied on LinkedIn's inflated metrics when agreeing to pay Rates for advertising campaigns, which necessarily include metrics.

177.   Plaintiffs and the Class members further relied on LinkedIn's inflated metrics when deciding how much advertising to purchase from LinkedIn.

178.   Plaintiffs and the Class members relied on LinkedIn's inflated metrics yet again when evaluating the success of their ad campaigns, and when deciding whether to continue to purchase subsequent ad campaigns from LinkedIn.

179.   As a result of LinkedIn's misrepresentations, Plaintiffs and Class members were harmed: Plaintiffs and Class members paid more for advertising on LinkedIn than they otherwise would have paid.

180.   Because LinkedIn does not disclose the data underlying its ad metrics or allow advertisers to communicate with third parties about their ad metrics or pricing, Plaintiffs and class members are unable to identify which of their campaign metrics were misrepresented and by how much.

181.   Plaintiffs seek an award of compensatory and punitive damages.   LinkedIn's conduct as previously described constitutes oppression, fraud, or malice, and was authorized or ratified by LinkedIn's officers.

1

**THIRD CAUSE OF ACTION**
**(On behalf of the class)**
**FRAUDULENT CONCEALMENT**

2

3      182.    Plaintiffs re-allege and incorporate by reference herein all the allegations contained

4      above.

5      183.    LinkedIn falsely represented its ad metrics. LinkedIn knew that it had been

6      systematically inflating ad metrics, yet it continued to collect inflated prices from advertisers based

7      on user engagement measures that it knew were incorrect.

8      184.    LinkedIn's metrics describing video "views," "view-throughs," and percentage

9      views did not actually represent user engagement with an advertisement because they included

10     playing of videos off the screen.  LinkedIn's CPM metrics also overstated the number of times

11     sponsored content ads appeared on user interfaces.

12     185.    LinkedIn also falsely represented the extent of other ad metrics, including user

13     "impressions" and "clicks" on advertisements, even though many of those metrics reflected non-

14     human and non-genuine traffic or misclicks.  LinkedIn either knew that the ad metrics it

15     communicated to advertisers were wrong or LinkedIn made these representations recklessly and

16     without regard for their truth.

17     186.    LinkedIn concealed from Plaintiffs and the Class members that its advertising

18     metrics count bot activity, misclicks, and off-screen interactions.

19     187.    Because LinkedIn does not disclose the data underlying its ad metrics, specific

20     information about LinkedIn's inflated ad metrics was exclusively in LinkedIn's control.

21     188.    LinkedIn knew that its ad metrics were inflated and misleading, and it used these

22     false metrics to conceal the fact that its advertising platform is of a lower quality than its metrics

23     suggest.

24     189.    LinkedIn had a duty to disclose to Plaintiffs and Class members that its ad metrics

25     are inflated and misleading; that its platform includes numerous fake accounts; that bots and

26     misclicks drive up the impression and click metrics communicated to advertisers; and that it has

27

28

been calculating estimates and final advertising costs on the basis of these false metrics. LinkedIn had exclusive knowledge of these material facts and did not disclose them to advertisers.

190. Because of LinkedIn's omissions and concealment, Plaintiffs and Class members did not know when they purchased LinkedIn advertisements that the ad metrics were inflated and misleading; that fraudulent accounts and misclicks lower the quality of LinkedIn advertisements; or that advertisers were systematically overpaying for LinkedIn advertisements.

191. LinkedIn intentionally concealed that its metrics were inflated and misleading and that fraudulent accounts and misclicks lowered the quality of LinkedIn ads with the intention of defrauding Plaintiffs and Class members.

192. Had LinkedIn not concealed the truth regarding its ad metrics, Plaintiffs and the Class would have paid less for LinkedIn advertisements.

193. As a result of LinkedIn's concealment and omissions described in this complaint, Plaintiffs and Class members paid more for advertising on LinkedIn than they otherwise would have.

194. Plaintiffs seek an award of compensatory and punitive damages. LinkedIn's conduct as previously described constitutes oppression, fraud, or malice, and was authorized or ratified by LinkedIn's officers.

**FOURTH CAUSE OF ACTION**
**(On behalf of the class)**
**NEGLIGENT MISREPRESENTATION**
**In the Alternative to the Second Cause of Action**

195. Plaintiffs re-allege and incorporate by reference paragraphs 1 through 166 and 183 through 194 as if fully set forth herein.

196. LinkedIn falsely represented its ad metrics. LinkedIn should have known that it had been systematically inflating ad metrics, yet it continued to collect inflated prices from advertisers based on user engagement measures that it knew were incorrect.

