1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Warren Postman (#330869)
  wdp@kellerlenkner.com
Jason Ethridge (*pro hac vice*)
  jason.ethridge@kellerlenkner.com
**KELLER LENKNER LLC**
1100 Vermont Ave., N.W., 12th Floor
Washington, DC 20005
Phone: (202) 918-1123
Facsimile: (312) 971-3502

*Attorneys for Plaintiffs and the Class*


(Additional counsel listed on signature page)

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

|  |  |
|---|---|
| *In Re LinkedIn Advertising Metrics Litigation* | ) Case No.:   5:20-cv-08324-SVK<br>)<br>) **SECOND AMENDED CLASS ACTION**<br>) **COMPLAINT**<br>)<br>) Violation of California's False Advertising<br>) Law;<br>)<br>) Violation of California's Unfair Competition<br>) Law;<br>)<br>) Breach of Implied Duty to Perform with<br>) Reasonable Care; and<br>)<br>) Breach of Implied Covenant of Good Faith<br>) and Fair Dealing<br>)<br>) **DEMAND FOR JURY TRIAL**<br>)<br>)<br>) |

Plaintiffs Noirefy, Inc. and TopDevz, LLC, individually and on behalf of all others similarly situated, bring this Second Amended Class Action Complaint and Demand for Jury Trial against Defendant LinkedIn Corp.  Plaintiffs allege the following upon personal knowledge as to their own acts and experiences, and as to all other matters upon information and belief, including investigation conducted by their attorneys.

## NATURE OF THE COMPLAINT

1.      LinkedIn claims to be the world's largest professional social network. One of LinkedIn's primary sources of revenue is the sale of advertisement space on its platform. Users join LinkedIn to make high-quality professional connections, and advertisers use the platform to reach a high-quality audience.

2.      When advertisers set up their first ad campaigns on LinkedIn, the last screen they see tells them that they will "only pay when someone clicks your ad."  That assurance in mind, advertisers upload their payment details and launch their first LinkedIn ad campaigns.

3.      Unfortunately, that promise is false.  Rampant bot and other fraudulent activity on LinkedIn's platform mean that advertisers regularly pay for fake clicks.  Advertisers regularly pay for fake ad impressions and video views too.

4.      In addition to charging advertisers for non-genuine activity, LinkedIn falsely represents the fake activity as genuine clicks, impressions, and views throughout its ad-sales process—from forecasted results at the inception of a campaign to reported results as a campaign progresses.

5.      The automated, fraudulent, mistaken, or miscalculated engagement with LinkedIn ads (collectively "non-genuine engagement") not only causes advertisers to be charged when they shouldn't be, it also artificially inflates the desirability of advertising on LinkedIn's platform.  In other words, LinkedIn advertisers think they are advertising to a much more valuable and engaged audience than is really the case. For this reason, LinkedIn advertisers are more willing to purchase ads and willing to pay more for those ads.  As a result, prices for LinkedIn ads artificially rose across the board.

6.     Plaintiffs TopDevz, LLC and Noirefy, Inc. advertised on LinkedIn.  They were charged for non-genuine engagement, and they also paid inflated prices as a result of the systematic demand inflation caused by the non-genuine engagement on LinkedIn's network.

7.     Because LinkedIn deceived them, reported inflated ad metrics to them, and allowed rampant non-genuine engagement to inflate the prices they paid, Plaintiffs bring suit for violations of California's False Advertising Law and Unfair Competition Law, breach of the implied covenant of good faith and fair dealing, and breach of the duty to perform with reasonable care.

**PARTIES**

8.     LinkedIn is a Delaware corporation headquartered in Sunnyvale, California.

9.     TopDevz is a California limited liability company headquartered in Sacramento, California.

10.     Noirefy is a Delaware corporation headquartered in Chicago, Illinois.

**JURISDICTION, VENUE, AND CHOICE OF LAW**

11.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because Plaintiffs are pursuing a class action under Rule 23 of the Federal Rules of Civil Procedure that includes claims asserted on behalf of a nationwide class including citizens from states other than California.  The Class includes hundreds of thousands of members and the amount in controversy exceeds $5 million.

12.     This Court has personal jurisdiction over LinkedIn because the company is headquartered in California.  LinkedIn also conducted substantial business from which the claims in this case arise in California and has agreed to personal jurisdiction in this Court.

13.     Venue is appropriate under 28 U.S.C. § 1391 because LinkedIn is headquartered in this judicial district, LinkedIn has engaged in substantial business within this district that gives rise to the claims in this case, and the parties have agreed by contract to venue in this district.

14.     LinkedIn's form contract with all advertisers, the "LinkedIn Ads Agreement," provides that it "is governed by the laws of the State of California, and any action or proceeding

1    (including those arising from non-contractual disputes or claims) related to this Ads Agreement

2    will be brought in a federal court in the Northern District of California."[1]

3    **INTRADISTRICT ASSIGNMENT**

4    15.    This action is properly assigned to the San Jose Division of this District under Civil

5    Local Rule 3-2(c) and (e), because LinkedIn is headquartered, and a substantial part of the events

6    that give rise to the claim occurred, in Santa Clara County, which is served by the San Jose Division.

7    **COMMON FACTUAL BACKGROUND**

8    **A.  LinkedIn sells itself as a premium platform for advertisers.**

9    16.    LinkedIn was founded in 2003 and began selling ad space on its platform in 2005.

10   Since then, LinkedIn has grown dramatically as a social network and as an advertising platform.

11   LinkedIn passed 100 million members in 2011 and was purchased by Microsoft for $26 billion in

12   2016.  Today, LinkedIn counts over 774 million members, and generates over $3 billion annually

13   from advertising sales.

14   17.    Companies have advertised on LinkedIn because of its self-proclaimed high-quality

15   audience.  As LinkedIn tells them, advertisers can "[m]arket to influencers, decision makers, and

16   executives who act on new opportunities."[2]  "LinkedIn's audience has 2x the buying power of the

17   average web audience," and "4 out of 5 LinkedIn members drive business decisions."[3]

18   18.    That perceived audience quality drove the cost of advertising on LinkedIn.

19   Advertisers did not think that they were paying for clicks, impressions, or views from just any

20   average human audience.  They thought they were paying for clicks, impressions, and views from

21   a uniquely valuable audience.

22   19.    The perceived audience quality also buoyed the prices paid by all LinkedIn

23   advertisers.  LinkedIn ads are sold through what LinkedIn calls "second-price" auctions.  A second-

24

25

26   [1] *LinkedIn Ads Agreement*, at § 9, LinkedIn (July 16, 2020), https://www.linkedin.com/legal/sas-terms, attached as Exhibit A.

27   [2] *Ad Targeting*, LinkedIn, https://business.linkedin.com/marketing-solutions/ad-targeting (last accessed Aug. 17, 2021).

28   [3] *Id.*

price auction is an auction in which the winning bidder pays $0.01 above the second highest bid in the auction.  Second-price auctions incentivize advertisers to bid the highest amount they are willing to pay to show an ad to members of a targeted audience, knowing that they will only end up paying $0.01 more than then second-price bid.

20.    Because of the second-price auction mechanism, LinkedIn ad prices were determined not only by the winning bidder's willingness to pay, but also by the value perceived in the ads by other bidders.

21.    LinkedIn's supposedly high-quality audience generated a substantial price premium. A recent report by Falcon.io, a social-media management platform, found that LinkedIn advertisers pay $5.26 per click on average, as opposed to $3.56 on Instagram, $0.97 on Facebook, and $0.38 on Twitter.[4]

22.    Since at least 2015, LinkedIn has delivered forecasted and actual metrics regarding the performance of its ads through its Campaign Manager interface.  Those metrics include "impressions," "views," and "clicks," which are sometimes referred to as "reach metrics."  An "impression" is an instance of an ad being displayed to a user such that it could have been seen.  A "view" means that the video was actually viewed by the user.  And a "click" occurs when a user presented with an ad selects either the ad or the advertiser's company page using a cursor (on desktop) or finger (on mobile).

23.    Those metrics were used to "grade the success of" marketing campaigns, which in turn allowed advertisers to determine what kinds of ads to purchase, and how much to pay for them.[5]

---

[4] Maxwell Gollin, *How Much Do Ads Cost on Facebook, Instagram, Twitter, and LinkedIn in 2021*, Falcon.io (Mar. 18, 2021), https://www.falcon.io/insights-hub/topics/social-media-roi/how-much-do-ads-cost-on-facebook-instagram-twitter-and-linkedin-in-2018/.
[5] LinkedIn, *The Sophisticated Marketer's Guide to LinkedIn*, LinkedIn, 5 (2017), https://business.linkedin.com/content/dam/me/business/en-us/marketing-solutions/cx/2017/pdfs/Sophisticated-Marketers-Guide-to-LinkedIn-v03.12.pdf, attached as Exhibit B.

**B.  LinkedIn ads were sold through a uniform process.**

24.     Before advertising on LinkedIn, advertisers first created their LinkedIn pages.  As part of that process, each company selected whether it was a small business (fewer than 200 employees), a medium to large business (more than 200 employees), or an educational institution.[6]

25.     Once the company page was established, the LinkedIn advertiser had to use Campaign Manager to create an ad account.  When creating an ad account, each advertiser assented to the LinkedIn Ads Agreement.[7]  The Ads Agreement was a contract of adhesion presented to advertisers on a take-it-or-leave-it basis.

26.     The Ads Agreement provided that every advertiser "agree[d] to pay on the basis and at the rate shown when a campaign, order or other purchase was submitted through your account ('Rate'), e.g., price per impression, click, other conversion, lead or period, whether with a fixed or automatically optimized bid, whether with daily budget, lifetime pacing, or other budget options."[8]

27.     Once a company connected its ad account to its LinkedIn page, it could start setting up its first LinkedIn advertising campaign.

28.     The first step in launching an ad campaign was to choose an objective for the campaign.  "An objective is the action you want your audience to take upon seeing your ad."[9]  Objectives included brand awareness, website visits, engagement, video views, lead generation, website conversions, or job applicants.

29.     After choosing an objective, advertisers built their target audiences, selected ad formats (for instance, single image, video, or messaging, among others), and then set bidding strategies and budgets.

30.     From there, advertisers chose the creative content (image, video, or text) that was displayed in their ads.

---

[6] *Create a LinkedIn Page*, LinkedIn, https://www.linkedin.com/company/setup/new/ (last accessed Aug. 17, 2021).
[7] *See* Ex. A.
[8] *Id.*, § 3.
[9] *Create your first campaign*, LinkedIn, https://business.linkedin.com/marketing-solutions/success/best-practices/create-your-first-campaign (last accessed Aug. 17, 2021).

31.    Throughout this process, from choosing a campaign objective to selecting the ad creative, LinkedIn displayed forecasted results.  Forecasted results are estimates regarding the expected audience size, cost, and performance of the ad campaign.  The particular results forecasted varied based on campaign objective and other settings, but the format always generally resembled the following:



32.    The Key Result label highlighted the ad metric tied to the advertiser's campaign objective, which also indicated the metric underlying the Rate charged to the advertiser.

33.    Finally, before launching its first campaign, advertisers set up payment methods using the following interface:



34.     Before any advertiser could pay to run an ad on LinkedIn, then, LinkedIn promised each advertiser that they will "only pay when *someone* clicks your ad."[10]

35.     Once the payment information was uploaded, the advertiser launched their campaigns.

36.     The campaign objective and bidding strategy selected while setting up a campaign determined the basis on which advertisers were charged, whether by clicks, impressions, or video views.    After the campaign launched, LinkedIn charged advertisers a Rate based on the pre-determined chargeable metrics, each time that metric was satisfied (i.e., each time the advertisement received an impression, video view, or click).

37.     When placing bids and agreeing to Rates, advertisers relied on the integrity of the underlying bid metrics, impressions, clicks, and views.    Put differently, every time a LinkedIn advertiser agreed to a Rate for a campaign, they relied on LinkedIn's representation that the underlying metric was real.    That is, that impressions were impressions before actual LinkedIn users, that clicks are real clicks and not bot activity or accidental clicks, that views are real views, and the like.