197. LinkedIn's metrics describing video "views," "view-throughs," and percentage views did not actually represent user engagement with an advertisement because they included

playing of videos off the screen.  LinkedIn's CPM metrics also overstated the number of times sponsored content ads appeared on user interfaces.

198.    LinkedIn also falsely represented the extent of other ad metrics, including user "impressions" of and "clicks" on advertisements, even though many of those metrics reflected non-human and non-genuine traffic or misclicks.  LinkedIn should have known that the ad metrics it communicated to advertisers were wrong.

199.    LinkedIn intended that Plaintiffs and Class members rely on its advertising metrics.

200.    LinkedIn knew that these metrics were material to advertisers, as the metrics were a term of each advertising transaction.

201.    Plaintiffs and Class members viewed LinkedIn's misrepresented ad metrics on their Campaign Manager accounts.

202.    Plaintiffs and the Class members relied on LinkedIn's misrepresented ad metrics at every stage of the advertising process.

203.    Plaintiffs and the Class members relied on LinkedIn's inflated metrics when deciding whether they would initially contract to purchase advertising from LinkedIn.

204.    Plaintiffs and the Class members again relied on LinkedIn's inflated metrics when agreeing to pay Rates for advertising campaigns, which necessarily include metrics.

205.    Plaintiffs and the Class members further relied on LinkedIn's inflated metrics when deciding how much advertising to purchase from LinkedIn.

206.    Plaintiffs and the Class members relied on LinkedIn's inflated metrics yet again when evaluating the success of their ad campaigns, and when deciding whether to continue to purchase subsequent ad campaigns from LinkedIn.

207.    As a result of LinkedIn's misrepresentations, Plaintiffs and Class members were harmed: Plaintiffs and Class members paid more for advertising on LinkedIn than they otherwise would have paid.

208.    Because LinkedIn does not disclose the data underlying its ad metrics or allow advertisers to communicate with third parties about their ad metrics or pricing, Plaintiffs and class

1   members are unable to identify which of their campaign metrics were misrepresented and by how

2   much.

3       209.    As a result of LinkedIn's misrepresentations, Plaintiffs and Class members were

4   injured by paying more for advertisements on LinkedIn than they would have been willing to pay.

5   

**FIFTH CAUSE OF ACTION**
**(On behalf of the Class)**

6   **BREACH OF IMPLIED DUTY TO PERFORM WITH REASONABLE CARE**

7       210.    Plaintiffs re-allege and incorporate by reference herein all the allegations contained

8   above.

9       211.    Plaintiffs and Class members contracted with LinkedIn to place ad campaigns.

10       212.    To place ads on LinkedIn using their Campaign Manager account, Plaintiffs and the

11   Class members had to agree to the "LinkedIn Ads Agreement,"[21] LinkedIn's "User Agreement,"[22]

12   and "LinkedIn Advertising Policies,"[23] among others.

13       213.    The LinkedIn Ads agreement governs all ad purchases on LinkedIn's platform.

14       214.    When LinkedIn accepted Plaintiffs' and the Class members' ad-campaign bids, the

15   Ads Agreement obligated Plaintiffs and the Class to pay LinkedIn at the agreed-upon Rate.

16       215.    Plaintiffs and Class members met all or substantially all of their contractual

17   obligations, including submitting their advertising for LinkedIn's approval and paying for

18   LinkedIn's advertising services.

19       216.    LinkedIn has obligations to the Class based on LinkedIn's course of dealing and

20   course of performance with the class, industry practice, and from the LinkedIn Ads agreement.

21       217.    One of LinkedIn's obligations is to provide Plaintiffs and Class members with

22   accurate ad metrics.  This obligation is implied by LinkedIn's conduct when dealing with the Class,

23   including LinkedIn's monopoly over audience and user-engagement data, and over the verification

24   and delivery of ad metrics.

25

26   --------

27   [21] *See* Exhibit C.
[22] *User Agreement*, LinkedIn (Aug. 11, 2020), https://www.linkedin.com/legal/user-agreement.

28   [23] *Supra* note 20.

218.     LinkedIn's obligation to provide accurate metrics is also implied by industry practice, which dictates that the platform provider accurately tells the advertiser how each campaign performs, and that the provider screen for fraudulent activity when doing so.

219.     LinkedIn's obligation to provide accurate metrics also arises from the Ads Agreement.  Plaintiffs and the Class members were obligated to pay LinkedIn the agreed-upon Rate for ad campaigns.  Because the Rate necessarily includes a metric, LinkedIn was obligated to deliver that information accurately.