**C.  To monitor active and past campaigns, advertisers depended on LinkedIn's data.**

38.     After launching their first campaigns, each time advertisers accessed Campaign Manager, Campaign Manager presented real-time results of the campaigns, including number of impressions, video views, and/or clicks, as well as derived metrics such as click-through rate and video view rates.

39.     That Campaign Manager interface was a closed network, meaning it was the only place where an advertiser could view comprehensive campaign performance metrics, because LinkedIn severely restricted its advertisers' access to data about their ads and audience.

40.     LinkedIn technologically prevented advertisers from evaluating the data underlying LinkedIn's reported campaign metrics by refusing to provide advertisers with access to raw data

---

[10] *Id.* (emphasis added).

that would allow them to determine which users viewed their ads, their level of engagement, or whether the users are real humans or automated bots.

41.    LinkedIn also contractually prohibited advertisers from evaluating the data underlying LinkedIn's reported campaign metrics, with its form contracts going so far as to ban advertisers from disclosing any information about LinkedIn's ad metrics or the corresponding ad pricing to any third party.

42.    Advertisers on LinkedIn's platform were therefore entirely dependent on LinkedIn for accurate metrics when evaluating how their ad campaigns perform and whether and how much to spend on additional campaigns.

**D.  LinkedIn lagged behind its competitors in ensuring the integrity of its metrics.**

43.    Advertising industry and standard-setting organizations have long recommended that closed network advertising systems like LinkedIn engage outside auditors to ensure the accuracy of their advertising metrics.  In early 2017, a leading industry association specifically called on closed system advertising platforms, including LinkedIn, to allow independent third-party auditors to validate their metrics.[11]

44.    LinkedIn's largest ad-platform competitors, Facebook and Google, heeded the industry calls and agreed to allow an independent auditor, the Media Ratings Council (MRC) to validate their metrics.[12]  Other industry participants followed suit.

45.    LinkedIn, by contrast, chose to continue self-auditing, a practice akin to "grading its own homework."[13]

---

[11] Barry Levine, *ANA calls for independent audits of ads in the 'walled gardens,'* MarTech (Mar. 17, 2017), https://martech.org/ana-calls-independent-audits-ads-walled-gardens/.

[12] Jessica Goodfellow, *Facebook agrees to be audited by Media Rating Council following misreporting scandal*, The Drum (Feb. 10, 2017) https://www.thedrum.com/news/2017/02/10/facebook-agrees-be-audited-media-rating-council-following-misreporting-scandal; Ronan Shields, *Google bows to third-party verification demands with YouTube now open to Media Ratings Council audit*, The Drum (Feb. 21, 2017), https://www.thedrum.com/news/2017/02/21/google-bows-third-party-verification-demands-with-youtube-now-open-media-ratings.

[13] Suzanne Vranica and Jack Marshall, *Facebook Overestimated Key Video Metric for Two Years*,

46.     By refusing outside auditing, LinkedIn removed any incentive to ensure the accuracy of its ad metrics.   In fact, self-auditing created a perverse incentive to overlook measurement errors that inflate metrics, since the platform would benefit from the higher revenue generated by inflated metrics.

47.     Further compounding this problem, unlike its competitors, LinkedIn did not and does not provide an adequate or transparent process for obtaining billing adjustments due to non-genuine engagement.  Small businesses have been denied refunds at LinkedIn's sole discretion even when presented with evidence of non-genuine engagement.

48.     Because of LinkedIn's longstanding refusal to engage a third-party to audit the accuracy of its ad metrics and its obstruction of any meaningful ability for its advertisers to validate or challenge LinkedIn's metrics, it created an environment where inflated metrics would not only go uncorrected but would also benefit LinkedIn.  Inevitably, inflated metrics inflated the perceived value of LinkedIn's platform, causing substantial harm to its advertisers.

**E.  LinkedIn's metrics were inflated by non-genuine engagement.**

49.     LinkedIn systematically inflated ad metrics in its favor, which enabled it to overstate the quality of its audiences, the quality of its ad inventory, and the engagement from its audiences.  That, in turn, allowed LinkedIn to collect inflated prices from advertisers.

50.     For instance, LinkedIn tracked user engagement with video advertisements in the LinkedIn mobile app.  One video metric was video "views," where a user watches a video for some time on the LinkedIn feed.  Another was video "view-through rates," or views divided by number of impressions.  Both of these video metrics directly affected the price advertisers will be charged for placing a video ad on LinkedIn.

---

Wall Street Journal (Sept. 22, 2016) (quoting Keith Weed, chief marketing officer of Unilever that "tech companies that don't let third parties measure their platforms is equivalent to 'letting them mark their own homework'."), https://www.wsj.com/articles/facebook-overestimated-key-video-metric-for-two-years-1474586951; John Herrman and Sapna Maheshwari, *Facebook Apologizes for Overstating Video Metrics*, New York Times (Sept. 23, 2016) (quoting Omnicom that "third-party verification is a fundamental requirement. Publishers should not 'grade their own homework'."), https://www.nytimes.com/2016/09/24/business/media/facebook-apologizes-for-overstating-video-metrics.html.

51.     Because advertisers could not access raw data in LinkedIn's closed system, they were forced to rely on LinkedIn's statements about when videos were viewed, for how long, and whether those views were legitimate.

52.     LinkedIn recently admitted that its video ad metrics were inflated, which inflated the prices charged to video advertisers.[14]  LinkedIn counted video views from a user's LinkedIn app even when the user merely scrolled past the video and the video was only playing off screen. In other words, advertisers were charged for a video "view" even when the user was not actually viewing the ad's content.  The off-screen views also inflated the "view-through rates" calculated by LinkedIn.

53.     Common usage, industry practice, and LinkedIn's own metrics definitions[15] would not count such activity as a view.

54.     LinkedIn also admitted to overstating user impressions on Sponsored Content[16] ad campaigns, counting impressions where ads only appeared briefly on screen as users rotated their phones or navigated to other parts of the LinkedIn app.  That overstatement increased prices across the board for impression-based advertisements.  In other words, LinkedIn systematically inflated the data that determines impression-based pricing in its own favor, and to advertisers' detriment.

55.     LinkedIn has admitted that these impression and video view ad metrics were inflated for more than two years, with over 418,000 advertisers overcharged as a result.[17]

56.     Advertisers had no way to know about LinkedIn's inflated metrics until November 12, 2020, when LinkedIn admitted as much.

---

[14] Sahil Patel, *LinkedIn Finds Measurement Errors That Inflated Video and Ad Metrics*, Wall St. J. (Nov. 12, 2020), https://www.wsj.com/articles/linkedin-finds-measurement-errors-that-inflated-video-and-ad-metrics-11605228577.

[15] *Video Metrics in Campaign Manager – Definitions*,  LinkedIn, https://www.linkedin.com/help/lms/answer/a426666/video-metrics-in-campaign-manager-definitions?lang=en (last accessed Aug. 17, 2021).

[16] Sponsored Content is LinkedIn's most popular ad format, and includes single-image ads, video carousel image ads, video ads, single job ads, and event ads.

[17] Gyanda Sachdeva, *We discovered two measurement issues. Here's how we're making it right*, LinkedIn Marketing Solutions Blog (Nov. 12, 2020), https://business.linkedin.com/marketing-solutions/blog/linkedin-news/2020/how-we-re-working-to-improve.

1    57.    Had LinkedIn used reasonable, industry-standard auditing measures, it would have

2    detected the impression and video view errors years earlier.

3    58.    LinkedIn's metric-inflation problem goes far beyond what it has publicly admitted.

4    59.    LinkedIn also inflated its metrics by reporting as legitimate widespread activity from

5    fraudulent accounts, automated accounts, or accidental clicks.

6    60.    LinkedIn was aware that many purported impressions, clicks, and other interactions

7    with ad content on its platform were not attributable to actual engaged users.

8    61.    For example, LinkedIn was aware that there were numerous automated accounts

9    (often referred to as "bots") and other fraudulent accounts on its platform.  These fraudulent

10   accounts and bots increased the amount of "inventory" on LinkedIn (i.e., the number of impressions

11   available for any given advertisement) as well as the number of clicks, views, and other interactions

12   with ad content.  Some bots are also designed to take further action after clicking on an ad (e.g.,

13   submitting a subsequent form on the destination page).

14   62.    However, these impressions, clicks, views, and subsequent activity from fraudulent

15   accounts and bots were worthless to advertisers.  LinkedIn was aware that these non-genuine

16   interactions with ad content were worthless, but it failed to take adequate preventative measures as

17   that would decrease its revenue and profits.

18   63.    LinkedIn also knew that many users mistakenly clicked on ads, but then

19   immediately left the page after realizing their mistake.  Because mistaken clicks and other

20   unintentional interactions with ad content drove up LinkedIn's ad revenues, LinkedIn looked the

21   other way.

22   64.    Investigations and studies conducted by digital marketing experts revealed that

23   LinkedIn's metrics included extensive traffic generated by fraudulent accounts, bot traffic, and

24   unchecked misclicks, in excess of industry standards.[18]  By counting non-genuine engagement with

25   ad content as genuine, LinkedIn reported inaccurate ad metrics across its platform and

26

27   _____

28   [18] RMG, *Why Your LinkedIn Marketing Campaign Isn't Working*, YouTube (Aug. 24, 2020),
     https://www.youtube.com/watch?v=jKuyxgWuiRM.

systematically overstated the quality of engagement with advertising on LinkedIn.   These
misrepresented metrics allowed LinkedIn to collect inflated ad prices from advertisers.

65.    For years, LinkedIn knew or was recklessly indifferent to fraudulent accounts and
misclicks overstating the quality of the audience, ad inventory, and audience engagement on its
platform.  LinkedIn's refusal or failure to correct its misrepresented metrics in turn allowed it to
collect a higher price from advertisers.

66.    Users paying premium prices for LinkedIn ads did not reasonably expect to be
charged for non-genuine engagement.  Indeed, LinkedIn claimed that the use of bots or other
automated fraudulent methods to access the platform is a violation of LinkedIn's User Agreement.

67.    Plaintiffs and the Class members were unaware and could not reasonably have been
aware until LinkedIn disclosed its metric inflation that non-genuine engagement caused them to
pay more for advertising campaigns on LinkedIn than they bargained for.  Further, advertisers
generally had no way of knowing the amount of non-genuine engagement they were paying for, in
part because LinkedIn's closed system prevented them from verifying the legitimacy of LinkedIn's
reported metrics.

68.    Instead of investing in the infrastructure required to ensure ad-metric accuracy years
earlier in line with industry practice, LinkedIn waited until November 2020 to announce that it
retained the Media Rating Council to "audit" its metrics.  LinkedIn's sub-standard practices and
failure to "invest[] in improvements to [its] processes and systems"[19] much earlier caused harm to
all advertisers placing ads on its platform.

**F.  Inflated metrics inflated LinkedIn ad prices.**

69.    LinkedIn's failure to properly audit its metrics and validate activity on its platform
resulted in two distinct types of overcharges to advertisers: Transaction-Specific Overcharges and
Platform-Based Overcharges.

70.    Transaction-Specific Overcharges occurred when advertisers were charged for
impressions, views, or clicks that should not have been charged.  Such overcharges resulted from

[19] Sachdeva, *supra* note 17.

the video-view and impression measurement errors identified above, and from the rampant automated, fraudulent, accidental, or mistaken activity that went undetected by advertisers on LinkedIn's platform.

71.    In contrast to these Transaction-Specific Overcharges, Platform-Based Overcharges resulted from the effect of inflated LinkedIn ad metrics on aggregate demand across the platform, and with it, the prices charged across the platform.  Platform-Based Overcharges occurred as part of every transaction on LinkedIn because of the artificially inflated demand at all stages of the ad-purchasing process.

72.    Specifically, LinkedIn's inflated metrics first artificially increased demand as advertisers prepared their campaigns.  Throughout the process of setting up a campaign, LinkedIn displayed forecasted campaign results, which included the target audience size, forecasted spend, and forecasted key campaign metrics.  Because LinkedIn calculated forecasted results based on simulated ad auctions, considering similar LinkedIn campaigns and advertisers, the inflated metrics in the campaigns used to generate the forecasted results in turn inflated the forecasted results.