220.     Under California law, LinkedIn was required to perform its contractual obligations to accurately communicate and calculate ad metrics competently and with reasonable care. LinkedIn breached that duty by incorrectly measuring viewer engagement with the advertising it placed for Plaintiffs and Class members; by including inaccurate metrics in what it communicated to advertisers; and by systematically reporting inaccurate advertising-performance metrics to Plaintiffs and Class members.

221.     Had LinkedIn used reasonable care, it would have calculated advertising metrics correctly and it would not have used inflated metrics for years.

222.     As a result of LinkedIn's failure to provide its agreed advertising services competently and using reasonable care, Plaintiffs and Class members paid an inflated price for advertising and failed to receive the benefit of their bargain.  They are entitled to damages in an amount to be proven at trial.

## SIXTH CAUSE OF ACTION
### (On behalf of the class)
### BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

223.     Plaintiffs re-allege and incorporate by reference herein all the allegations contained above.

224.     Plaintiffs and Class members contracted with LinkedIn to provide them with advertising services when purchasing advertisements on their LinkedIn Campaign Manager account.

225.     These contracts were subject to implied covenants of good faith and fair dealing that all parties would act in good faith and with reasonable efforts to perform their contractual duties

(both explicit and fairly implied) and not to impair the rights of other parties to receive the rights, benefits, and reasonable expectations under the contracts.

226.    The contracts between LinkedIn and Plaintiffs  included the covenants that LinkedIn would act fairly and in good faith in carrying out its contractual obligations to provide Plaintiffs and Class members with accurate advertising metrics.

227.    LinkedIn breached these implied covenants of good faith and fair dealing by failing to provide Plaintiffs and Class members with accurate advertising metrics.  For example, LinkedIn ignored industry custom by failing to implement a process to ensure the accuracy of the metrics that it communicated to advertisers until November 2020.

228.    LinkedIn's calculation and communication of inaccurate or inflated ad metrics frustrated the entire purpose of the contract, which was for Plaintiffs and the Class members to engage with their intended, human audience.

229.    LinkedIn's calculation and communication of inflated ad metrics were accordingly breaches of the covenant of good faith and fair dealing on the part of LinkedIn in performing its contractual obligations.

230.    Plaintiffs and Class members met all or substantially all of their contractual obligations, including submitting their advertisements for approval and paying for LinkedIn's advertising services.

231.    LinkedIn's failure to act in good faith in providing accurate metrics denied Plaintiffs and Class members the full benefit of their bargain.  Plaintiffs and Class members received advertising services that were less valuable than what they paid for and less valuable than their reasonable expectations under their agreement with LinkedIn.  Plaintiffs and Class members were damaged by an amount at least equal to this overpayment.

232.    Accordingly, Plaintiffs have been injured as a result of LinkedIn's breach of the covenant of good faith and fair dealing and are entitled to damages and/or restitution in an amount to be proven at trial.

1

2

3

**SEVENTH CAUSE OF ACTION**
**(On behalf of the class)**
**ACCOUNTING**
**In the Alternative to the First through Sixth Causes of Action**

4      233.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 141 as if fully

5   set forth herein.

6      234.    LinkedIn and advertisers contracted when advertisers submitted winning auction

7   bids, obligating advertisers to pay LinkedIn money for ad placement on LinkedIn.

8      235.    LinkedIn has admitted that it miscalculated certain ad metrics, such as those related

9   to videos and impressions, for a period of years.  LinkedIn has also admitted that it knew about

10   these errors in at least August 2020, but it did not communicate them until November 2020.

11   Meanwhile, millions of bids for advertising space were submitted and accepted on LinkedIn.

12      236.    LinkedIn's admissions demonstrate that it owes money to Plaintiffs and Class

13   members as a result of inaccurate and inflated ad metrics based on impressions and views.

14      237.    LinkedIn has failed to provide the data needed for the Plaintiffs and Class members

15   to determine the nature and scope of the inflated metrics and the extent of economic loss that those

16   advertisers have suffered as a result of LinkedIn's communication and calculation of inaccurate

17   and inflated ad metrics.

18      238.    The data and information needed to calculate the harmed caused by LinkedIn and

19   the damages that Plaintiffs and Class members suffered remains exclusively within the control of

20   LinkedIn and has remained so at all relevant times.  LinkedIn harvests this data and information in

21   performing its end of the contract and prevents advertisers from communicating information about

22   ad metrics and pricing in its form contracts with advertisers.

23      239.    Given LinkedIn's communication and calculation of inaccurate and inflated ad

24   metrics for years, and in intentionally keeping advertisers in the dark about its failures for months,

25   LinkedIn must be held accountable and must compensate Plaintiffs and Class members for their

26   overcharges with appropriate oversight.