73.    Advertisers relied on these forecasted results while making decisions about how to set up their campaigns, how to bid, and how much to bid.  LinkedIn's overstatement of the forecasted metrics artificially inflated advertisers' willingness to pay the Rates bid upon.  Higher forecasted results drew higher bids, and artificially high forecasted results drew artificially high bids.

74.    LinkedIn also overstated metrics after campaigns were launched, further inflating demand for future campaigns.  After advertisers launched campaigns, the metrics associated with the campaigns were displayed on the home pages of the advertisers' campaign manager account, meaning that advertisers immediately observed these metrics every time they access their ad accounts.  Because LinkedIn overstated performance metrics and presents those metrics to advertisers every time they logged in to Campaign Manager, advertisers' willingness to pay for subsequent campaigns was inflated.

75.    Because of the repeated and pervasive inflation of metrics presented, all advertisers competing in LinkedIn's second price ad auctions were willing to pay more than they otherwise

would have if their forecasted and reported campaign metrics had not been inflated.  As a result, across auctions, the second prices were higher than they otherwise would have been, and the "winning" advertisers paid artificially inflated prices.

76.     Thus, not only did rampant non-genuine engagement on LinkedIn's network result in Transaction-Specific Overcharges for particular instances of non-genuine activity, LinkedIn's years of falsely reporting ad metrics at each stage of the advertising process led to artificially inflated demand, and, with it, Platform-Based Overcharges on every advertising purchase.

**G.  LinkedIn's inflated metrics harmed the public at large.**

77.     The harm caused by LinkedIn's misconduct was not limited to Transaction-Specific Overcharges and Platform-Based Overcharges.  It also had consequences that substantially harmed the public.

78.     The majority of LinkedIn advertisers are small businesses, which allocate a substantial portion of their budgets to marketing and advertising.  By charging inflated advertising costs, LinkedIn left advertisers with less money to spend on other aspects of their businesses, including the content and quality of their ads, which diminished LinkedIn users' experience on the platform, and their product and service offerings, which diminished overall consumer welfare.

79.     Many of LinkedIn's advertisers, including Plaintiff TopDevz, ran LinkedIn ads as part of their recruiting efforts.  By overstating metrics and charging for non-genuine engagement, LinkedIn wasted advertisers' budgets and impeded those advertisers' ability to hire for open positions and frustrated workers' ability to apply for open jobs.  Those effects were exacerbated throughout 2020, as the COVID-19 pandemic led to both skyrocketing unemployment *and* staffing shortages nationwide.

80.     LinkedIn's overcharges also caused public harm by interfering with the work of social-justice focused organizations, including both nonprofits and for-profit organizations like Noirefy, which use LinkedIn as a tool for addressing social inequities.

1

**ALLEGATIONS SPECIFIC TO TOPDEVZ**

2

**A. TopDevz relied on LinkedIn's inflated metrics while purchasing ads.**

3    81.    TopDevz is a small-business team of software developers, designers, project

4  managers, and quality assurance testers that develops custom software solutions for sophisticated

5  businesses.

6    82.    TopDevz typically has approximately 150 full- and part-time workers.

7    83.    TopDevz does not have an in-house ad analytics department or expert.

8    84.    According to LinkedIn's own website, TopDevz is a small business.[20]

9    85.    In March 2019, TopDevz ran a Sponsored Content Ad Campaign titled "TopDevz

10  People – 51k." While creating and launching the "TopDevz People – 51k" Campaign, TopDevz

11  CEO Ashkan Rajaee viewed and relied on forecasted spend, impressions, VTR, and video views.

12    86.    In March 2019, TopDevz also ran a Sponsored Content Ad Campaign titled "1 –

13  Min Intro – Video View 860k 11-10,000." While creating, launching, and operating the 1 – Min

14  Intro – Video View 860k 11-10,000" Campaign, Mr. Rajaee viewed and relied on forecasted and

15  actual spend, impressions, VTR, and video views.

16    87.    In March 2019, TopDevz also ran a Sponsored Content Ad Campaign titled "Lead

17  generation – Auto Bid – 3.1MM Form Fill 11-10,000." While creating, launching, and operating

18  the "Lead generation – Auto Bid – 3.1MM Form Fill 11-10,000" Campaign, Mr. Rajaee viewed

19  and relied on forecasted and actual spend, impressions, CTR, leads, and clicks.

20    88.    In March 2019, TopDevz also ran a Sponsored Content Ad Campaign titled "Lead

21  generation – 78k CRM list." While creating, launching, and operating the "Lead generation – 78K

22  CRM List" Campaign, Mr. Rajaee viewed and relied on the forecasted and actual metrics for the

23  campaign, in addition to performance metrics for that campaign and the previously launched

24  campaigns.

25

26

27

28

[20] *Create a LinkedIn Page*, LinkedIn, https://www.linkedin.com/company/setup/new/ (last accessed Aug. 17, 2021).

89.     Before launching its first campaigns, TopDevz was required to set up payment credentials. When Mr. Rajaee did so on TopDevz's behalf, LinkedIn promised that for these campaigns and any subsequent campaigns, TopDevz would only be charged for clicks, views, or impressions by "someone."  When it purchased ads for these campaigns and subsequent campaigns, TopDevz relied on LinkedIn's representation that it would only be charged for clicks, views, or impressions by "someone."

90.     In March 2019, TopDevz also ran a Sponsored Content Ad Campaign titled "Website visits Ad – 740k."  Before creating that campaign, Mr. Rajaee evaluated the performance metrics for his prior campaigns, which he viewed in his campaign manager account and appeared substantially similar to the following images:

| Campaign Name | | Key Results | Cost Per Result | Impressions | Clicks | Average CTR | Bid |
|---|---|---|---|---|---|---|---|
| 29 campaigns | | - | - | 10,237 | 61 | 0.6% | - |
| Lead generation -Auto Bid - 3.1MM Form Fill 11-10,000 ID: 148092314 · Sponsored Content | ... | 1 Leads | $953.54 | 7,984 | 54 | 0.68% | Manual Bid: $300.00 |
| 1 - Min Intro - Video View 860K 11-10,00 ID: 148092204 · Sponsored Content | ... | 540 Views | $0.25 | 1,592 | 1 | 0.06% | Maximum Delivery |
| TopDevz People -51K ID: 148092084 · Sponsored Content | ... | 65 Views | $2.02 | 144 | 0 | 0% | Maximum Delivery |
| Lead generation - 78K CRM List ID: 148092444 · Sponsored Content | ... | 0 Leads | - | 517 | 6 | 1.16% | Manual Bid: $50.00 |

| Campaign Name | | Average CPM | Average CPC | Conversions | Cost Per Conversion | Leads | Cost Per Lead | Event Registrations |
|---|---|---|---|---|---|---|---|---|
| 29 campaigns | | $127.72 | $21.43 | 0 | - | 1 | $1,039.73 | 0 |
| Lead generation -Auto Bid - 3.1MM Form Fill 11-10,000 ID: 148092314 · Sponsored Content | ... | $119.43 | $17.66 | 0 | - | 1 | $953.54 | 0 |
| 1 - Min Intro - Video View 860K 11-10,00 ID: 148092204 · Sponsored Content | ... | $85.92 | $136.78 | 0 | - | 0 | - | 0 |
| TopDevz People -51K ID: 148092084 · Sponsored Content | ... | $909.65 | - | 0 | - | 0 | - | 0 |
| Lead generation - 78K CRM List ID: 148092444 · Sponsored Content | ... | $166.71 | $14.37 | 0 | - | 0 | - | 0 |

91.     Mr. Rajaee reasonably relied on the accuracy of the metrics associated with his prior campaigns when deciding whether to launch a subsequent campaign.  While creating, launching, and operating the "Website visits Ad – 740K" Campaign, Mr. Rajaee also viewed and relied on the forecasted spend, impressions, CTR, and clicks for that campaign

92.     In April 2020, TopDevz ran a Sponsored Content Ad Campaign titled "Lead generation – Apr 25, 2020."  Before creating that campaign, Mr. Rajaee evaluated the performance

1    metrics for his prior campaigns, which he viewed in his campaign manager account and appeared

2    substantially similar to the following images:

| Campaign Name ⌄ | | Key Results ⌄ | Cost Per Result ⌄ | Impressions ⌄ | Clicks ⌄ | Average CTR ⌄ | Bid ⌄ |
|---|---|---|---|---|---|---|---|
| 29 campaigns | | - | - | 188,868 | 1,392 | 0.74% | - |
| Lead generation -Auto Bid - 3.1MM For m Fill 11-10.000<br>ID: 148092314 - Sponsored Content | ••• | 19<br>Leads | $1,094.86 | 145,487 | 1,072 | 0.74% | Manual Bid:<br>$300.00 |
| Lead generation - 78K CRM List<br>ID: 148092444 - Sponsored Content | ••• | 8<br>Leads | $609.22 | 22,169 | 207 | 0.93% | Manual Bid:<br>$50.00 |
| Website visits Ad - 740K<br>ID: 148242614 - Sponsored Content<br>Legacy | ••• | - | - | 18,229 | 95 | 0.52% | Maximum Delivery |
| Lead generation - Apr 25, 2020<br>ID: 159575154 - Sponsored Content | ••• | 0<br>Leads | - | 1,247 | 17 | 1.36% | Maximum Delivery |
| 1 - Min Intro - Video View 860K 11-10,0 00<br>ID: 148092204 - Sponsored Content | ••• | 540<br>Views | $0.25 | 1,592 | 1 | 0.06% | Maximum Delivery |
| TopDevz People -51K<br>ID: 148092084 - Sponsored Content | ••• | 65<br>Views | $2.02 | 144 | 0 | 0% | Maximum Delivery |

| | Campaign Name ⌄ | | Average CPM ⌄ | Average CPC ⌄ | Conversions ⌄ | Cost Per Conversion ⌄ | Leads ⌄ | Cost Per Lead ⌄ |
|---|---|---|---|---|---|---|---|---|
| ☐ | 29 campaigns | | $144.93 | $19.66 | 0 | - | 27 | $960.76 |
| ☐ | Lead generation -Auto Bid - 3.1MM For m Fill 11-10.000<br>ID: 148092314 - Sponsored Content | ••• | $142.98 | $19.41 | 0 | - | 19 | $1,094.86 |
| ☐ | Lead generation - 78K CRM List<br>ID: 148092444 - Sponsored Content | ••• | $219.84 | $23.54 | 0 | - | 8 | $609.22 |
| ☐ | Website visits Ad - 740K<br>ID: 148242614 - Sponsored Content<br>Legacy | ••• | $63.87 | $12.26 | 0 | - | 0 | - |
| ☐ | Lead generation - Apr 25, 2020<br>ID: 159575154 - Sponsored Content | ••• | $212.17 | $15.56 | 0 | - | 0 | - |
| ☐ | 1 - Min Intro - Video View 860K 11-10,0 00<br>ID: 148092204 - Sponsored Content | ••• | $85.92 | $136.78 | 0 | - | 0 | - |
| ☐ | TopDevz People -51K<br>ID: 148092084 - Sponsored Content | ••• | $909.65 | - | 0 | - | 0 | - |

19         93.    Mr. Rajaee reasonably relied on the accuracy of the metrics associated with his prior

20   campaigns when deciding whether to launch a subsequent campaign.  While creating, launching,

21   and operating the "Lead generation – Apr 25, 2020" Campaign, Ashkan Rajaee also viewed and

22   relied on the forecasted spend, impressions, CTR, leads, and clicks, in addition to performance

23   metrics for that campaign and the previously launched campaigns.

24         94.    In August 2020, TopDevz ran a Sponsored Content Ad Campaign titled "Grant

25   Promo."  A third party was responsible for the campaign, including assessment of the forecasted

26   metrics.