27

28

240.    LinkedIn's misstatements have forfeited its ability to dictate unilaterally who gets compensated, in what form, and how much they will get.  Plaintiffs and Class members are not required to accept payment on LinkedIn's terms and accepting LinkedIn's word as fact, as LinkedIn's conduct and performance in communicating and calculating ad metrics in an inaccurate and inflated manner demonstrates that LinkedIn is unreliable when it comes to calculating what advertisers owe and the value that they will receive from their ad spend.

241.    Accordingly, Plaintiffs and Class members seek, at a minimum, an order requiring LinkedIn to provide a full and complete accounting of all transactions and records relating to Plaintiff's and other Class members' advertising on LinkedIn to enable Plaintiff and Class members to determine the nature and scope of the inaccurate and inflated metrics, and the full extent of the harm caused by the ad metrics that LinkedIn communicated to and calculated on behalf of all advertisers.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, seek the following relief:

a.    An order certifying this action as a class action under Fed. R. Civ. P. 23, defining the Class as requested herein, finding that Plaintiffs are proper representatives of the Class requested herein, and appointing Plaintiffs' counsel as Class Counsel.

b.    Injunctive and other equitable relief as is necessary to protect the interests of the Class, including those members who will pay inflated prices in the future absent such relief. Accordingly, Plaintiffs seek injunctive and equitable relief, including, but not limited to: (i) an order prohibiting LinkedIn from engaging in the wrongful acts described herein; (ii) requiring LinkedIn to engage third-party auditors to conduct audits and evaluations of LinkedIn's ad metrics and ordering them to promptly correct any problems or issues detected by these auditors; and (iii) requiring LinkedIn to disclose any further inaccuracies with respect to its ad metrics in a timely and accurate manner.

c.    In the alternative, Plaintiffs seek an order requiring LinkedIn to provide a full and complete accounting of all transactions and records relating to Plaintiff's and other Class members' advertising on LinkedIn to enable Plaintiff and Class members to determine the nature and

1    scope of the inaccurate and inflated metrics, and the full extent of the harm caused by the

2    ad metrics that LinkedIn communicated to and calculated on behalf of all advertisers.

3       d.  Plaintiffs also request damages, restitution, punitive damages, attorneys' fees, statutory

4         costs, and such other relief as is just and proper.

5    **<u>DEMAND FOR JURY TRIAL</u>**

6         Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand trial

7    by jury in this action of all issues so triable.

8

9       Dated: March 17, 2021               Respectfully submitted,

10                                     s/ J. Dominick Larry

11

12   Warren Postman (#330869)         Brooke Smith (*pro hac vice*)
       wdp@kellerlenkner.com           brooke.smith@kellerlenkner.com

13   Jason Ethridge (*pro hac vice*)      J. Dominick Larry (*pro hac vice*)
       jason.ethridge@kellerlenkner.com   nl@kellerlenkner.com

14   **KELLER LENKNER LLC**        **KELLER LENKNER LLC**

15   1300 I Street, N.W., Suite 400E    150 N. Riverside Plaza, Suite 4270
     Washington, DC 20005        Chicago, IL 60606

16   Phone: (202) 918-1123        Phone: (312) 216-8656
     Facsimile: (312) 971-3502     Facsimile: (312) 971-3502

17

18   Antonio Romanucci (*pro hac vice*)  Keith Custis (#218818)
       aromanucci@rblaw.net         kcustis@custislawpc.com

19   David Neiman (*pro hac vice*)     **CUSTIS LAW, P.C.**
       dneiman@rblaw.net            1875 Century Park East, Suite 700

20   Bryce T. Hensley (*pro hac vice*)   Los Angeles, CA 90067
       bhensley@rblaw.net           Phone: (213) 863-4276

21   **ROMANUCCI & BLANDIN, LLC**   Facsimile: (213) 863-4277

22   321 N. Clark Street, Suite 900
     Chicago, IL 60654

23   Phone: (312) 458-1000
     Facsimile: (312) 458-1004

24   *Attorneys for Plaintiffs TopDevz, LLC, and*

25   *Noirefy, Inc.*

26

27   Jordan L. Lurie (SBN 130013)
     jlurie@pomlaw.com

28   Ari Y. Basser (SBN 272618)
       abasser@pomlaw.com

1

**POMERANTZ LLP**
1100 Glendon Avenue, 15th floor
Los Angeles, CA  90024
Phone: (310) 432-8492
Facsimile: (310) 861-8591

Joshua E. Fruchter (*pro hac vice*)
jfruchter@wohlfruchter.com
**WOHL & FRUCHTER LLP**
25 Robert Pitt Drive, Suite 209G
Monsey, NY 10952
Phone: (845) 290-6818
Facsimile: (718) 504-3773

*Attorneys for Plaintiff Synergy RX PBM LLC*