27         95.    In August 2020, TopDevz ran a Sponsored Content Ad Campaign titled "Website

28   visits – Aug 20, 2020."  Before creating that campaign, Mr. Rajaee evaluated the performance

metrics for his prior campaigns, which he viewed in his campaign manager account and appeared substantially similar to the following images:

| Campaign Name | | Key Results | Cost Per Result | Impressions | Clicks | Average CTR | Bid |
|---|---|---|---|---|---|---|---|
| 29 campaigns | | - | - | 196.811 | 1,453 | 0.74% | - |
| Lead generation -Auto Bid - 3.1MM For m Fill 11-10.000<br>ID: 148092314 · Sponsored Content | ••• | 19 Leads | $1,094.86 | 145,487 | 1,072 | 0.74% | Manual Bid: $300.00 |
| Lead generation - 78K CRM List<br>ID: 148092444 · Sponsored Content | ••• | 8 Leads | $609.22 | 22,169 | 207 | 0.93% | Manual Bid: $50.00 |
| Website visits Ad - 740K<br>ID: 148242614 · Sponsored Content<br>Legacy | ••• | - | - | 18,229 | 95 | 0.52% | Maximum Delivery |
| Lead generation - Apr 25, 2020<br>ID: 159575154 · Sponsored Content | ••• | 0 Leads | - | 8,324 | 76 | 0.91% | Maximum Delivery |
| 1 - Min Intro - Video View 860K 11-10.00<br>ID: 148092204 · Sponsored Content | ••• | 540 Views | $0.25 | 1,592 | 1 | 0.06% | Maximum Delivery |
| TopDevz People -51K<br>ID: 148092084 · Sponsored Content | ••• | 65 Views | $2.02 | 144 | 0 | 0% | Maximum Delivery |
| Grant Promo | | 2 | | | | | |

| Campaign Name | | Average CPM | Average CPC | Conversions | Cost Per Conversion | Leads | Cost Per Lead |
|---|---|---|---|---|---|---|---|
| 29 campaigns | | $141.75 | $19.20 | 0 | - | 27 | $979.83 |
| Lead generation -Auto Bid - 3.1MM For m Fill 11-10.000<br>ID: 148092314 · Sponsored Content | ••• | $142.98 | $19.41 | 0 | - | 19 | $1,094.86 |
| Lead generation - 78K CRM List<br>ID: 148092444 · Sponsored Content | ••• | $219.84 | $23.54 | 0 | - | 8 | $609.22 |
| Website visits Ad - 740K<br>ID: 148242614 · Sponsored Content<br>Legacy | ••• | $63.87 | $12.26 | 0 | - | 0 | - |
| Lead generation - Apr 25, 2020<br>ID: 159575154 · Sponsored Content | ••• | $93.62 | $10.25 | 0 | - | 0 | - |
| 1 - Min Intro - Video View 860K 11-10,0 00<br>ID: 148092204 · Sponsored Content | ••• | $85.92 | $136.78 | 0 | - | 0 | - |
| TopDevz People -51K<br>ID: 148092084 · Sponsored Content | ••• | $909.65 | - | 0 | - | 0 | - |
| Grant Promo<br>ID: 154279126 · Sponsored Content | ••• | $12.18 | $5.00 | 0 | - | 0 | - |

96.     Mr. Rajaee reasonably relied on the accuracy of the metrics associated with his prior campaigns when deciding whether to launch a subsequent campaign.  While creating, launching, and operating the "Website Visits – Aug 20, 2020" Campaign, Ashkan Rajaee also viewed and relied on the forecasted spend, impressions, CTR, clicks, and landing page clicks for the campaign, in addition to performance metrics for that campaign and the previously launched campaigns.

97.     In September 2020, TopDevz ran a Sponsored Content Ad Campaigns titled "1-Ruff Commercial – Sept 14-21," "2-We Can Do It In House," "Website Visits – 1 – Ruff," and "TopDevz.com – Website visits – 18-31 and Feel Great."  Before creating those campaigns, Mr. Rajaee evaluated the performance metrics for his prior campaigns, which he viewed in his campaign manager account and appeared substantially similar to the following images:

| Campaign Name | | Key Results | Cost Per Result | Impressions | Clicks | Average CTR | Bid |
|---|---|---|---|---|---|---|---|
| 29 campaigns | | - | - | 215,768 | 1,529 | 0.71% | - |
| Lead generation -Auto Bid - 3.1MM For m Fill 11-10,000 ID: 148092314 · Sponsored Content | ••• | 19 Leads | $1,094.86 | 145,487 | 1,072 | 0.74% | Manual Bid: $300.00 |
| Lead generation - 78K CRM List ID: 148092444 · Sponsored Content | ••• | 8 Leads | $609.22 | 22,169 | 207 | 0.93% | Manual Bid: $50.00 |
| Website visits Ad - 740K ID: 148242614 · Sponsored Content Legacy | ••• | - | - | 18,229 | 95 | 0.52% | Maximum Delivery |
| Lead generation - Apr 25, 2020 ID: 159575154 · Sponsored Content | ••• | 0 Leads | - | 8,324 | 76 | 0.91% | Maximum Delivery |
| Grant Promo ID: 154279126 · Sponsored Content | ••• | 74 Website Visits | $5.13 | 18,889 | 74 | 0.39% | Target Cost: $6.05 |
| 1 - Min Intro - Video View 860K 11-10,00 ID: 148092204 · Sponsored Content | ••• | 540 Views | $0.25 | 1,592 | 1 | 0.06% | Maximum Delivery |
| TopDevz People -51K ID: 148092084 · Sponsored Content | ••• | 65 Views | $2.02 | 144 | 0 | 0% | Maximum Delivery |
| 1-Ruff Commercial - Sept 14-21 ID: 155025186 · Sponsored Content | ••• | 180 Views | $0.29 | 348 | 2 | 0.57% | Target Cost: $0.18 |

| Campaign Name | | Average CPM | Average CPC | Conversions | Cost Per Conversion | Leads | Cost Per Lead |
|---|---|---|---|---|---|---|---|
| 29 campaigns | | $131.32 | $18.53 | 0 | - | 27 | $979.83 |
| Lead generation -Auto Bid - 3.1MM For m Fill 11-10,000 ID: 148092314 · Sponsored Content | ••• | $142.98 | $19.41 | 0 | - | 19 | $1,094.86 |
| Lead generation - 78K CRM List ID: 148092444 · Sponsored Content | ••• | $219.84 | $23.54 | 0 | - | 8 | $609.22 |
| Website visits Ad - 740K ID: 148242614 · Sponsored Content Legacy | ••• | $63.87 | $12.26 | 0 | - | 0 | - |
| Lead generation - Apr 25, 2020 ID: 159575154 · Sponsored Content | ••• | $93.62 | $10.25 | 0 | - | 0 | - |
| Grant Promo ID: 154279126 · Sponsored Content | ••• | $20.11 | $5.13 | 0 | - | 0 | - |
| 1 - Min Intro - Video View 860K 11-10,0 00 ID: 148092204 · Sponsored Content | ••• | $85.92 | $136.78 | 0 | - | 0 | - |
| TopDevz People -51K ID: 148092084 · Sponsored Content | ••• | $909.65 | - | 0 | - | 0 | - |
| 1-Ruff Commercial - Sept 14-21 ID: 155025186 · Sponsored Content | ••• | $151.84 | $26.42 | 0 | - | 0 | - |
| Website visits - Aug 20, 2020 ID: 154279476 · Sponsored Content | ••• | $23.38 | $6.85 | 0 | - | 0 | - |

98.     Mr. Rajaee reasonably relied on the accuracy of the metrics associated with his prior campaigns when deciding whether to launch subsequent campaigns.   While creating, launching, and operating the "1-Ruff Commercial – Sept 14-21" Campaign, Mr. Rajaee also viewed and relied on forecasted spend, impressions, CTR, video views, and target cost, in addition to performance metrics for that campaign and the previously launched campaigns.

99.     While creating, launching, and operating the "2-We Can Do It In House" Campaign, Mr. Rajaee also viewed and relied on the forecasted spend, CTR, clicks, and landing page clicks

1    for the campaign, in addition to performance metrics for that campaign and the previously launched

2    campaigns.

3          100.    While creating, launching, and operating the "Website Visits – 1- Ruff" Campaign,

4    Mr. Rajaee also viewed and relied on the forecasted, impressions, CTR, clicks, landing page clicks,

5    and target cost for the campaign, in addition to performance metrics for that campaign and the

6    previously launched campaigns.

7          101.    While creating, launching, and operating the "TopDevz.com – Website visits – 18-

8    31 and Feel Great" Campaign, Mr. Rajaee also viewed and relied on the forecasted spend,

9    impressions, CTR, clicks, landing page clicks, and target cost for the campaign, in addition to

10   performance metrics for that campaign and the previously launched campaigns.

11         102.    In September 2020, Plaintiff also ran a Sponsored Content Ad Campaign titled

12   "Reach – Brand awareness – Build In-House."   Before creating this campaign, Mr. Rajaee

13   evaluated the performance metrics for his prior campaigns, which he viewed in his campaign

14   manager account and appeared substantially similar to the following images:

15

| Campaign Name | | Key Results | Cost Per Result | Impressions | Clicks | Average CTR | Bid | Average CPM |
|---|---|---|---|---|---|---|---|---|
| 29 campaigns | | - | - | 231,581 | 1,569 | 0.68% | - | $123.66 |
| Lead generation -Auto Bid - 3.1MM For m Fill 11-10,000<br>ID: 148092314 - Sponsored Content | ••• | 19<br>Leads | $1,094.86 | 145,487 | 1,072 | 0.74% | Manual Bid:<br>$300.00 | $142.98 |
| Lead generation - 78K CRM List<br>ID: 148092444 - Sponsored Content | ••• | 8<br>Leads | $609.22 | 22,169 | 207 | 0.93% | Manual Bid:<br>$50.00 | $219.84 |
| Website visits Ad - 740K<br>ID: 148242614 - Sponsored Content<br>Legacy | ••• | - | - | 18,229 | 95 | 0.52% | Maximum Delivery | $83.87 |
| Lead generation - Apr 25, 2020<br>ID: 159575154 - Sponsored Content | ••• | 0<br>Leads | - | 8,324 | 76 | 0.91% | Maximum Delivery | $93.62 |
| Grant Promo<br>ID: 134279126 - Sponsored Content | ••• | 113<br>Website Visits | $5.87 | 33,738 | 113 | 0.33% | Target Cost: $6.05 | $19.68 |
| 1- Min Intro - Video View 860K 11-10,0 00<br>ID: 148092204 - Sponsored Content | ••• | 540<br>Views | $0.25 | 1,592 | 1 | 0.06% | Maximum Delivery | $85.92 |
| TopDevz People -51K<br>ID: 148092084 - Sponsored Content | ••• | 65<br>Views | $2.02 | 144 | 0 | 0% | Maximum Delivery | $909.65 |
| 1-Ruff Commercial - Sept 14-21<br>ID: 155025186 - Sponsored Content | ••• | 234<br>Views | $0.26 | 463 | 2 | 0.43% | Target Cost: $0.18 | $130.13 |
| Website visits - Aug 20, 2020<br>ID: 154279476 - Sponsored Content | ••• | 2<br>Website Visits | $6.85 | 586 | 2 | 0.34% | Manual Bid: $6.85 | $23.38 |
| Website Visits - 1- Ruff<br>ID: 155082916 - Sponsored Content | ••• | 1<br>Website Visits | $12.63 | 808 | 1 | 0.12% | Target Cost:<br>$10.00 | $15.63 |

| Campaign Name | Average CPM | Average CPC | Conversions | Cost Per Conversion | Leads | Cost Per Lead |
|---|---|---|---|---|---|---|
| 29 campaigns | $123.66 | $18.25 | 0 | - | 27 | $979.83 |
| Lead generation -Auto Bid - 3.1MM For m Fill 11-10,000  •••  ID: 148092314 - Sponsored Content | $142.98 | $19.41 | 0 | - | 19 | $1,094.86 |
| Lead generation - 78K CRM List  •••  ID: 148092444 - Sponsored Content | $219.84 | $23.54 | 0 | - | 8 | $609.22 |
| Website visits Ad - 740K  ID: 148242614 - Sponsored Content  Legacy  •••  ry | $63.87 | $12.26 | 0 | - | 0 | - |
| Lead generation - Apr 25, 2020  •••  ry  ID: 159575154 - Sponsored Content | $93.62 | $10.25 | 0 | - | 0 | - |
| Grant Promo  •••  5  ID: 154279126 - Sponsored Content | $19.68 | $5.87 | 0 | - | 0 | - |
| 1 - Min Intro - Video View 860K 11-10,0 00  •••  ry  ID: 148092204 - Sponsored Content | $85.92 | $136.78 | 0 | - | 0 | - |
| TopDevz People -51K  •••  ry  ID: 148092084 - Sponsored Content | $909.65 | - | 0 | - | 0 | - |
| 1-Ruff Commercial - Sept 14-21  •••  8  ID: 155025186 - Sponsored Content | $130.13 | $30.12 | 0 | - | 0 | - |
| Website visits - Aug 20, 2020  •••  5  ID: 154279476 - Sponsored Content | $23.38 | $6.85 | 0 | - | 0 | - |
| Website Visits 1- Ruff  •••  ID: 155082916 - Sponsored Content | $15.63 | $12.63 | 0 | - | 0 | - |

103.    Mr. Rajaee reasonably relied on the accuracy of the metrics associated with his prior campaigns when deciding whether to launch subsequent campaigns.  While creating, launching, and operating the "Reach – Brand awareness – Build In-House" Campaign, Mr. Rajaee also viewed and relied on the forecasted spend, impressions, CTR, CPM, and clicks, in addition to performance metrics for that campaign and the previously launched campaigns.

104.    In September 2020, Plaintiff also ran a Sponsored Messaging Ad Campaign titled "Reach – Message."  Before creating that campaign, Mr. Rajaee evaluated the performance metrics for his prior campaigns, which he viewed in his campaign manager account and appeared substantially similar to the following images:

| Campaign Name | Key Results | Cost Per Result | Impressions | Clicks | Average CTR | Bid | Average CPM |
|---|---|---|---|---|---|---|---|
| 29 campaigns | - | - | 247,039 | 1,600 | 0.65% | - | $117.03 |
| Lead generation -Auto Bid - 3.1MM For m Fill 11-10,000 — ID: 148092314 · Sponsored Content | 19 Leads | $1,094.86 | 145,467 | 1,072 | 0.74% | Manual Bid: $530.00 | $142.98 |
| Lead generation - 78K CRM List — ID: 148092444 · Sponsored Content | 8 Leads | $609.22 | 22,169 | 207 | 0.93% | Manual Bid: $50.00 | $219.64 |
| Website visits Ad - 740K — ID: 148242614 · Sponsored Content — Legacy | - | | 18,229 | 95 | 0.52% | Maximum Delivery | $63.87 |
| Grant Promo — ID: 154279126 · Sponsored Content | 135 Website Visits | $6.13 | 44,631 | 135 | 0.3% | Target Cost: $5.05 | $18.54 |
| Lead generation - Apr 25, 2020 — ID: 159575154 · Sponsored Content | 0 Leads | - | 8,324 | 76 | 0.91% | Maximum Delivery | $93.82 |
| 1 - Min intro - Video View 860K 11-10,00 — ID: 148092204 · Sponsored Content | 540 Views | $0.25 | 1,592 | 1 | 0.06% | Maximum Delivery | $85.92 |
| TopDevz People -51K — ID: 148092084 · Sponsored Content | 65 Views | $2.02 | 144 | 0 | 0% | Maximum Delivery | $909.65 |
| Website Visits - 1- Ruff — ID: 155082916 · Sponsored Content | 9 Website Visits | $12.38 | 4,829 | 9 | 0.19% | Target Cost: $10.00 | $23.07 |
| 1-Ruff Commercial - Sept 14-21 — ID: 155025186 · Sponsored Content | 234 Views | $0.26 | 463 | 2 | 0.43% | Target Cost: $0.18 | $130.13 |
| Website visits - Aug 20, 2020 | 2 | $6.85 | 536 | 2 | 0.84% | Manual Bid: $6.85 | $23.38 |

| Campaign Name | Average CPM | Average CPC | Conversions | Cost Per Conversion | Leads | Cost Per Lead |
|---|---|---|---|---|---|---|
| 29 campaigns | $117.03 | $18.07 | 0 | - | 27 | $979.85 |
| Lead generation -Auto Bid - 3.1MM For m Fill 11-10,000 — ID: 148092314 · Sponsored Content | $142.98 | $19.41 | 0 | - | 19 | $1,094.86 |
| Lead generation - 78K CRM List — ID: 148092444 · Sponsored Content | $219.84 | $23.54 | 0 | - | 8 | $609.22 |
| Website visits Ad - 740K — ID: 148242614 · Sponsored Content — Legacy | $63.87 | $12.26 | 0 | - | 0 | - |
| Grant Promo — ID: 154279126 · Sponsored Content | $18.54 | $6.13 | 0 | - | 0 | - |
| Lead generation - Apr 25, 2020 — ID: 159575154 · Sponsored Content | $93.82 | $10.25 | 0 | - | 0 | - |
| 1 - Min intro - Video View 860K 11-10,00 — ID: 148092204 · Sponsored Content | $85.92 | $136.78 | 0 | - | 0 | - |
| TopDevz People -51K — ID: 148092084 · Sponsored Content | $909.65 | - | 0 | - | 0 | - |
| Website Visits - 1- Ruff — ID: 155082916 · Sponsored Content | $23.07 | $12.38 | 0 | - | 0 | - |
| 1-Ruff Commercial - Sept 14-21 — ID: 155025186 · Sponsored Content | $130.13 | $30.12 | 0 | - | 0 | - |
| Website visits - Aug 20, 2020 — ID: 154279476 · Sponsored Content | $23.38 | $6.85 | 0 | - | 0 | - |
| Reach - Brand awareness - Build In-House — ID: 155294286 · Sponsored Content | $21.49 | $11.37 | 0 | - | 0 | - |

105.    Mr. Rajaee reasonably relied on the accuracy of the metrics associated with his prior campaigns when deciding whether to launch subsequent campaigns.  While creating, launching, and operating the "Reach – Message" Campaign, Mr. Rajaee viewed and relied on the forecasted spend and sends for the campaign, in addition to performance metrics for that campaign and the previously launched campaigns.

106.    In October 2020, TopDevz ran a Sponsored Content Ad Campaign titled "Reach – Brand Awareness – We Can Build It In House – Custom Audience."  Before creating that campaign,

Mr. Rajaee evaluated the performance metrics for his prior campaigns, which he viewed in his campaign manager account and appeared substantially similar to the following images:

| Campaign Name | Key Results | Cost Per Result | Impressions | Clicks | Average CTR | Bid | Average CPM |
|---|---|---|---|---|---|---|---|
| 29 campaigns | - | - | 312,620 | 2,172 | 0.69% | - | $102.55 |
| Lead generation -Auto Bid - 3.1MM For m Fill 11-10,000 / ID 148092314 - Sponsored Content | 19 Leads | $1,094.86 | 145,487 | 1,072 | 0.74% | Manual Bid: $300.00 | $142.98 |
| Lead generation - 78K CRM List / ID 148092444 - Sponsored Content | 8 Leads | $609.22 | 22,169 | 207 | 0.93% | Manual Bid: $50.00 | $219.84 |
| Reach - Brand awareness - Build In-Ho use / ID 155294286 - Sponsored Content | 4,857 Reach | $461.44 | 26,736 | 84 | 0.31% | Manual Bid: $100.00 | $83.63 |
| Grant Promo / ID 154279126 - Sponsored Content | 211 Website Visits | $6.53 | 79,615 | 211 | 0.27% | Target Cost: $6.05 | $17.30 |
| Website visits Ad - 740K / ID 148242614 - Sponsored Content Legacy | - | - | 18,229 | 95 | 0.52% | Maximum Delivery | $63.87 |
| Lead generation - Apr 25, 2020 / ID 159575154 - Sponsored Content | 0 Leads | - | 8,324 | 76 | 0.91% | Maximum Delivery | $93.62 |
| Reach - Message / ID 155497676 - Sponsored Messaging | 7 Website Visits | $40.29 | 649 | 406 | 47.82% | Manual Bid: $0.30 | $332.21 |
| Website Visits 1- Ruff / ID 155062916 - Sponsored Content | 16 Website Visits | $12.36 | 8,373 | 16 | 0.19% | Target Cost: $10.00 | $23.62 |
| 1 - Min Intro - Video View 860K 11-10,000 / ID 148092204 - Sponsored Content | 540 Views | $0.25 | 1,592 | 1 | 0.06% | Maximum Delivery | $85.92 |
| TopDevz People -51K / ID 148092084 - Sponsored Content | 65 Views | $2.02 | 144 | 0 | 0% | Maximum Delivery | $909.65 |
| 1-Ruff Commercial - Sept 14-21 / ID 155025186 - Sponsored Content | 234 Views | $0.26 | 463 | 2 | 0.43% | Target Cost: $0.18 | $130.13 |
| Website visits - Aug 20, 2020 / ID 154279476 - Sponsored Content | 2 Website Visits | $6.83 | 586 | 2 | 0.34% | Manual Bid: $6.85 | $23.38 |

| Campaign Name | R | Bid | Average CPM | Average CPC | Conversions | Cost Per Conversion | Leads | Cost Per Lead |
|---|---|---|---|---|---|---|---|---|
| 29 campaigns | | | $102.55 | $14.76 | 0 | - | 27 | $979.83 |
| Lead generation -Auto Bid - 3.1MM For m Fill 11-10,000 / ID 148092314 - Sponsored Content | | Manual Bid: $300.00 | $142.98 | $15.41 | 0 | - | 19 | $1,094.86 |
| Lead generation - 78K CRM List / ID 148092444 - Sponsored Content | | Manual Bid: $50.00 | $219.84 | $25.54 | 0 | - | 8 | $609.22 |
| Reach - Brand awareness - Build In-Ho use / ID 155294286 - Sponsored Content | | Manual Bid: $100.00 | $83.63 | $26.69 | 0 | - | 0 | - |
| Grant Promo / ID 154279126 - Sponsored Content | | Target Cost:$6.05 | $17.30 | $6.53 | 0 | - | 0 | - |
| Website visits Ad - 740K / ID 148242614 - Sponsored Content | | Maximum Delivery | $63.87 | $12.26 | 0 | - | 0 | - |
| Lead generation - Apr 25, 2020 / ID 159575154 - Sponsored Content | | Maximum Delivery | $93.62 | $10.23 | 0 | - | 0 | - |
| Reach - Message / ID 155497676 - Sponsored Messaging | | Manual Bid:$0.30 | $332.21 | $0.49 | 0 | - | 0 | - |
| Website Visits 1- Ruff / ID 155062916 - Sponsored Content | | Target Cost: $10.00 | $23.62 | $12.36 | 0 | - | 0 | - |
| 1 - Min Intro - Video View 860K 11-10,000 / ID 148092204 - Sponsored Content | | Maximum Delivery | $85.92 | $136.78 | 0 | - | 0 | - |
| TopDevz People -51K / ID 148092084 - Sponsored Content | | Maximum Delivery | $909.65 | - | 0 | - | 0 | - |
| 1-Ruff Commercial - Sept 14-21 / ID 155025186 - Sponsored Content | | Target Cost:$0.18 | $130.13 | $30.12 | 0 | - | 0 | - |
| Website visits - Aug 20, 2020 / ID 154279476 - Sponsored Content | | Manual Bid:$6.85 | $23.38 | $6.85 | 0 | - | 0 | - |

107.    Mr. Rajaee reasonably relied on the accuracy of the metrics associated with his prior campaigns when deciding whether to launch subsequent campaigns.  While creating, launching, and operating the "Reach – Brand Awareness – We Can Build It In House – Custom Audience" Campaign, Mr. Rajaee viewed and relied on the forecasted spend, impressions, CTR, CPM, and clicks for the campaign, in addition to performance metrics for that campaign and the previously launched campaigns.

**B.  TopDevz was subject to Transaction-Specific and Platform-Based Overcharges.**

108.    LinkedIn has admitted to TopDevz that it "may have over-reported some []
Sponsored Content metrics for impression and video views."[21]

109.    Prior to LinkedIn's disclosure of its measurement errors, TopDevz did not know and
had no reason to know that LinkedIn's ad metrics were inflated.

110.    TopDevz relied on LinkedIn's forecasted metrics and its representation that it would
only be charged when "someone" engaged with its advertisements and would not have paid the
premium prices charged had it known that LinkedIn's advertising metrics were inflated.

111.    Because of the rampant non-genuine engagement on LinkedIn's platform, TopDevz
was subject to Transaction-Specific Overcharges when it was charged for engagement that was
automated, fraudulent, mistaken, or miscalculated.

112.    TopDevz was also subject to Platform-Based Overcharges, as its winning bids—i.e.,
the second highest competing bid plus $0.01—would have been lower but for LinkedIn's pervasive
overstatement of its ad metrics.

**C.  LinkedIn's overcharges injured TopDevz and the public.**

113.    LinkedIn's misrepresented ad metrics prevented TopDevz from accurately
evaluating the success of its ad campaigns and making informed business decisions about its digital
advertising strategy.

114.    By paying inflated prices for advertisements on LinkedIn, TopDevz had less money
to spend on other aspects of its business.

115.    After learning about LinkedIn's metrics inflation, TopDevz reduced its LinkedIn
advertising and substantially reduced the maximum amount it would be willing to bid on LinkedIn
advertisements.  TopDevz would like to purchase more LinkedIn ads in the future based upon
accurate metrics and with industry-standard auditing and anti-fraud measures in place.

---

[21] *See* LinkedIn, *Transactional Email Message to Ashkan Rajaee (CEO of TopDevz)*, attached as
Exhibit C.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## ALLEGATIONS SPECIFIC TO NOIREFY

**A. Noirefy relied on LinkedIn's inflated metrics while purchasing ads.**

116.    Noirefy is a diversity recruiting startup that connects underrepresented professionals with career opportunities at high-growth companies.

117.    Noirefy has two full-time workers and does not have an in-house ad analytics department or specialist.

118.    According to LinkedIn's own website, Noirefy is a small business.[22]

119.    In September 2018, Noirefy launched a Sponsored Content ad campaign titled "Candidate."   While creating and launching the "Candidate" Ad Campaign in August and September 2018, Noirefy's CEO Shaniqua Davis viewed and relied on forecasted metrics for the campaign, including forecasted clicks, impressions, CTR, and video views.

120.    After setting up the Candidate campaign, Noirefy was required to set up payment credentials.  When Ms. Davis did so on Noirefy's behalf, LinkedIn promised that for the Candidate campaign and any subsequent campaigns, Noirefy would only be charged for clicks, views, or impressions by "someone."  When it purchased ads for the Candidate campaign and subsequent campaigns, Noirefy relied on LinkedIn's representation that it would only be charged for clicks, views, or impressions by "someone."

121.    In August 2020, Noirefy ran a Sponsored Content Ad Campaign titled "Website visits – Aug 18, 2020."  Before creating that campaign, Ms. Davis evaluated the performance metrics for her prior campaign, which she viewed in her campaign manager account and appeared substantially similar to the following images:

| Campaign Name ⌄ | | Key Results ⌄ | Cost Per Result ⌄ | Impressions ⌄ | Clicks ⌄ | Average CTR ⌄ | Bid ⌄ |
|---|---|---|---|---|---|---|---|
| 1 selected campaigns | | - | - | 1,415 | 8 | 0.57% | - |
| Candidate<br>ID: 143075414 · Sponsored Content | ••• | 484<br>Views | $0.21 | 1,415 | 8 | 0.57% | Maximum Delivery |

| Campaign Name ⌄ | | Average CPM ⌄ | Average CPC ⌄ | Conversions ⌄ | Cost Per Conversion ⌄ | Leads ⌄ | Cost Per Lead ⌄ |
|---|---|---|---|---|---|---|---|
| 1 selected campaigns | | $70.67 | $12.50 | 0 | - | 0 | - |
| Candidate<br>ID: 143075414 · Sponsored Content | ••• | $70.67 | $12.50 | 0 | - | 0 | - |

---

[22] *Create a LinkedIn Page*, LinkedIn, https://www.linkedin.com/company/setup/new/ (last accessed Aug. 17, 2021).

122.     Ms. Davis reasonably relied on the accuracy of the metrics associated with her prior campaign when deciding whether to launch a subsequent campaign.  While creating and launching the "Website visits – aug 18, 2020" ad campaign, Ms. Davis also viewed and relied on forecasted metrics for the campaign, including forecasted clicks, impressions, and CTR.

123.     In September 2020, Noirefy ran a Sponsored Content ad campaign titled "Website visits – Sep 1, 2020."  Before creating that campaign, Ms. Davis evaluated the performance metrics for her prior campaigns, which she viewed in her campaign manager account and appeared substantially similar to the following images:

| Campaign Name | Key Results | Cost Per Result | Impressions | Clicks | Average CTR | Bid |
|---|---|---|---|---|---|---|
| 2 selected campaigns | - | - | 1,673 | 15 | 0.9% | - |
| Candidate<br>ID: 143075414 · Sponsored Content | 484<br>Views | $0.21 | 1,415 | 8 | 0.57% | Maximum Delivery |
| Website visits - Aug 18, 2020<br>ID: 154182426 · Sponsored Content | 7<br>Website Visits | $5.07 | 258 | 7 | 2.71% | Maximum Delivery |

| Campaign Name | Average CPM | Average CPC | Conversions | Cost Per Conversion | Leads | Cost Per Lead |
|---|---|---|---|---|---|---|
| 2 selected campaigns | $80.99 | $9.03 | 0 | - | 0 | - |
| Candidate<br>ID: 143075414 · Sponsored Content | $70.67 | $12.50 | 0 | - | 0 | - |
| Website visits - Aug 18, 2020<br>ID: 154182426 · Sponsored Content | $137.56 | $5.07 | 0 | - | 0 | - |

124.     Ms. Davis reasonably relied on the accuracy of the metrics associated with her prior campaigns when deciding whether to launch a subsequent campaign.  While creating and launching the "Website visits – Sept 1, 2020" ad campaign, Ms. Davis also viewed and relied on forecasted metrics for that campaign, including forecasted clicks, impressions, and CTR.

125.     In November 2020, Noirefy ran a Sponsored Content ad campaign titled "Website visits – Nov 2, 2020."  Before creating that campaign, Ms. Davis evaluated the performance metrics for her prior campaigns, which she viewed in her campaign manager account and appeared substantially similar to the following images:

| Campaign Name | Key Results | Cost Per Result | Impressions | Clicks | Average CTR | Bid |
|---|---|---|---|---|---|---|
| 3 selected campaigns | - | - | 16,327 | 118 | 0.72% | - |
| Website visits - Sep 1, 2020<br>ID: 167157824 · Sponsored Content | 103<br>Website Visits | $3.01 | 14,654 | 103 | 0.7% | Maximum Delivery |
| Candidate<br>ID: 143075414 · Sponsored Content | 484<br>Views | $0.21 | 1,415 | 8 | 0.57% | Maximum Delivery |
| Website visits - Aug 18, 2020<br>ID: 154182426 · Sponsored Content | 7<br>Website Visits | $5.07 | 258 | 7 | 2.71% | Maximum Delivery |

| Campaign Name | Average CPM | Average CPC | Conversions | Cost Per Conversion | Leads | Cost Per Lead |
|---|---|---|---|---|---|---|
| 3 selected campaigns | $27.29 | $3.78 | 10 | $31.00 | 0 | - |
| Website visits - Sep 1, 2020<br>ID: 167157824 · Sponsored Content | $21.15 | $3.01 | 10 | $31.00 | 0 | - |
| Candidate<br>ID: 143075414 · Sponsored Content | $70.67 | $12.50 | 0 | - | 0 | - |
| Website visits - Aug 18, 2020<br>ID: 154182426 · Sponsored Content | $137.56 | $5.07 | 0 | - | 0 | - |

126.   Ms. Davis reasonably relied on the accuracy of the metrics associated with her prior campaigns when deciding whether to launch a subsequent campaign.  While creating and launching the "Website visits – Nov 2, 2020" ad campaign, Ms. Davis also viewed and relied on forecasted metrics for that campaign, including forecasted clicks, impressions, and CTR.

**B.  Noirefy was subject to Transaction-Specific and Platform-Based Overcharges.**

127.   LinkedIn has admitted to Noirefy that it "may have over-reported some [] Sponsored Content metrics for impression and video views."[23]

128.   Prior to LinkedIn's disclosure of its measurement errors, Noirefy did not know and had no reason to know that LinkedIn's ad metrics were inflated.

129.   Noirefy relied on LinkedIn's forecasted metrics and its representation that it would only be charged when "someone" engaged with its advertisements and would not have paid the premium prices charged had it known that LinkedIn's advertising metrics were inflated.

130.   Because of the rampant non-genuine engagement on LinkedIn's platform, Noirefy was subject to Transaction-Specific Overcharges when it was charged for engagement that was automated, fraudulent, mistaken, or miscalculated.

131.   Noirefy was also subject to Platform-Based Overcharges, as its winning bids—i.e., the second highest competing bid plus $0.01—would have been lower but for LinkedIn's pervasive overstatement of its ad metrics.

---

[23] *See* LinkedIn, *Transactional Email Message to Shaniqua Davis (Noirefy CEO)*, attached as Exhibit D.

**C. LinkedIn's overcharges injured Noirefy and the public.**

132.   LinkedIn's misrepresented ad metrics prevented Noirefy from accurately evaluating the success of its ad campaigns and making informed business decisions about its digital advertising strategy.

133.   By paying inflated prices for advertisements on LinkedIn, Noirefy had less money to spend on other aspects of its business, which directly impacted its ability to achieve its mission of connecting underrepresented professionals with career opportunities.

134.   Because its advertisements underperformed relative to their cost, businesses that would have otherwise posted job opportunities through Noirefy did not do so, and workers who would have applied to positions through Noirefy did not do so.  For Noirefy's campaigns that ran in August, September, and October of 2020, in particular, LinkedIn's metric inflation harmed businesses facing labor shortages and would-be job applicants in need of work and wages.

135.   Noirefy has stopped purchasing ads on LinkedIn.  Noirefy would like to purchase LinkedIn ads in the future, based upon accurate metrics and with industry-standard auditing and anti-fraud measures in place.

## CLASS ALLEGATIONS

136.   Plaintiffs re-allege and incorporate by reference herein all the allegations contained above.

137.   Pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3), Plaintiffs assert claims on behalf of the following Class: "All persons or entities who paid for the placement of advertisements on LinkedIn's platform up to the date of the filing of this action."  Excluded from the Class are Defendant, any entity in which Defendant or its corporate parent Microsoft have a controlling interest, and Defendant's officers, directors, legal representatives, successors, and assigns.  Also excluded from the Class are any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

138.   Plaintiffs reserve the right to amend the Class definition if discovery and further investigation reveal that the Class should be expanded, divided into subclasses, or modified in any other way.

139.   Although the precise number of Class members is unknown and can only be determined through appropriate discovery, the proposed Class numbers at least in the hundreds of thousands and is therefore so numerous that joinder of all members would be impracticable.

140.   Questions of law and fact common to the putative Class predominate over questions affecting only individual members.  Those common questions include:

141.   Whether LinkedIn's use of inaccurate, unaudited, and unverified ad metrics violated California's False Advertising Law (Cal. Bus. & Prof Code § 17500);

    a.   Whether LinkedIn's use of inaccurate, unaudited, and unverified ad metrics was likely to deceive members of the public and thus constituted a fraudulent business practice under California's Unfair Competition Law (Cal. Bus. & Prof. Code § 17200);

    b.   Whether LinkedIn's failure to properly audit and verify its ad metrics was unethical, unscrupulous, or substantially injurious to ad purchasers and thus constituted an unfair business practice under California's Unfair Competition Law;

    c.   Whether LinkedIn negligently misrepresented its advertising metrics;

    d.   Whether LinkedIn breached its contractual duty to perform competently and with reasonable care when it reported erroneous ad metrics and failed to adequately audit and verify those metrics; and

    e.   Whether LinkedIn breached the implied covenant of good faith and fair dealing when it reported erroneous ad metrics and failed to adequately audit and verify those metrics; and, in the alternative to the questions above.

142.   Plaintiffs are members of the putative Class.  The claims asserted by the Plaintiffs in this action are typical of the claims of the members of the putative Class, as the claims arise from the same course of conduct by the Defendant and the relief sought is common.

143.   Plaintiffs will fairly and adequately represent and protect the interests of the members of the putative Class, as their interests are coincident with, not antagonistic to, the other members of the Class.

144.   Plaintiffs have retained counsel competent and experienced in both unfair competition claims and class action litigation.

145.    Certification of the Class is appropriate pursuant to Fed. R. Civ. P. 23(b)(3) because questions of law or fact common to the respective members of the Class predominate over questions of law or fact affecting only individual members.   This predominance makes class litigation superior to any other method available for the fair and efficient adjudication of these claims including consistency of adjudications.   Absent a class action it would be unlikely that many members of the Class would be able to protect their own interests because the cost of litigation through individual lawsuits might exceed the expected recovery.

146.    A class action is a superior method for the adjudication of the controversy in that it will permit a large number of claims to be resolved in a single forum simultaneously, efficiently, and without the unnecessary hardship that would result from the prosecution of numerous individual actions and the duplication of discovery, effort, expense, and the burden of the courts that individual actions would create.

147.    In the alternative, the Class should be certified under Rule 23(b)(2) because LinkedIn has acted or refused to act on grounds generally applicable to the proposed Class, thereby making appropriate final and injunctive relief with respect to the members of the proposed Class as a whole.

**FIRST CAUSE OF ACTION**
**(On behalf of the Class)**
**FALSE ADVERTISING LAW**
**CAL. BUS. & PROF. CODE §§ 17500, *et seq***

148.    Plaintiffs re-allege and incorporate by reference herein all the allegations contained above.

149.    California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 *et seq.* ("FAL") protects consumers by promoting honest advertising in the sale goods and services.

150.    Plaintiffs are small businesses of the sort the FAL was designed to protect.

151.    The FAL prohibits companies from making false or misleading statements to the public in connection with the sale of goods or services where the company knows or should know of the statement's falsity.

152.    Reasonable purchasers of LinkedIn ads, including Plaintiffs, understood LinkedIn's representation that they would only be charged when "someone" engaged with their ads to mean

1  that they would only be charged for genuine engagement by members of LinkedIn's high-quality,

2  professional audience.

3       153.    Reasonable purchasers of LinkedIn ads, including Plaintiffs, relied on LinkedIn's

4  representation that they would only be charged when "someone" engaged with their ads when

5  purchasing LinkedIn ads and would not have paid for non-genuine engagement had it been

6  disclosed to them.

7       154.    Because of LinkedIn's closed ecosystem, Plaintiffs and the Class had no choice but

8  to believe LinkedIn's representation that they would only be charged when "someone" engaged

9  with their ads.

10      155.    As described above, LinkedIn regularly charges advertisers for non-genuine

11  engagement with ads, and as such, its representation that advertisers would only be charged when

12  "someone" engaged with their ads was false.

13      156.    LinkedIn, and LinkedIn alone, knew or had reason to know of the falsity of its

14  representation that advertisers would only be charged when "someone" engaged with their ads is

15  false.  LinkedIn is the world's largest professional network, it generates billions in advertising

16  revenue each year, and it operates a walled garden, giving it exclusive insight into the composition

17  of its ad audience and the nature of their activities on the platform.

18      157.    Alternatively, LinkedIn chose not to engage a third-party auditor of its metrics prior

19  to 2020, like its competitors did, and had it done so it would have known the falsity of its

20  representation that advertisers would only be charged when "someone" engaged with their ads.

21      158.    LinkedIn's false representation that advertisers would only be charged when

22  "someone" engaged with their ads was likely to deceive reasonable purchasers, and did deceive

23  Plaintiffs, who had no reason to know of the representation's falsity at the time it was made and no

24  available means of verifying its accuracy.

25      159.    LinkedIn's false representation that advertisers would only be charged when

26  "someone" engaged with their ads duped Plaintiffs and the Class into believing that they would be

27  paying for legitimate engagement with their ads by LinkedIn's professional, high-quality audience,

28  when, in fact, much of that engagement was automated, fraudulent, mistaken, and miscalculated.

SECOND AMENDED CLASS ACTION COMPLAINT
31

160.   Throughout the process of setting up ad campaigns, LinkedIn presented advertisers with forecasted metrics.  Once campaigns launched, LinkedIn provides performance metrics for each campaign.

161.   Reasonable purchasers of LinkedIn ads would have and did rely on LinkedIn's represented user-engagement metrics.  Because of LinkedIn's closed ecosystem and strict terms, Plaintiffs and the Class had no choice but to do so.

162.   LinkedIn's forecasted and actual metrics conveyed to advertisers including Plaintiffs were inflated as described above, and therefore false.

163.   LinkedIn, and LinkedIn alone, knew or had reason to know of the falsity its forecasted and actual ad metrics.  LinkedIn is the world's largest professional network, it generates billions in advertising revenue each year, and it operates a walled garden, giving it exclusive insight into the composition of its ad audience and the nature of their activities on the platform.

164.   Alternatively, LinkedIn should have engaged a third-party auditor of its metrics prior to 2020, like its competitors did, and had it done so it would have known he falsity of its forecasted and actual ad metrics.

165.   LinkedIn's inflated ad metrics were likely to and did deceive reasonable purchasers, including Plaintiffs, who had no reason to know of the metrics' falsity and no available means of verifying their accuracy.

166.   LinkedIn's inflated metrics duped Plaintiffs and the Class members into believing that their advertisements would and did receive greater engagement than was actually the case.

167.   LinkedIn's false representation that advertisers would only be charged when "someone" engaged with their ads and its inflated metrics caused Plaintiffs and the Class to suffer Transaction-Specific Overcharges and Platform-Based Overcharges.

168.   Pursuant to Cal. Bus. & Prof. Code § 17535, Plaintiffs, individually and on behalf of the Class, seek public and private injunctive relief in the form of an order requiring LinkedIn to: (1) maintain regular auditing of its ad metrics through the MRC or a similar accredited third-party auditor; (2) adopt and maintain processes monitored and validated by an accredited third party for limiting fraudulent and automated accounts on LinkedIn; (3) adopt and maintain processes

monitored and validated by an accredited third party for minimizing automated, fraudulent, and mistaken engagement with LinkedIn ads; (4) utilize a multi-factor user-authentication system; (5) conspicuously disclose non-genuine engagement to advertisers; (6) conspicuously warn advertisers of the risks of non-genuine engagement; (7) implement and maintain a uniform system, monitored and validated by an accredited third party, by which advertisers can dispute charges for suspected non-genuine engagement; (8) conspicuously inform advertisers of the system for disputing charges for suspected non-genuine engagement; (9) implement routine and regular training of customer service, account management, and ad sales personnel regarding the signs and risks of non-genuine engagement; (10) publish guide documents to educate current and potential advertisers regarding the existence of non-genuine engagement, signs of non-genuine engagement, and the process for disputing non-genuine engagement; (11) engage in marketing and advertising efforts to educate the general public regarding the public and private costs of non-genuine engagement, and best practices for identifying and reporting non-fraudulent and automated activity on LinkedIn.

169.   Plaintiffs, individually and on behalf of the Class, also seek restitution to Plaintiffs and the Class for the Transaction-Specific and Platform-Based Overcharges and attorneys' fees and costs.

170.   Plaintiffs lack an adequate remedy at law for the relief sought in conjunction with this claim.  No legal claim offers prospective relief that would prevent future injuries as the public and private injunctive relief sought herein would do, nor does any legal claim entitle Plaintiffs to restitution of the Transaction-Specific Overcharges combined with Platform-Based Overcharges.

171.   Plaintiffs demand a trial by jury on their claim for restitution under the FAL.

### SECOND CAUSE OF ACTION
**(On behalf of the Class)**
**CALIFORNIA UNFAIR COMPETITION LAW,**
**CAL. BUS. & PROF. CODE §§ 17200, *et seq.***

172.   Plaintiffs re-allege and incorporate by reference herein all the allegations contained above.

173.     California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.* ("UCL") protects consumers and competitors by promoting fair competition in commercial markets for goods and services.

174.     Plaintiffs are small businesses of the sort the UCL was designed to protect.  Noirefy has two full-time employees, and TopDevz three. Neither company has an in-house ad analytics team.

175.     The UCL prohibits any unlawful, unfair, or fraudulent business act or practice.  A business practice need only meet one of the three criteria to be considered unfair competition. LinkedIn violated all three.

176.     LinkedIn's promise that advertisers would only be charged for views, clicks, and impressions by "someone," and its dissemination of inflated performance metrics and forecasted metrics violated the UCL's prohibition on deceptive conduct because it was likely to and did mislead consumers, including Plaintiffs.

177.     Reasonable purchasers of LinkedIn ads, including Plaintiffs, understood LinkedIn's representation that they would only be charged when "someone" engaged with their ads to mean that they would only be charged for genuine engagement by members of LinkedIn's high-quality, professional audience.

178.     Reasonable purchasers of LinkedIn ads, including Plaintiffs, relied on LinkedIn's representation that they would only be charged when "someone" engaged with their ads when purchasing LinkedIn ads, and would not have paid the prices charged had they known that representation to be false.

179.     Because of LinkedIn's closed ecosystem, Plaintiffs and the Class had no choice but to believe LinkedIn's representation that they would only be charged when "someone" engaged with their ads.

180.     As described above, LinkedIn regularly charged advertisers for non-genuine engagement with ads, and as such, its representation that advertisers would only be charged when "someone" engaged with their ads was false.

181.   LinkedIn's false representation that advertisers would only be charged when "someone" engaged with their ads was likely to deceive reasonable purchasers, and did deceive Plaintiffs, who had no reason to know of the representation's falsity at the time it was made and no available means of verifying its accuracy.

182.   LinkedIn's false representation that advertisers would only be charged when "someone" engaged with their ads duped Plaintiffs and the Class into believing that they would be paying for legitimate engagement with their ads by LinkedIn's professional, high-quality audience, when, in fact, much of that engagement was automated, fraudulent, mistaken, and miscalculated.

183.   Throughout the process of setting up ad campaigns, LinkedIn presented advertisers with forecasted metrics.  Once a campaign has gone active, LinkedIn provides performance metrics for each campaign.

184.   Reasonable purchasers of LinkedIn ads would have and did rely on LinkedIn's represented user-engagement metrics.  Because of LinkedIn's closed ecosystem and strict terms, Plaintiffs and the Class had no choice but to do so.

185.   LinkedIn's forecasted and actual metrics conveyed to advertisers including Plaintiff were inflated as described above, and therefore false.

186.   LinkedIn's inflated ad metrics were likely to and did deceive reasonable purchasers, including Plaintiffs, who had no reason to know of the metrics' falsity and no available means of verifying their accuracy.

187.   LinkedIn's inflated metrics duped Plaintiffs and the Class members into believing that their advertisements would and did receive greater engagement than was actually the case.

188.   LinkedIn's false representation that advertisers would only be charged when "someone" engaged with their ads and its inflated metrics caused Plaintiffs and the Class to suffer Transaction-Specific Overcharges and Platform-Based Overcharges.

189.   In addition to being deceptive, LinkedIn's misconduct was unlawful.  As set forth in the First Cause of Action, above, LinkedIn's overstatement of metrics and its false representation that advertisers would only be charged when "someone" engaged with their ads violated the FAL.

190.   As set forth above, LinkedIn's unlawful conduct caused Plaintiffs and the Class to suffer Transaction-Specific Overcharges and Platform-Based Overcharges.

191.   Finally, LinkedIn's misconduct is immoral, unethical, unscrupulous, and substantially injurious to consumers, and is therefore unfair under the UCL.

192.   As noted above, unlike its largest competitors and contrary to industry best-practices, LinkedIn chose to self-audit its ad metrics until 2020.

193.   At the same time, LinkedIn actively prevented its advertisers from collecting performance data relating to their campaigns or disputing LinkedIn's reported metrics, leaving advertisers entirely dependent on LinkedIn to provide accurate metrics.

194.   Because of LinkedIn's longstanding refusal to engage a third-party to audit the accuracy of its ad metrics, and its obstruction of any meaningful ability for its advertisers to validate or challenge LinkedIn's metrics, it created an environment where inflated metrics would not only go uncorrected but would also benefit LinkedIn.  Inevitably, inflated metrics inflated the perceived value of LinkedIn's platform, causing substantial harm to its advertisers.

195.   Absent any external feedback or validation mechanism, non-genuine engagement pervaded LinkedIn's platform, artificially inflating all performance metrics.

196.   LinkedIn's inflated metrics artificially increased demand as advertisers prepared their campaigns, when advertisers bid and agreed to pay Rates for campaigns, and after campaigns were launched, when advertisers viewed campaign performance.

197.   Because of the repeated and pervasive inflation of metrics presented, not only were bidding advertisers more willing to pay than they otherwise would have been, so too were all the other advertisers competing in LinkedIn's auctions.  As a result, the second price was higher than it otherwise would have been, and the "winning" advertisers paid artificially inflated prices.

198.   Thus, LinkedIn's years of falsely reporting ad metrics at each stage of the advertising process led to artificially inflated demand and caused Plaintiffs and the Class to suffer Transaction-Specific Overcharges and Platform-Based Overcharges.

199.   Pursuant to Cal. Bus. & Prof. Code §§ 17203 and 17204, Plaintiffs, individually and on behalf of the Class, seek public and private injunctive relief in the form of an order requiring

LinkedIn to: (1) maintain regular auditing of its ad metrics through the MRC or a similar accredited third-party auditor; (2) adopt and maintain processes monitored and validated by an accredited third party for limiting fraudulent and automated accounts on LinkedIn; (3) adopt and maintain processes monitored and validated by an accredited third party for minimizing automated, fraudulent, and mistaken engagement with LinkedIn ads; (4) utilize a multi-factor user-authentication system; (5) conspicuously disclose non-genuine engagement to advertisers; (6) conspicuously warn advertisers of the risks of non-genuine engagement; (7) implement and maintain a uniform system, monitored and validated by an accredited third party, by which advertisers can dispute charges for suspected non-genuine engagement; (8) conspicuously inform advertisers of the system for disputing charges for suspected non-genuine engagement; (9) implement routine and regular training of customer service, account management, and ad sales personnel regarding the signs and risks of non-genuine engagement; (10) publish guide documents to educate current and potential advertisers regarding the existence of non-genuine engagement, signs of non-genuine engagement, and the process for disputing non-genuine engagement; (11) engage in marketing and advertising efforts to educate the general public regarding the public and private costs of non-genuine engagement, and best practices for identifying and reporting non-fraudulent and automated activity on LinkedIn.

200.     Plaintiffs, individually and on behalf of the Class, also seek restitution to Plaintiffs and the Class for the Transaction-Specific and Platform-Based Overcharges and attorneys' fees and costs.

201.     Plaintiffs lack an adequate remedy at law for the relief sought in conjunction with this claim.  No legal claim offers relief that would prevent future injuries as the public and private injunctive relief sought herein would do, nor does any legal claim entitle Plaintiffs to restitution of the Transaction-Specific Overcharges combined with Platform-Based Overcharges.

202.     Plaintiffs demand a trial by jury on their claim for restitution under the UCL.

**THIRD CAUSE OF ACTION**
**(On behalf of the Class)**
**BREACH OF IMPLIED DUTY TO PERFORM WITH REASONABLE CARE**

203.     Plaintiffs re-allege and incorporate by reference herein all the allegations contained above.

204.   Plaintiffs and Class members contracted with LinkedIn to place ad campaigns.

205.   LinkedIn's obligations to Plaintiffs and the Class arise from the LinkedIn Ads Agreement and the parties' course of dealing.

206.   When LinkedIn accepted Plaintiffs' and the Class members' ad-campaign bids, the Ads Agreement obligated Plaintiffs and the Class to pay LinkedIn at the agreed-upon Rate.

207.   Plaintiffs and Class members met all or substantially all of their contractual obligations, including submitting their advertising for LinkedIn's approval and paying for LinkedIn's advertising services.

208.   One of LinkedIn's obligations is to provide Plaintiffs and Class members with accurate ad metrics.  This obligation is implied by LinkedIn's conduct when dealing with the Class, including LinkedIn's monopoly over audience and user-engagement data, and over the verification and delivery of ad metrics.

209.   LinkedIn's obligation to provide accurate metrics is also implied by industry practice, which dictates that the platform provider accurately tells the advertiser how each campaign performs, and that the provider screen for fraudulent activity when doing so.

210.   LinkedIn's obligation to provide accurate metrics also arises from the Ads Agreement.  Plaintiffs and the Class members were obligated to pay LinkedIn the agreed-upon Rate for ad campaigns.  *See* Ex. A, § 3.  Because the Rate necessarily includes a metric, such as "price per impression or click, *see id.*", LinkedIn was obligated to use reasonable care to calculate and apply that Rate correctly.

211.   Under California law, LinkedIn was required to perform its contractual obligations to accurately communicate and calculate ad metrics competently and with reasonable care. LinkedIn breached that duty by failing to maintain industry-standard auditing systems, resulting in LinkedIn charging Plaintiffs and the Class for non-genuine engagement.

212.   Had LinkedIn used reasonable care in calculating Rates and providing accurate metrics, Plaintiffs and the Class would not have been charged for non-genuine engagement.

213.   As a result of LinkedIn's failure to provide its agreed advertising services competently and using reasonable care, Plaintiffs and Class members were improperly charged for non-genuine engagement.  They are entitled to damages in an amount to be proven at trial.

**FOURTH CAUSE OF ACTION**
**(On behalf of the class)**
**BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

214.   Plaintiffs re-allege and incorporate by reference herein all the allegations contained above.

215.   Plaintiffs and Class members contracted with LinkedIn to provide them with advertising services when purchasing advertisements on their LinkedIn Campaign Manager account.

216.   These contracts were subject to implied covenants of good faith and fair dealing that all parties would act in good faith and with reasonable efforts to perform their contractual duties (both explicit and fairly implied) and not to impair the rights of other parties to receive the rights, benefits, and reasonable expectations under the contracts.

217.   The payment provision of the LinkedIn Ads Agreement, which obligates advertisers to pay at the Rate "e.g. price per impression, click, other conversion, lead or period," Ex. A, § 3, implies a covenant that LinkedIn would act fairly and in good faith by accurately calculating and charging that Rate.

218.   LinkedIn breached that implied covenant of good faith and fair dealing by charging Plaintiffs for non-genuine engagement.  For example, LinkedIn ignored industry custom by failing to implement a process to ensure the accuracy of the metrics that it communicated to advertisers until November 2020.

219.   LinkedIn's inclusion of non-genuine engagement in the Rate frustrated the entire purpose of the contract, which was for Plaintiffs and the Class members to pay for engagement with their intended, human audience.

220.   LinkedIn's charging of Plaintiffs and the Class for non-genuine engagement was accordingly a breach of the covenant of good faith and fair dealing on the part of LinkedIn in performing its contractual obligations.

221.   Plaintiffs and Class members met all or substantially all of their contractual obligations, including submitting their advertisements for approval and paying for LinkedIn's advertising services.

222.   LinkedIn's failure to act in good faith in charging Plaintiffs the agreed-upon Rate denied Plaintiffs and Class members the full benefit of their bargain. Plaintiffs and Class members received advertising services that were less valuable than what they paid for and less valuable than their reasonable expectations under their agreement with LinkedIn. Plaintiffs and Class members were damaged by an amount at least equal to this overpayment.

223.   Accordingly, Plaintiffs have been injured as a result of LinkedIn's breach of the covenant of good faith and fair dealing and are entitled to damages in an amount to be proven at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, seek the following relief:

a.   An order certifying this case as a class action under Fed. R. Civ. P. 23, defining the Class as proposed herein, finding that Plaintiffs are adequate and proper representatives of the proposed Class, and appointing Plaintiffs' counsel as Class Counsel;

b.   Public and private injunctive and other equitable relief as is necessary to protect the interests of the Class, including (1) maintaining regular auditing of its ad metrics through the MRC or a similar accredited third-party auditor; (2) adopting and maintaining processes monitored and validated by an accredited third party for limiting fraudulent and automated accounts on LinkedIn; (3) adopting and maintaining processes monitored and validated by an accredited third party for minimizing automated, fraudulent, and mistaken engagement with LinkedIn ads; (4) utilizing a multi-factor user-authentication system; (5) conspicuously disclosing non-genuine engagement to advertisers; (6) conspicuously warning advertisers of the risks of non-genuine engagement; (7) implementing and maintaining a uniform system, monitored and validated by an accredited third party, by which advertisers can dispute charges for suspected non-genuine engagement; (8) conspicuously informing advertisers of the system for disputing charges for suspected non-genuine engagement; (9)

1   implementing routine and regular training of customer service, account management, and

2   ad sales personnel regarding the signs and risks of non-genuine engagement; (10) publishing

3   guide documents to educate current and potential advertisers regarding the existence of non-

4   genuine engagement, signs of non-genuine engagement, and the process for disputing non-

5   genuine engagement; and (11) engaging in marketing and advertising efforts to educate the

6   general public regarding the public and private costs of non-genuine engagement, and best

7   practices for identifying and reporting non-fraudulent and automated activity on LinkedIn;

8   c.   Restitution to Plaintiffs and the Class for the Transaction-Specific and Platform-Based

9   Overcharges;

10   d.   Damages in an amount to be determined at trial;

11   e.   Plaintiffs' attorneys' fees and costs; and

12   f.   Such other and further relief as is just and proper.

13   ## DEMAND FOR JURY TRIAL

14   Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand trial

15   by jury in this action of all issues so triable.

16

17   Dated: August 17, 2021                          Respectfully submitted,

18                                                   s/ J. Dominick Larry

19

20   Warren Postman (#330869)                        Brooke Smith (*pro hac vice*)
       wdp@kellerlenkner.com                           brooke.smith@kellerlenkner.com

21   Jason Ethridge (*pro hac vice*)                 J. Dominick Larry (*pro hac vice*)
       jason.ethridge@kellerlenkner.com                nl@kellerlenkner.com

22   **KELLER LENKNER LLC**                          **KELLER LENKNER LLC**
       1100 Vermont Avenue, N.W.,                       150 N. Riverside Plaza, Suite 4270

23   12th Floor                                      Chicago, IL 60606
       Phone: (202) 918-1123                           Phone: (312) 216-8656

24   Facsimile: (312) 971-3502                       Facsimile: (312) 971-3502

25

26   Antonio Romanucci (*pro hac vice*)              Keith Custis (#218818)
       aromanucci@rblaw.net                            kcustis@custislawpc.com

27   David Neiman (*pro hac vice*)                   **CUSTIS LAW, P.C.**
       dneiman@rblaw.net                               1875 Century Park East, Suite 700

28   Bryce T. Hensley (*pro hac vice*)               Los Angeles, CA 90067

SECOND AMENDED CLASS ACTION COMPLAINT
41

bhensley@rblaw.net
**ROMANUCCI & BLANDIN, LLC**
321 N. Clark Street, Suite 900
Chicago, IL 60654
Phone: (312) 458-1000
Facsimile: (312) 458-1004

Jordan L. Lurie (SBN 130013)
jlurie@pomlaw.com
Ari Y. Basser (SBN 272618)
abasser@pomlaw.com
**POMERANTZ LLP**
1100 Glendon Avenue, 15th floor
Los Angeles, CA  90024
Phone: (310) 432-8492
Facsimile: (310) 861-8591

Joshua E. Fruchter (*pro hac vice*)
jfruchter@wohlfruchter.com
    **WOHL & FRUCHTER LLP**
25 Robert Pitt Drive, Suite 209G
Monsey, NY 10952
Phone: (845) 290-6818
Facsimile: (718) 504-3773

Phone: (213) 863-4276
Facsimile: (213) 863-4277

*Attorneys for Plaintiffs and the Class*